[Crim. No. 37534. Second Dist., Div. One. Dec. 3, 1980.]

# In re ELMER GERARD PRATT on Habeas Corpus.

**COUNSEL**

Stuart Hanlon, Margaret Ryan, John B. Mitchell, Lewis Myers, Fred Okrand, Mark Rosenbaum, Leonard I. Weinglass, Victor Goode, Jonathan Lubell and Paul N. McCloskey, Jr., for Petitioner.

Laurence R. Sperber as Amicus Curiae on behalf of Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Respondent.

**OPINION**

**HANSON (Thaxton), J.—**

### INTRODUCTION

In 1972 following a protracted trial a jury convicted petitioner/defendant Elmer Gerard Pratt (hereinafter defendant and/or Pratt) of the

murder in the first degree (Pen. Code, § 187) of Caroline Olsen in Santa Monica on December 18, 1968 (known as the tennis court murder); of two counts of robbery in the first degree (Pen. Code, § 211); and of assault with intent to commit murder on Kenneth Olsen (Pen. Code, § 217). The jury also found he was armed with a deadly weapon (pistol) in connection with each offense. The judgment of conviction was affirmed on appeal by division four of this district in an unpublished opinion (2 Crim. No. 22504). The California State Supreme Court unanimously denied defendant's petition for a hearing.

Defendant Pratt is presently serving a life sentence in state prison for the murder of Caroline Olsen and the commission of the other crimes of which he was convicted. By this petition for writ of habeas corpus he seeks his release from prison essentially on the grounds that the Federal Bureau of Investigation (FBI) reports obtained through the Freedom of Information (FOI) Act disclose that key prosecution witness Julius C. Butler during the trial in 1972 "was informing to the (FBI), a fact he denied, under oath, at petitioner's original trial," that "the FBI concealed and withheld surveillance evidence corroborative, in part, of [defendant's] alibi defense," and that the FBI "had a spy in the defense camp" during the trial.

By reason of the extremely serious allegation by current defense counsel (a) that *"a totally innocent man has languished in the San Quentin and Folsom prisons since mid-1972, and that . . . he was sent there as the result of a case which was deliberately contrived by agents of our state and federal governments"* (petn. for writ of habeas corpus filed in the Super. Ct. of Los Angeles County which has been incorporated by reference with the petn. for writ of habeas corpus filed with this court); and (b) that the assertion in the petition for writ of habeas corpus lodged in this court that defendant Pratt's *"conviction was the result of a joint effort by state and federal governments to neutralize and discredit him because of his membership in the militant [Black Panther Party]"* which committed *"a fraud upon the court and jury,"* we have ordered up, pursuant to California Rules of Court, rule 60, for review along with the extensive record of the petition before this court the entire record of the 1972 jury trial, including pertinent exhibits, and the record of the petition for writ of habeas corpus previously filed in the superior court which was denied. (See also Cal. Rules of Court, rule 12(a).)

In addition to the foregoing and by reason of the nature of these proceedings; the public interest generated by persons or groups seeking to obtain defendant Pratt's release from prison as evidenced by newspaper articles; the personal involvement of United States Congressman Paul N. McCloskey, Jr., 12th District of California;[1] the large list of individuals and organizations appearing as amici curiae[2] on behalf of defendant Pratt; and the accusation by defense counsel that a court of this state was "implicated" in the "cover up" of the "framing" of Pratt (see fn. 5, *infra*), a more detailed treatment than usual of the series of events leading up to this proceeding, the trial evidence, and an analysis of the FBI documents supplied this court is deemed necessary in order to place the entire case in proper perspective.

CHRONOLOGY OF EVENTS

In order to render the great mass of evidence and the court actions contained in the very extensive record more manageable and understandable, interspersed below in chronological order are the key out-of-court events which triggered subsequent governmental or defense actions and the court actions resulting therefrom.

*On December 18, 1968,* at about 8 o'clock in the evening Kenneth Olsen and his wife Caroline Olsen, who was also a school teacher, went

[1]Congressman McCloskey joined the defense team of lawyers and appeared for the first time as an attorney of record (in a private capacity and not in his official capacity as a member of Congress) during oral argument before this court on August 26, 1980, and argued on behalf of petitioner/defendant Pratt.

[2]Following is the list of individuals and organizations who are amici curiae on behalf of defendant Pratt and who are represented by Attorney Laurence R. Sperber:

James Burford, Chair, Coalition to Free Geronimo Pratt, Vice President, A.C.L.U. of Southern California; Wallace Albertson, President, California Democratic Council; Rabbi Leonard Beerman, Leo Baeck Temple; Catherine Bodenstein, Community Activist; Reverend Dr. George W. Cole, Coordinator, Social and Ecuminical Concerns Commission, Synod of Southern California United Presbyterian Church; Leo Branton, Attorney; Willie Brown, Jr., California State Assembly, 17th A.D.; Reverend Edgar Edwards, Immanuel United Church of Christ; Hillard Ham, President, Ham Publications; Reverend Wilbur Johnson, Executive Director, Interdenominational Ministerial Alliance; Reverend Dr. Thomas Kilgore, Jr., Second Baptist Church; Reverend James Lawson, Jr., Holman United Methodist Church; Leonard Levy, Vice President, West Coast Joint Board, Amalgamated Clothing and Textile Workers Union; Reverend Stanley Lewis, Pastor, Friendship Baptist Church; Gwen Moore, California State Assembly, 49th A.D.; Reverend Cecil Murray, Pastor, First A.M.E. Church; National La Raza Legal Alliance; R. Samuel Paz, Vice President, Mexican-American Bar Assn.; Sam Rosenwein, Member of Bar of United States Supreme Court and New York; Shockley, Duff, & Hart-Nibbrig, Attorneys; Maxine Waters, California State Assembly, 48th A.D.; Diane Watson, California State Senate, 30th S.D.; Don Wheeldin, Orange Heights Neighborhood Association.

to the Lincoln Park Tennis Courts in Santa Monica to play tennis. After they had put money into the light meter and turned on the lights, they were accosted by two armed black males who ordered them to lie face down on the pavement. They were relieved of their valuables which were on a nearby bench and then the gunmen turned and from a distance of 8 to 10 feet opened fire upon the Olsens as they lay helpless, face down, on the tennis court pavement. Caroline Olsen subsequently died as a result of two gunshot wounds which she received.[3] Kenneth Olsen was hit five times and although he bled profusely, he survived the ordeal.[4]

Three expended .45 caliber automatic pistol shell casings and three lead slugs (one underneath Mrs. Olsen) found at the scene of the crime by Officer Richard Plasse of the Santa Monica Police Department were marked and booked into evidence. A slug was also removed from Mrs. Olsen's body in the emergency room at the hospital and booked into evidence.

*On January 17, 1969*, at about 2 o'clock in the afternoon (about one month after the tennis court murder in Santa Monica) Al Prentice (Bunchy) Carter and John Huggins, officers in the Black Panther Party (BPP), were shot to death in the cafeteria at Campbell Hall on the UCLA campus. The killings occurred during a joint meeting of about 400 members of the Black Student Union (BSU) and members of the BPP and another rival black militant group called United Slaves (US) incorporated. There was a lot of friction between the Black Panthers and US to take over the BSU and the assassinations of Carter and Huggins were attributed to the US organization.

James F. Naveau, a state police officer assigned to the UCLA campus with the job of penetrating subversive militant groups on campus, infiltrated and became a member of the Students for a Democratic Society (SDS) and was also a member of the Friends of the BPP.

Officer Naveau testified at a subsequent defense motion to suppress as evidence (pursuant to Pen. Code, § 1538.5) the .45 caliber automatic

[3]According to the coroner's autopsy report, one bullet passed through Caroline Olsen's left kidney, the liver, the tissues surrounding the pancreas and the stomach exiting the abdomen. The other bullet entered the upper portion of her left buttock and passed through the pelvis area, the bowels and the liver exiting through the abdomen. She died of internal hemorrhaging and peritonitis due to the gunshot wounds.

[4]The five bullets fired at Kenneth Olsen struck him once in the head, in the forearm, in the hip and twice in the hand.

pistol later determined to be the murder weapon in the Olsen case. He said that "there was a lot of friction between the Black Panthers and the US to take over the black student union." Officer Naveau went to Campbell Hall when he heard of the killings and met a Joe Brown who said: "They just blew up two of my brothers." When asked "who," Joe Brown said: "US." Joe Brown told him (Officer Naveau) that other Panthers "had split to go to John's [John Huggins'] pad to get the shit [weapons or explosives] and a lot of US people and a lot of L.A.P.D. pigs were going to get blown up that night." Officer Naveau knew John Huggins' address was 806 Century Boulevard in Los Angeles. He immediately communicated this information to his immediate supervisor of the campus police (Captain Lynn) and to Sergeant Davis of the Los Angeles Police Department (L.A.P.D.) intelligence division as well as Jim Clark of the state C.I.I.

Officer Lloyd R. Lucy of the L.A.P.D., according to his testimony at the hearing of the defendant's pretrial motion to suppress the murder weapon, testified that after he had received the information from Officer Naveau he and other L.A.P.D. officers in order to prevent bloodshed proceeded to the Huggins residence at 806 West Century Boulevard where they observed Melvin Carl Smith and Lujuana Campbell emerge carrying a rifle and a metal-type military ammunition box to a car. This car was stopped by the police shortly after it departed the area, Lujuana Campbell had a loaded .45 caliber automatic pistol in the waistband of her capris, and there was a .30 caliber rifle, ammunition, camping gear, gas masks and medical supplies found in the car. Defendant Pratt was arrested while crouching behind a station wagon parked in the driveway outside the building. Pratt was unarmed. However, a large arsenal of weapons was found inside the location including an M-1 Garand rifle, Browning automatic shotgun, J. C. Higgins shotgun, 7.65 millimeter pistol, three .45 caliber automatic pistols, three knives and a bayonet.

*One loaded .45 caliber automatic pistol found by Officer Jim Finn on a table adjacent to a second floor window overlooking the front of the premises was later determined by a ballistic expert to be the weapon used in the "tennis court murder" of Caroline Olsen on December 18, 1968.* (See trial evidence *infra.*)

*On August 10, 1969* (about seven months and three weeks after the tennis court murder), Julius Carl Butler, also known as "Julio," met with Sergeant Duwayne Rice, a black officer of the 77th division of the

L.A.P.D., whom he knew socially and trusted as a friend and handed Rice a sealed envelope. When Butler handed the envelope to Sergeant Rice, he told Rice that he felt there was a contract out on his life, that he may be killed and that if anything happened to him to read it and give it to his mother. The envelope on the outside had written on it "Sgt. Rice" and "Only to be opened in the event of my death." (See *infra* concerning the circumstances surrounding the writing, sealing and delivery of the envelope to Sergeant Rice.)

Sergeant Rice retained the envelope in his possession unopened for five or six months. Then feeling that he (Sergeant Rice) may also be killed he gave the sealed envelope to Captain Henry, the commandant of the 77th division of the L.A.P.D., who kept it in his safe at home unopened.

*On October 20, 1970* (over 14 months after Butler handed the letter to Sergeant Rice and over 22 months after the murder of Caroline Olsen), the sealed letter which Butler gave to Sergeant Rice on August 10, 1969, was opened for the first time. Butler therein stated that defendant Pratt had confessed and bragged to him about being the "tennis court murderer." (See *infra* concerning the circumstances surrounding the opening of the envelope.)

*The information contained in the letter inside the envelope was what caused law enforcement investigators for the first time to focus on Pratt as being involved in the December 18, 1968, "tennis court murder" of Caroline Olsen.*

(The letter itself was not submitted to the trial jury as evidence but the circumstances surrounding the delivery, safekeeping and then opening of the letter were explained to the jury. Butler, who wrote the letter, testified before the grand jury and at the trial. He was also cross-examined in depth by defense counsel, during the trial, concerning defendant Pratt's confession to him. The letter itself is a part of the record of these proceedings. A typed copy of the letter is attached as Appen. A.)

*On December 4, 1970,* following intensive investigation by detectives an indictment was returned by the Grand Jury of Los Angeles County charging Pratt with one count of murder, one count of assault to commit murder and two counts of robbery arising out of the December 18, 1968, "tennis court" crimes.

*On April 8, 1971*, defendant Pratt was arraigned and pleaded not guilty.

*On July 28, 1972*, following a hotly contested jury trial which began on June 11, 1972, in the superior court, Honorable Kathleen Parker, judge presiding, defendant Pratt, represented by Johnnie L. Cochran, Jr., and Charles Hollopeter, was found guilty on all counts and the degree was determined to be first degree as to the murder count and as to each of the robbery counts.

*On August 28, 1972*, defendant's motion for a new trial was denied and he was sentenced to state prison for the term of life as to the murder count and for the term prescribed by law as to the other three counts to run concurrently with the life sentence.

*On August 28, 1972*, defendant filed a timely notice of appeal from the judgment of conviction.

*On February 1, 1974*, Division Four, Second Appellate District, with Acting Presiding Justice Edwin Jefferson and Justices Gerald Dunn and Robert Kingsley constituting the panel, filed its unpublished opinion (2 Crim. No. 22504) which unanimously affirmed the judgment of conviction. This opinion, heretofore unpublished, is attached hereto as Appendix B.

*On April 17, 1974*, the California Supreme Court unanimously denied defendant's petition for a hearing.

*On November 4, 1974*, the United States Supreme Court denied defendant's petition for a writ of certiorari.

*On April 23, 1976*, the "Final Report" of the "Select Committee to Study Governmental Operations with Respect to Intelligence Activities" to the United States Senate, Senator Frank Church, chairman (hereinafter for the sake of brevity the Church Committee Report), was published describing the purposes and methods used by the FBI's counterintelligence program (COINTELPRO). The Church Committee Report describes COINTELPRO activities as covert action programs initiated for the purpose of "protecting national security, preventing violence, and maintaining the existing social and political order by 'disrupting' and 'neutralizing' groups and individuals perceived as threats." (P. 5.)

COINTELPRO's activities during the 15-year period it was operational (between 1956 and 1971) were described as being aimed at five targeted groups "perceived [as] threats to domestic tranquility: the 'Communist Party, USA' program (1956-71); the 'Socialist Workers Party' program (1961-69); the 'White Hate Group' program (1964-71); the 'Black Nationalist-Hate Group' program (1967-71); and the 'New Left' program (1968-71)." (P. 4.)

A chapter in the Church Committee Report entitled "The FBI's Covert Action Program to Destroy the Black Panther Party" states that "[i]n August 1967 the FBI initiated a covert action program—COINTELPRO—to disrupt and 'neutralize' organizations which the Bureau characterized as 'Black Nationalist Hate Groups'."

The Church Committee Report states that: "The Black Panther Party (BPP) was not among the original 'Black Nationalist' targets. In September 1968, however, FBI Director J. Edgar Hoover described the Panthers as: 'the greatest threat to the internal security of the country.

'Schooled in the Marxist-Leninist ideology and the teaching of Chinese Communist leader Mao Tse-tung, its members have perpetrated numerous assaults on police officers and have engaged in violent confrontations with police throughout the country. Leaders and representatives of the Black Panther Party travel extensively all over the United States preaching their gospel of hate and violence not only to ghetto residents, but to students in colleges, universities and high schools as well.'

"By July 1969, the Black Panthers had become the primary focus of the program, and was ultimately the target of 233 of the total 295 authorized 'Black Nationalist' COINTELPRO actions." (Pp. 187-188, fns. omitted.)

The Church Committee Report goes on to say that in the FBI's efforts to "neutralize" and disrupt the BPP's effectiveness various COINTELPRO techniques were used for the purpose of discrediting BPP's members, creating rifts and factions within the party itself, setting rival groups against the Panthers, undermining support of the party and destroying its public image because the FBI perceived the BPP to be a heavily armed, violence-prone organization.

*On November 20, 1979*, defendant Pratt relying on the Church Committee Report and certain FBI documents obtained pursuant to the FOI Act filed a petition for writ of habeas corpus in the Los Angeles Superior Court which was heard by the Honorable Kathleen Parker (the same judge who had presided over the trial of the case seven years earlier in 1972). The alleged basis for the relief sought was essentially that defendant Pratt had been "framed" by the FBI and state agencies as part of COINTELPRO.

*On January 18, 1980*, Judge Parker following a four-day hearing denied defendant's motion for a summary judgment, and denied his petition for habeas corpus and his request for an evidentiary hearing stating that she didn't think defendant "by wishful thinking...can step from one point to another by speculation" and that "an evidentiary hearing at this time would [not] serve any useful purpose" as she didn't "see sufficient evidence that Mr. Pratt was framed and that he did not have a fair trial."[5]

---

[5]The superior court file reflects that defense counsel argued, as before this court, that the prosecution's case was "a close case" and the jury took 10 days to deliberate. Judge Parker, who as noted was also the trial judge, disagreed with this analysis and pointed out that the jury did not take an inordinate length of time to arrive at a verdict. The court stated:

"THE COURT: Let me just interrupt you for a minute there.

"I think maybe I can shorten this. I do not agree with the defense this was a weak case.

"Furthermore, the defense says that the jury took ten days. Two and one half days of that time the jury was sitting having testimony read to them.

"The case took a month, approximately, I think maybe a little over, to try.

"They did ask almost immediately to have testimony reread. July—if it was submitted on the 17th, I think it was—I may be incorrect on the date, but I think on the following day they asked, before they had done any deliberations to speak of—

"Yes; the jury retired to deliberate on July 17th, 1972, at 9:55 a.m.

"On July 18th and 19th testimony was reread.

"Then on the 20th, the following day, a juror was excused and was replaced by an alternate juror, which would require further deliberation with all—with a new juror present.

"On July 21st the proceedings were continued to the 24th because there was a weekend. So another two days is out of that ten days.

"So now we have got four and one half days out of that ten days.

"I don't think that the jury in a case of a murder such as this, that you could say that they took a long time to deliberate.

"Furthermore, the first time they came in and the second time they came in the foreman felt there was the possibility of a verdict, in which case of course the Court gave them further time to deliberate, and they did reach a verdict.

"So I don't agree with the defense that this was a close case, number one, and I don't agree with their analysis of the length of time it took the jury to deliberate.

"Now, proceed from there."

We also note that the file reflects that an attempt was made to coerce Judge Parker and that she was subjected to a flood of letters apparently from individuals connected

*On April 10, 1980,* defendant Pratt filed the instant petition for writ of habeas corpus in this Court of Appeal. He does not seek review of the superior court's denial of relief but rather seeks review by way of an original proceeding in this court.

with an organization called "the National Task Force for Cointelpro Litigation and Research" and "Committee for the Suit against Government Misconduct" demanding that she immediately release Elmer "Geronimo" Pratt from prison. Forty of the letters are identical in typed content.* All are signed but many do not have return addresses and most of the envelopes bear a New York, New York, postmark while nine show a postmark from Springfield, Massachusetts, and several from each of the cities of San Francisco or Fresno, California, and Chicago, Illinois. In addition a cable from Amnesty's international headquarters in London urged defendant Pratt be granted a new trial because Pratt was the target of COINTELPRO which was unknown at the time of the trial.

We further note that following Judge Parker's denial of relief defense counsel accused the court of being implicated in a "cover up" of the "framing" of Pratt by the prosecution and the state. The following statement by defense counsel appears in the reporter's transcript:

"MR. HANLON [defense counsel]: I would submit too, Your Honor, that this case has been since its inception a coverup. What the Court has just said has implicated itself in this coverup. [¶] That the Court is the only— [¶] (Clapping in audience.)

"MR. HANLON: —the Court is the only thing in this system of law that separates the prosecution, the state, from framing people. It is what separated Watergate from having to become more of a national disgrace than it was.

"And people turn to the courts to keep the government in line.

"And this Court has said we will not deal with it, we will side with the state. And that makes this Court part of the coverup.

"And the record should reflect that. That this is our opinion—or this is my own opinion as to the action of this Court."

*Following is a copy of the contents of the forty letters addressed to Judge Kathleen Parker:

"January 6, 1980

"Honorable Kathleen Parker
"Los Angeles Superior Court
"111 N. Hill
"Los Angeles, California 90012
"[¶] Dear Judge Parker:
"[¶] I am familiar with the case of Elmer Geronimo Pratt and am convinced that he is innocent of all charges against him. [¶] As more evidence is revealed everyday, unequivocably proving Geronimo Pratt's innocence, his continued imprisonment is an outrageous affront to Mr. Pratt's human rights. [¶] The National Task Force for Cointelpro Litigation and Research has worked for years to uncover the conspiracy which has caused Mr. Pratt to be held illegally for 9 years, much of it in solitary confinement. Now the evidence is clear and there is no justification for continuing his imprisonment. [¶] Therefore, L demand the immediate release of Elmer Geronimo Pratt from prison.

"Sincerely,
/s/ Joe Hamill
"84 6th Ave.
"Bklyn NY 11217

"cc: Ms. Ashaki Pratt
　　　"c/o Stuart Hanlon, Esq.
　　　"294 Page Street
　　　"San Francisco, California 94102"

## The Evidence at Trial

Following is a brief summary of some key evidence, direct and circumstantial, contained in over 1,500 pages of the reporter's transcript of the pretrial hearing and the jury trial in 1972.

### The Prosecution's Case

EYEWITNESS IDENTIFICATION OF PRATT:

Victim Kenneth Olsen, who survived five gunshot wounds, on two separate occasions made a positive in-court identification of Pratt as one of the two male black gunmen who robbed him and his wife, murdered his wife Caroline and then attempted to murder him. The first in-court positive identification of defendant was made during the pretrial hearing on defendant's motion to suppress Mr. Olsen's identification testimony[6] and the second in-court positive identification was made

---

[6]Following are the pertinent portions of Mr. Olsen's testimony during *the pretrial hearing* when he made the first positive in-court identification of defendant as the person who robbed him and his wife and shot him and murdered his wife on December 18, 1968:

"DIRECT EXAMINATION

"BY MR. KALUSTIAN [deputy district attorney]: Q. Mr. Olsen, on December 18th, 1968, were you at the Lincoln Park tennis courts in Santa Monica?

"A. Yes, I was.

"Q. Do you recall the approximate time?

"A. About 8 p.m.

"Q. Is that approximate?

"A. Yes.

"Q. Were you accosted by two male blacks?

"A. Yes, I was.

"Q. Do you see either one of those two gentlemen in court today?

"A. Yes, I do.

"Q. Would you point the gentleman out and describe him, if you will?

"A. The gentleman sitting next to Mr. Hollopeter.

"Q. The gentleman here (indicating)?

"A. Yes.

"MR. KALUSTIAN: May the record reflect I have my hand over Mr. Pratt.

"THE COURT: Yes, the record may so indicate.

"Q. BY MR. KALUSTIAN: Sometime before the Grand Jury hearing on this matter in late 1970 were you shown some photographs of individuals by Sergeant Callahan and Sergeant Buckles, and perhaps Sergeant Eckstein?

"A. Detective Eckstein.

"Q. At that time did you select an individual whom you believed to be one of the perpetrators of the crime against you on December 18th, 1968?

"A. Yes, I did.

"Q. Of the two blacks who accosted you on the tennis court in Santa Monica, do you recall whether one was taller or shorter than the other, or there was a height

during the jury trial.[7]

Witness Barbara Reed, who with her husband Fred Reed owned and operated the Lincoln Hobby Center in Santa Monica about four blocks

---

difference?

"A. There was a height difference.

"Q. One was taller and one was shorter; is that correct?

"A. That's correct.

"Q. Which gentleman was Mr. Pratt?

"A. The shorter.

" . . . . . . . . . . . . .

"CROSS-EXAMINATION

"Q. So you are now identifying Mr. Pratt in court as being the same person depicted in Defendant's A; is that right?

"A. Yes.

"Q. It's the same man on that picture, isn't it?

"A. Yes.

"Q. As far as you can tell?

"A. Yes.

"Q. Now, as you look at him today, is there anything about looking at this man that you recall independent of the photograph from December of 1968?

"A. Yes; his eyes.

"Q. What do you notice about his eyes, without looking at him?

"A. It's—it just looks like the man on the tennis court. That is the man.

"Q. You said his eyes. What did you notice about his eyes?

"A. Well, they are fairly small, and they are quite bright and intense.

"Q. Small, bright, intense eyes?

"A. Yes.

" . . . . . . . . . . . .

"Q. You told us that the man that you saw on that date had either a beard or a moustache; is that correct?

"A. That's correct.

"Q. Did he have sideburns?

"A. If so, very short.

" . . . . . . . . . . . .

"Q. Approximately how long did you see this individual involved in this attack upon you in December of 1968, from the start to the finish? About how long did the incident take, sir?

"A. Well, no more than five minutes, I would say.

"Q. What was the closest this individual, the shorter of the two men, got to you during that period of time, sir?

"A. Probably about as close as the court clerk is.

"Q. Perhaps within three or four feet then?

"A. Yes.

"Q. And it was dark at that time, was it not?

"A. No. The tennis court was well lit.

" . . . . . . . . . . . .

"Q. Would it be a fair statement to say that your memory of the events which transpired in December of 1968 is somewhat vague or hazy at this time?

---

[7]Footnote 7 commences, *post*, at page 813.

from the tennis court, testified that on December 18, 1968, a few minutes before the "tennis court murder" two male blacks entered her shop while she was alone in the shop addressing Christmas cards and waiting

"A. No, it is very vivid. I don't remember jackets, but it is very vivid.

"Q. With your vivid memory can you tell us what kind of jacket this man had on in December of 1968?

"A. I wasn't noticing a jacket with a gun in my face.

"Q. So your answer is you can't recall; is that right?

"A. I can't recall. I know he was wearing a jacket. I can't tell you—I believe it was a light color. It could have been beige or light gray.

". . . . . . . . . . . . .

"THE COURT: May I ask one question, Mr. Olsen. *You have identified the defendant in court here today. Is your identification today a positive identification, or do you still have the same feeling that you had when you selected the picture and when you selected someone from the lineup?*

"THE WITNESS: *I feel it is a positive identification.*

"THE COURT: *You feel today it is a positive identification?*

"THE WITNESS: *Yes, ma'am.*

"THE COURT: *Is there anything about the defendant that makes you feel that you are sure that this is the man, anything else?*

"THE WITNESS: *I thought at the time that I would remember him if I ever saw him in person again.*

". . . . . . . . . . . . ."

(Italics added.)

[7]Victim Kenneth Olsen testified under direct examination at time of *the jury trial* as follows:

"Q. What was the first thing that was said by either of them?

"A. I don't recall the exact words, but it was something to the effect of, 'Yeah, man, this is a stickup. We want your bread, or we're going to burn you. Come on, put your hands up.'

"Q. Do you recall the word 'burn'?

"A. Yes.

"Q. At that time did you notice they both had guns?

"A. Yes.

"Q. Do you see anybody in court who was one of those people?

"A. Yes, I do.

"Q. Would you so indicate, please.

"A. Yes. The man sitting next to Mr. Cochran.

"Q. The gentleman I have my hand over.

"A. That's correct.

"MR. KALUSTIAN: May the record reflect that I have my hand over Mr. Pratt?

"THE COURT: The record may so indicate.

"Q. BY MR. KALUSTIAN: Who was doing the talking, Mr. Pratt or the other guy?

"A. Mr. Pratt.

". . . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: Okay. Now, you have indicated that they came up to you and indicated that they wanted your money or they'd burn you; is that right?

"A. That's correct.

"Q. What was said next?

"A. Then there was—Pratt said, 'The lights, the lights. Get the lights off.'

"Q. To who?

"A. To me, and I said, 'There's no way to turn the lights off. It's on a time meter.'

for her husband to return; that one of the men was defendant Pratt who was the shorter of the two; that the defendant looked down into the office and then the taller of the two proceeded along with him to the back of the store and looked into two cases. Mrs. Reed asked if she might

I said, 'You'll have to shoot them out if you want them out.'

"Q. What was said or done next?

"A. Pratt then sent the other fellow over to the light meter. No, first—excuse me—first he told me to get them off any way, whether they could or not, and I started to go over to the meter, and he said, 'No, no, no. Stay where you are. Keep your hands up.'

" . . . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: What did he say to the other guy, if you can recall?

"A. Well, something to the effect of 'Go over to the meter, see if you can get them off,' or, 'get them off.'

" . . . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: Did the guy finally go over to the light meter?

"A. Yes, he did.

"Q. Was he able to turn the lights off?

"A. No.

"Q. What happened next?

"A. Well, we were asked where our—where our money was and where our valuables were, and I told him my wallet was in my tennis bag and my wife's purse had her wallet in it, which was sitting next to the tennis bag on the bench.

" . . . . . . . . . . . . .

"Q. Approximately how long were the two people on the tennis court?

"A. It was just a few minutes.

"Q. Give us your best estimate.

"A. Maybe five minutes."

(Under cross-examination Mr. Olsen testified that the two gunmen were varying distances within 12 feet of him and were also "face-to-face ['two, three feet'] with both of them probably two or three separate times.")

Mr. Olsen testified that following the murder, he was asked by the police to view pictures on "seven or eight" occasions but was unable to identify the assailant. It was not until about a year later when he was again asked to view pictures. He then testified as follows:

"Q. ... When was the next time you were called upon to look at any pictures?

"A. I didn't hear anything until approximately a year later, about November, I believe it was, of—that would be 1970.

"Q. Where did you view pictures, then?

"A. At the same place, the Santa Monica police station.

" . . . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: What did you do, did you go down to the police station?

"A. Yes, I went down to the police station.

"Q. Did you see some photos?

"A. Yes, I did.

"Q. How many photos did you see?

"A. I think it was about 15 or 16.

"Q. Was it in a fold-out form?

"A. Yes, it was.

"MR. KALUSTIAN: Miss Clerk, may I have that exhibit, please?

"Q. Would you take a look at exhibit No. 8. Go through it and tell me whether that appears to be—I say appears to be—the same group of photos that you saw at Santa Monica, and in the same form.

help them and defendant inquired if they had merchandise to build a doll house for his wife. She replied that they did not have material at the time to build a doll house since they were just starting the shop and defendant said: "'You act as if you don't want to sell us anything.'" Mrs. Reed said, "'Sir, you have to realize we are just moving up into this store. We don't have much merchandise in here at the present time, and each night my husband brings up a carload on the way home.'" The two men then left the store and Mrs. Reed, feeling suspicious, locked the door and turned the sign from "open" to "closed." Shortly thereafter she heard male voices, looked through the window of the door and saw the same two men walking back and talking to each other. She saw both men standing in the doorway with a gun protruding from the right hand of the tall man while defendant Pratt shook the doorknob saying, "'Let us in.'" Mrs. Reed immediately went to the telephone to call the police and the two men departed.

"A. Yes, it does.
"Q. At that time were you able to select one of the photographs?
"A. Yes, I was.
"Q. Would you look at those now and tell me which one you were able to select then?
"A. No. 13.
"Q. What was your state of mind with reference to photograph No. 13?
"A. Well, I felt that this definitely did look and appear photographically to be one of the assailants, and that while I didn't think I could make a positive identification from any photograph, and had expressed this to the police department, I felt that that was a picture of the person.
"Q. Was this the first time that you felt that you had seen the person?
"A. Yes.
" . . . . . . . . . . . . . .

"MR. KALUSTIAN: May the record reflect that photograph No. 13, on exhibit No. 8, is Elmer Pratt?
"THE COURT: The record may so indicate.
" . . . . . . . . . . . . . .

"Q. You have indicated that the people who accosted you at the tennis court each had guns; is that correct?
"A. Yes.
"Q. Can you describe each of the guns, to the best of your recollection?
"A. I believe there was a .45 automatic and a snub-nosed .38 police revolver.
"Q. Do you recall which person had which gun?
"A. I don't now. I don't recall.
" . . . . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: *Is there any doubt in your mind at this time that Elmer Pratt, the defendant in this case, was one of the two men on the tennis court in Santa Monica on December 18, 1968?*
" . . . . . . . . . . . . . .

"THE WITNESS: *There is no doubt.*" (Italics added.)
During the extensive cross-examination by defense counsel Mr. Olsen was asked if there was "anything unusual about the manner in which he [defendant Pratt] walked or conducted himself?" Mr. Olsen replied, "very definitely...the fact that he held us up, and then pumped bullets into us, and murdered my wife."

(Fred S. Reed, husband of Barbara Reed, testified that he was driving to the Santa Monica hobby shop at about 8 p.m. on December 18, 1968, and as he approached the store he saw two black individuals jimmying the front door trying to get in. After he circled the block, he saw the same two black men, one of whom was wearing a safari jacket, hurry away on Lincoln Boulevard and disappear between two parked cars.)

At the pretrial hearing of defendant's motion to suppress Mrs. Reed's identification of him (which motion was denied by the court), she (Mrs. Reed) made a positive in-court identification of Pratt as being the shorter of the two blacks who on December 18, 1968, at about 8 p.m. shortly before the tennis court murder were in her hobby shop and who then returned later and tried to get in the locked front door.[8]

---

[8]Following is the testimony of Mrs. Reed at *the pretrial hearing* on defendant's motion to suppress her identification testimony:

"Q. What time did you lock the door to the hobby shop?

"A. Normally 8 o'clock. This evening it was possibly a few minutes before eight.

"Q. Just before that, moments before that did you see somebody in the hobby shop who you now recognize?

"A. Yes.

"Q. Who was that person?

"A. The gentleman sitting right there (indicating).

"Q. This gentleman I have my hand over?

"A. Yes.

"MR. KALUSTIAN: May the record reflect I have my hand over the defendant Elmer Pratt.

"THE COURT: Yes, the record may so indicate.

"Q. BY MR. KALUSTIAN: Did he come in with another gentleman?

"A. Yes.

"Q. Distinguishing the two in terms of height, if you can, was Mr. Pratt any taller or the shorter of the two?

"A. Mr. Pratt was the shorter man.

"Q. Sometime after that, I think maybe close to two years later, were you called upon to view approximately 16 photographs in connection with this case?

"A. Yes.

"Q. Looking at those photographs, could you remember now how they were arranged, or what kind of a layout there was to them?

"A. It was in a type of an album, and I looked at quite a few, and toward the end of the book was a picture, two pictures, that I identified that as being Mr. Pratt.

"Q. Were these two pictures on the same or different pages?

"A. I think on the same page, one above and one below the other one.

"Q. Were there more than one photograph of each of the individuals pictured?

"A. Yes. There were two photographs.

"Q. Seeing Mr. Pratt now, and assume for a moment that you had not seen this group of photographs about two years after the time Mr. Pratt came into your store, just to set the time, Mrs. Reed, was it just before you appeared before the Grand Jury that you were called upon to view these photographs?

"A. Yes.

At the jury trial Mrs. Reed again positively identified defendant Pratt as one of the two gunmen. She "remember[ed] his face thoroughly" and that "one predominent feature" was a round scar ("indentation") "between his eyes on the lower part of the forehead, above the eyebrows."[9] (Exhibit 8 includes a photograph [No. 13] of defendant Pratt which shows he has a small round-shaped scar or indentation on his lower forehead similar to that described by witness Barbara Reed.) She testified that Pratt was wearing a safari jacket hanging open with a black or navy blue tank type shirt or sweater underneath, brown trousers, tan shoes and no hat.

---

"Q. Going back to that time, and assuming that you had never seen those photographs, and looking at Mr. Pratt today, can you tell us whether, in your own mind, not seeing those photographs you could have identified Mr. Pratt today?

"A. Yes.

"Q. Do you feel you could or could not have today?

"A. I could have identified him today.

"Q. *In looking back, if you can, you have identified Mr. Pratt here today as being in your store on December 18th, 1968, can you tell us whether your identification of Mr. Pratt today is based upon the time you saw him in your store on that date, or whether it was based on any other factors?*

"A. *As I see Mr. Pratt now, I recall the scar he has above the bridge of his nose. Today I am positive I was drawn to that scar, and I, in my conversation with him, I noticed, and I do remember more explicitly than ever the scar above his nose today.*

" . . . . . . . . . . . . .

"Q. Now, when you looked at the photographs, were you looking for some particular distinctive feature in particular?

"A. No.

"Q. Would it be fair to say that you retained a general impression of the appearance of the men that had been in your store?

"A. Yes.

"Q. *Did you recall any specific feature of either of the men?*

"A. *The short one, I could just picture his entire face, his entire person in my mind.*

"Q. But you didn't have in mind any scar above his nose?

"A. Yes, I knew he had something on his face; yes.

"Q. *You mean the man that had been in the hobby store had something on his face?*

"A. *The shorter man, yes.*

"Q. *What did the short man that was in the hobby store have on his face?*

"A. *The scar above the bridge of his nose.*

"Q. *Describe the scar.*

"A. *It was a round scar, deep, indented.*

"Q. *You noticed that when the man was in the hobby store?*

"A. *Yes. I was talking to him face to face.*

" . . . . . . . . . . . . . . . ."

(Italics added.)

[9]Witness Barbara Reed testified at *the trial* in the following manner:

"Q. In looking at Mr. Pratt today, what is it about him that enables you to say that he was in your store, that gentleman there, Mr. Pratt, on the 18th of December, 1968?

"A. I remember his face thoroughly.

THE MURDER WEAPON:

The chief forensic chemist for the L.A.P.D., DeWayne Wolfer, testified that a barrel for a .45 caliber automatic pistol is removable but that marks left on an expended shell from the breech face, firing pin and ejecter are positive means of firearm identification. He positively identified, by use of a comparison microscope, that the three expended casings recovered at the scene of the "tennis court murder" of Caroline Olsen on December 18, 1968, were fired from the .45 caliber automatic pistol found in the second floor living room next to the window over-

---

"Q. Anything else about his face?

"A. Exactly everything about his features.

"Q. Well, tell us specifically what you recall from that night that you now see.

"A. Everything about him, his haircut, the shape of his head, his eyes.

"Q. Tell us a little bit what you mean about his haircut. Is there anything significant to you about his hair?

"A. I would call it a crew cut. That is the same today as it was then.

"Q. A short cut?

"A. Yes.

" . . . . . . . . . .

"Q. BY MR. KALUSTIAN: Did you notice anything about the configuration or shape of the hair?

"A. No, just a full head of hair and a widow's peak in the front.

"Q. Sorry?

"A. What is called a widow's peak, a point in front of the forehead.

"Q. You mean as the hairline comes down to a point?

"A. This is called a widow's peak, yes.

" . . . . . . . . . .

"Q. BY MR. KALUSTIAN: *You have indicated that when you were talking with Mr. Pratt, you were standing face-to-face talking with him; is that right?*

"A. *Yes. He was about the same height I am.*

"Q. *And did you get a look at his face as you were standing?*

"A. *Yes. I was face-to-face with the man, and what drew my attention to him, one predominent feature, well, indirectly a feature, was a scar on his forehead.*

"Q. *Where was the scar?*

"A. *Between his eyes on the lower part of the forehead, above the eyebrows.*

"Q. *What was the shape of the scar?*

"A. *Just an indentation of some kind.*

"Q. *Well, was it a long scar?*

"A. *More round than anything else.*

" . . . . . . . . . .

"Q. BY MR. KALUSTIAN: *Do you recognize anything about Mr. Pratt's face as you look at it now that was the same as the individual you saw in your store?*

"A. *Yes.*

"Q. *Tell us, please, what?*

"A. *Well, as I said before, the scars on his forehead seemed to draw my attention.*

" . . . . . . . . . .

"Q. *Is there any doubt in your mind as you view Mr. Pratt now that he was in your store at about 8:00 P.M. on December 18th, 1968?*

"A. *There is no doubt in my mind.*" (Italics added.)

looking the front of the premises at 806 West Century Boulevard on January 17, 1969.[10] He was unable to identify the slugs recovered as matching the same .45 caliber automatic pistol but surmised the barrel had been changed or that excessive firing of the weapon precluded identification. (The failure to match the slugs with the barrel is consistent with Butler's testimony that defendant Pratt told him he had changed the barrel in the murder weapon; see *infra.*)

*The above testimony of ballistics expert Wolfer was uncontradicted.* At defense counsel's request the court appointed a ballistics expert of the defense's choosing, namely M. L. Miller. Mr. Miller examined the

---

[10]Officer Wolfer testified as follows at the trial:

"Q. You have indicated your opinion was that your test shells and the shells supplied to you by Sgt. Buckles were fired by the same gun, that is, People's 27, the one you compared it with; is that correct?

"A. That's correct.

"Q. Is that a positive opinion?

"A. That's correct.

"Q. Is there any doubt in your mind that opinion is positive?

"A. Based upon all my studies and experience in the field for the past twenty some-odd years, that is a positive identification, that it came from this gun and no other gun."

Previous to the introduction of the above testimony by ballistics expert Wolfer, the prosecuting attorney and defense counsel stipulated to a tracing of the slugs and spent shell casings found at the scene of the crime to the witness as follows:

"MR. KALUSTIAN: May it be stipulated that on or about 12-19-68, December 19th, 1968, Det. Eckstein of the Santa Monica Police Department received from Dr. Harold Eisele of Santa Monica a slug that Dr. Eisele removed from Caroline Olsen;

"That Det. Eckstein transported the slug to the Santa Monica Police Department and booked it into evidence in the same manner that Officer Plasse indicated he did;

"That on or about January 29th, 1969 Officer Sollee—S-o-l-l-e-e—of the Santa Monica Police Department transported the slug and spent shell casings found by Officer Plasse at the scene, and the .45 caliber slug put in evidence by Det. Eckstein from Dr. Eisele, and transported them to Sgt. Warner of the Sheriff's Crime Lab in Los Angeles;

"That on January 29th, 1969 Sgt. Warner received them and booked them into Sheriff's Evidence.

"May it further be stipulated that sometime prior to the Grand Jury hearing, within two or three months, I don't recall the exact date, Sgt. Buckles, then of the Los Angeles Police Department, received from Sgt. Montgomery of the Sheriff's Department the spent shell casings and slugs turned over to the Sheriff's Department by Sollee, that is, the evidence found by Plasse at the scene and the slug removed from Mrs. Olsen by Dr. Eisele, and, further, that Sgt. Buckles picked up out of evidence the .45 caliber automatic, I believe now referred to as Exhibit—is it 27?

"THE WITNESS: Just a moment, and I'll tell you. The clip is 28, the gun is 27.

"MR. KALUSTIAN: Sgt. Buckles delivered the gun, spent shell casings, and slugs to De Wayne Wolfer of the Los Angeles Police Department Special Investigation Division, commonly called the Crime Lab. [¶] Counsel?

"MR. HOLLOPETER [defense counsel]: Yes, so stipulate.

"THE COURT: The stipulations are accepted."

same evidence and made an independent microscopic comparison in the presence of Officer Wolfer but was not called as a witness by the defense to testify to contradict Officer Wolfer's testimony.

THE GETAWAY CAR:

Witness Mitchell Lachman who was parked in a van next to Lincoln Park at about 8 p.m. on December 18, 1968, testified at the trial that he heard shots and then saw two black men run very fast from the tennis courts and get into a red (shiny-polished) car with a white canvas convertible top and speed away. He did not get the license number but saw that the license plate had a white background with dark numerals. At the trial he identified a 1968 North Carolina license plate as having a color consistent with the color of the plate on the getaway car. He further identified a photograph of a car which was once red but which had been repainted blue as having the same body design as the getaway car and the red under a right front chrome headlight frame which had not been repainted blue as similar to the color of the car he saw speed away from the scene of the crimes.

Officer John Lawrence Higgins of the L.A.P.D. testified that on April 12, 1969, at about 11:30 p.m. at 28th and Westview Streets he stopped a 1967 Pontiac convertible, white over red in color with a California license number YEZ 997, which was driven by defendant Pratt with a Roger Lewis as a passenger. He made a report that the identification number of the vehicle was 242677P-239094. He further testified that the strip of red under the headlight rim of the car (the car that had been repainted blue) was the color of the car he stopped on April 12, 1969.

The following are the stipulations entered into between the prosecution and defense counsel and accepted by the court in respect to the getaway car:

"MR. KALUSTIAN: At this time may it be stipulated between the defense, Mr. Hollopeter and Mr. Cochran, and myself, the prosecution, that the following information was obtained from the Department of Motor Vehicle records from the State of North Carolina and the State of California;

"That on October 3rd, 1967 the defendant Elmer Pratt purchased a 1967 Pontiac convertible, red body, white top, in North Carolina.

"It bore identification number 242677, P as in Paul, 239094, and was assigned North Carolina license D5113.

"This vehicle entered California on September 6th, 1968. The defendant Elmer Pratt first made application for California registration on February 3rd, 1969 for the 1967 Pontiac convertible, red body, white top, bearing identification number 242677P239094, and North Carolina license D5113.

"On March 27th, 1969 the California Department of Motor Vehicles issued to this vehicle California license plate YEZ, Young Edward Zebra, 997.

"On August 22nd, 1969 the defendant Elmer Pratt made application to the California Department of Motor Vehicles for a new license plate.

"On September 4th, 1969 the California Department of Motor Vehicles issued new California license plates, Young Zebra X-ray, YZX 618 to defendant Elmer Pratt's vehicle, a 1967 Pontiac convertible, identification number 242677P239094.

"On April 8th, 1970 the defendant Elmer Pratt sold the above described vehicle to Haste and Hirste, Incorporated, automobile dealers.

"Further, that the car shown in Exhibits 11 and 12 [painted blue] is the same car heretofore referred to, that is, the one bearing ID number 242677P239094.

"MR. HOLLOPETER: So stipulated.

". . . . . . . . . . . . . .

"MR. COCHRAN: Stipulate."

THE TESTIMONY OF JULIUS CARL BUTLER (JULIO):

Julius Carl Butler,[11] one of the prosecution's key witnesses, on December 18, 1968 (the date of the tennis court murder), was a hair stylist operating his own beauty shop and was also a member of the

---

[11]BACKGROUND: Following graduation from high school in 1950 Butler joined the United States Marine Corps, saw service in Korea and was honorably discharged in the rank of sergeant in 1954. He then attended Los Angeles City College (mainly at night)

BPP. At that time he was a bodyguard with the rank of lieutenant in the BPP with duties of supplying security at party rallies and events. He was called "Julio." Although his shop was not a hangout of the Black Panthers, it was used according to Butler to "communicate sometimes with each other through [him]." At the trial Butler testified substantially as follows:

On December 18, 1968 (the date of the tennis court murder), Pratt came to his shop with another person whom he (Pratt) introduced as "Tyrone." Pratt told him (Butler) to come outside as he had something to tell him. As they stood in the doorway "he [Pratt] told me [Butler] he was going on a mission, and if he didn't come back, you know, to notify the other members of the Party that something might have happened to him." Pratt did not indicate what the "mission" was. The two then left and Butler went back to work. Butler had no conversation with Tyrone who was taller than Pratt.

Later the same night, around midnight or in the early hours of December 19, 1968, Pratt returned to the shop and "appeared to be very nervous." He told him (Butler) "that he had shot some people, and he didn't know whether or not he had killed them, or words to that effect." Pratt also told him the shooting occurred in Santa Monica. Nothing else was said about the shootings at that time and Pratt told Butler he would check with him later.

On December 19, 1968 (the day following the tennis court shootings), Butler saw an article in the Los Angeles Times newspaper which reported a shooting incident in Santa Monica. Later that day he met Pratt "at the 3-A office" (the Black Panther headquarters at 7th Avenue and Venice in Los Angeles). He testified that there were "quite a few people there but I [Butler] talked to him [Pratt] outside of the office." Just the two of them were present. Butler testified that "I showed him the newspaper and the incident, and he [Pratt] stated that that was the incident that he [Pratt] was talking about the night before." Butler asked Pratt what happened to his car because the newspaper indicated that his car had been apprehended or taken, seized, and he (Pratt) said, "no, it wasn't, and that it was hid out." Butler also stated that Pratt had

for about three years, primarily studying criminology. He became a Los Angeles County Deputy Sheriff in 1956 but resigned in 1960 because of domestic problems. Thereafter he worked as a laborer in construction for three years before attending a school of cosmetology. Following his graduation from that school he was employed for several years as an operator in various beauty salons until he opened his own beauty parlor called "Mr. Julio" on West Adams Boulevard in Los Angeles.

a red or burgundy Pontiac GTO convertible with a white top which was always kept washed and polished.[12]

Butler testified that while discussing the newspaper article with Pratt "I asked about the weapon that was used and what he had done with it, and he told me he had destroyed the barrel." Pratt at that time did not state what kind of weapon he had used, but later acknowledged that it was a .45 caliber automatic. Pratt bragged about "his own capacity and proficiency" in the shootings and how "cool" he was for disposing of the gun barrel.[13] Butler testified that the writing, sealing and delivery of the letter (see Appen. A) to Sergeant Rice on August 10, 1969, stemmed from the fact that he had become disenchanted and disillusioned with the BPP and its philosophy and decided to quit but when he (Butler) told Pratt that he wanted out of the party his life was threatened and he was told he couldn't quit because he knew too much. Butler then decided as an "insurance policy" to write the letter, which he did, and gave it to Sergeant Rice, a friend whom he trusted, in a sealed envelope with instructions that it should only be opened in the event of his death. He

---

[12]The record indicates that a car was seized by the police shortly after the murder but after further investigation it was released as having not been the getaway car.

[13]The reporter's transcript contains the following colloquy between the prosecuting attorney and witness Butler in respect to Pratt's statements to him, the murder weapon and the getaway car.

"THE WITNESS: I asked about the weapon that was used and what he had done with it, and he told me he had destroyed the barrel.

"Q. BY MR. KALUSTIAN: What kind of a weapon did he say he used, if he did?

"A. He didn't say at that time.

"Q. Go on.

"A. He said later on, at another incident.

"Q. Okay. What else, if anything, did he say .at that time in regard to anything concerning the events in Santa Monica?

"A. He stated to me that he was the one that did the shooting, that shot the people, because Tyrone couldn't shoot.

"Q. Did he indicate why Tyrone couldn't shoot?

"A. No, he didn't.

"Q. Did he indicate it was because of accuracy, or his inability to shoot, or what; do you recall?

"A. He was expressing his own capacity and proficiency.

"Q. Was there any other conversation regarding what he was to do about it, or anything else?

"A. He said he was cool. He said the car was cool and he was cool.

"Q. Did he indicate why?

"A. Well, the disposal of the gun barrel.

"Q. By this time, he still had not disclosed the kind of gun he had used; is that correct?

"A. No, he hadn't.

"Q. Did he carry or usually carry a particular type of gun?

"A.. He usually carried a .45 automatic.

"Q. Did you have any other conversations with him regarding these events, whether

then put the word out on the street that such a letter was in existence so it would reach defendant Pratt.[14]

---

it be a total conversation, or words, a few words here and there? When is the next time that he said anything about it?

"A. I didn't see him for quite some time after that, because I was looking for him later when a newspaper account stated that the lady had died.

" . . . . . . . . . . .

"Q. BY MR. KALUSTIAN: When was the next time you recall seeing him?

"A. The date that Bunchy Carter was killed.

"Q. What were the circumstances?

"A. He came to my shop and told me that he thought that the deputy had been killed on the campus at UCLA, but he wasn't sure.

"Q. Who is the deputy?

"A. He was referring to Bunchy Carter. He was commonly called the deputy.

"Q. Did you eventually go the Century Boulevard address, John Huggins' house, that night?

"A. Yes, I did.

"Q. When was the next time that you can recall that Mr. Pratt talked about the event in Santa Monica?

"A. It came up on numerous occasions. People would tell him that the car wasn't cool, and Bunchy had told him to get rid of the car, and he would shine it on.

"Q. What do you mean by that? .

"A. He would say it was all right.

"Q. You have indicated that one time he did not tell you what kind of a gun was used. Did he ever indicate what kind of a gun was used?

"A. I told him I saw it in a newspaper later, that they said it was a .45.

"Q. When was this that you told him that?

"A. When he came back—well, this was after Bunchy's burial, we was discussing it.

"Q. What did Elmer Pratt say about that, if anything?

"A. He reminded me that he was—he said he was cool, because he had disposed of it. He had disposed of the barrel, so he wasn't worried about it.

"On one occasion I asked him—when he laid the .45 on my table—was that the . weapon, and he stated, 'No,' because I told him I didn't want it in the house.

"Q. When was that?

"A. This was after Bunchy's death. I couldn't give you a specific date.

"Q. But it was after the killing of Bunchy Carter at UCLA?

"A. Yes.

"Q. Do you recall any particular person talking to Elmer Pratt about getting rid of the car?

"A. Elaine Brown on several occasions.

"Q. What would she say and what would Mr. Pratt say?

" . . . . . . . . . .

"THE WITNESS: Elaine—she reminded him that Bunchy had told him to get rid of the car, you know. On one occasion, I remember they were having car problems, you know, and they told him they would buy him a new car.

"Q. BY MR. KALUSTIAN: They would or would not?

"A. He said that the girls would buy him a new car.

"Q. What did he say?

"A. He said he'd think about it, but he didn't want to get rid of it right now.

" . . . . . . . . . . . "

[14]Following are pertinent portions of witness Butler's testimony at the pretrial hearing pertaining to the materiality and relevancy of the letter:

(Sergeant Rice at the trial corroborated Butler's testimony pertaining to the receipt of the sealed envelope from Butler and that Butler had told him that he (Butler) felt that he was going to be killed and handed

"Q. Originally when you delivered the letter to Sgt. Rice did you intend that the contents of the letter be disclosed to the Police Department?
"A. No. No, not at that time.
"Q. Was this letter delivered because Sgt. Rice was a friend of yours?
"A. Yes.
"Q. At that time what was your reason for giving Sgt. Rice the letter?
" . . . . . . . . . . . . . . .
"THE WITNESS: Sgt. Rice was a personal friend of mine and I trusted Sgt. Rice, and there had been several threats on my life, so I didn't want to give it to anyone else that—I didn't want to upset members of my family or other people, and I didn't want to give it to somebody else that was not responsible, and I trusted him not to open the contents until something did happen.
"Q. Was it through circumstances not originally foreseen by you that caused the letter to be opened by the police department?
"A. That's correct.
"Q. Did you attempt to make known on the street the existence of information that you had?
"A. I did.
"Q. What did you say in that regard and who did you say it to, if you can recall?
"A. Well, I wanted—for security reasons, I'm not going to disclose the people I let it drop through, but I let it drop in the streets that if they continued to threaten me and if anything happened to me, that the information would be revealed to law enforcement agencies.
"Q. What information?
"A. Information relative to Pratt's incident in Santa Monica.
"Q. When you dropped the information, did you drop it with the expectation and to people, hopefully, who would bring it back to Pratt?
"A. That's correct.
" . . . . . . . . . . . . . . .
"Q. Would you tell us who were the people that made threats against your life?
"A. Elmer Pratt, Long John Washington, Blue, Elaine Brown.
"Q. Is Blue Roger Lewis?
"A. Yes.
"Q. What form of threat had it taken when Mr. Pratt threatened you?
"A. Well, one night they threatened me. They held me at gunpoint in my house.
"Q. Tell us about it.
"A. I was having contradictions with Elmer Pratt and some of the other members of the party, and Long John—there was [sic] some more people in my house, who were related to me personally.
"Long John picked up a pistol and cocked the pistol and told me he was going to shoot me, and Geronimo kept saying, 'Shoot him. Shoot him,' and I told him, I said, 'Well, you would have to deal with these other people that are in the house, and if you kill me, you won't get out of the building.' And, finally, they put the gun down.
"Q. Did this series of events, which led to the threats on your life, begin with some disagreement regarding party philosophy?
"A. Yes.
"Q. Did it culminate with the writing of the letter and delivering it to Sgt. Rice?
"A. Well, the culmination—that last incident, when they pulled the gun on me, I told them to stay away from me because I didn't trust them, and Pratt came to my

Rice the envelope with instructions that it should only be opened in the event of his [Butler's] death.[15])

shop and I was holding a gun under a towel.

"He told me I couldn't quit. I told him I could quit. He told me I knew too much. Then he told me he would deal with me later, and I told him if he approached me again, that I was paranoid enough to shoot him.

"MR. COCHRAN [defense counsel]: I didn't hear the date of this occurrence. Was there a date on this?

"MR. KALUSTIAN: It probably wasn't given.

"MR. COCHRAN: Could we have a further foundation on this occurrence?

"THE COURT: Yes.

"Q. BY MR. KALUSTIAN: When did it occur?

"A. I can't give you the exact date.

"Q. Was it before or after the letter?

"A. It was before the letter.

"Q. Could you give us an idea in terms of days, or weeks, or months?

"A. About the month of June.

"THE COURT: Was the year 1969?

"THE WITNESS: Yes, ma'am.

"Q. BY MR. KALUSTIAN: Did you tell Sgt. Rice what information the letter contained?

"A. No.

"Q. Did you leave him or did you intend to leave him with the impression that it was personal to you, rather than police business?

"A. Yes. I told him. It was all done in an unofficial capacity. This was the understanding we had.

"Q. You understood that he was a policeman at that time, didn't you?

"A. Yes.

"Q. And that he was working community relations?

"A. Yes.

"Q. And that he had contact with the Black Panthers, the US organization, and other groups in the street?

"A. Yes."

Following are the pertinent portions of Butler's testimony at the trial in respect to the delivery of the sealed envelope to Sergeant Rice.

"Q. [By Mr. Kalustian]: Do you know Sgt. Duwayne Rice of the Los Angeles Police Department?

"A. I do.

"Q. Is he a friend of yours?

"A. Yes, he is.

"Q. Back on or about August 10th, 1969 did you deliver to him a written document sealed in an envelope?

"A. Approximately that time, yes.

"Q. Did you tell him something in regard to the document?

"A. Yes, I did.

"Q. Would you tell us what you told Sgt. Rice?

" . . . . . . . . . . . . .

"THE WITNESS: I gave Sgt. Rice an envelope and stated to him that there had been death threats on my life and that this envelope was only to be opened in the event of same.

"Q. BY MR. KALUSTIAN: Did you state that on the outside of the envelope?

---

[15]Footnote 15 commences, *post*, at page 827.

In respect to the circumstances surrounding the opening of the sealed envelope on October 20, 1970 (over fourteen months after Butler handed it to him), Sergeant Rice testified that he had first given it to Captain Henry for safekeeping five or six months after he received it as a personal friend from Butler; that he did not know the contents of the envelope; that he (Sergeant Rice) was under investigation by internal affairs of the L.A.P.D. for a matter unrelated to the delivery of the letter to him (for striking a white police officer). The L.A.P.D. internal affairs knew of the existence of the sealed envelope and demanded to see it as part of their investigation. Sergeant Rice asked Butler's permission to turn it over to internal affairs officers, which was granted. Sergeant Rice then asked Captain Henry for the sealed envelope and turned it over to Sergeant Edmund M. Lutes, Jr., of internal affairs who opened the envelope. As previously noted, the information contained in the letter (see Appen. A) was what caused the detectives for the first time to focus on defendant Pratt as a suspect in the December 18, 1968, murder of Caroline Olsen.

(During the course of the trial Butler substantially corroborated Sergeant Rice's testimony in respect to the opening of the sealed envelope.) As a result of the investigation prompted by the contents of the letter, Butler was called as a witness before the grand jury. Butler stated that he reluctantly testified before the grand jury because "[he] figured that the testimony would nullify the fact that [he] had the information, that

---

"A. Yes, I did.
"Q. Did you give the envelope to Sgt. Rice as a policeman or as a friend?
"A. I gave it to him as a personal friend.
"Q. Why did you give it to him?
"A. Because I felt he was one of the most reliable persons that I could rely on not to open it without my permission, and I didn't want to upset other members of my family with it.
"Q. Well, why did you feel it necessary to deliver this envelope with information?
"A. Because the envelope at that particular time was the only bit of leverage that I could have used against the people that were making the threats against me."

[15]Following is the testimony of Sergeant Rice at the trial in respect to Butler's delivery of the letter to him with instructions.
"Q. BY MR. KALUSTIAN: What did Julio Butler tell you when he delivered the sealed envelope to you?
"A. We had been talking about several things and he says, just prior to giving me the envelope, he says he feels that he's going to be killed, that he understood there was a contract out for him and that if anything happens to him,—simultaneously, he was reaching in his inside pocket. He gave me the envelope—Would you read this, he said, and give it to my mother?
"Q. What event was supposed to occur before you were to read it?
"A. I had the impression he had to die first."

[he] was using it as leverage" (an "insurance policy") against the threat on his life.[16]

THE OLLIE TAYLOR INCIDENT:

Julio Butler testified that when he returned home the night of April 22, 1969, defendant Pratt and some other Black Panthers were already at his apartment and were waiting for someone. Ollie Taylor, a 17-year-old Black Panther whom he did not know, was brought in and the other Panthers started interrogating him (Taylor) about being affiliated with the US organization; that during the interrogation Blue struck Taylor in the mouth with a gun; that the group then moved into a back room where the interrogation continued; that Pratt then with a

---

[16]During the defense pretrial motion attacking the materiality and relevancy of the letter Butler testified as follows:

"Q. After you delivered the letter to Sgt. Rice in 1969, when was the next time you heard anything about the letter?

"A. Approximately a year later.

"Q. Were you approached by somebody regarding it?

"A. The Internal Affairs of the LAPD.

"Q. Because of the investigation involving Sgt. Rice, you agreed to have the contents disclosed; is that correct?

"A. Yes, because they were going to—well, they might have prosecuted Sgt. Rice, so I figured he had done as much as he was supposed to do for me as a friend, and I wasn't going to let him go down the drain by it."

At the trial Butler testified as follows:

"Q. BY MR. KALUSTIAN: Did you have a conversation with Sgt. Rice regarding opening the envelope?

"A. Yes, I did.

"Q. What did you say and what did he say regarding that particular item?

"A. Sgt. Rice stated to me that the Internal Affairs Bureau of the Los Angeles Police Department had instituted an investigation relevant to him being possibly subversive because of his relationship with me and the envelope, and that as a personal friend he would not open the envelope and would take his chances on being persecuted or fired if I stated so, and I told—at which time I told him he had subjected hisself [sic] enough for my friendship, and to go ahead and open the envelope.

"Q. Later on you testified before the Grand Jury, didn't you, Mr. Butler?

"A. That's correct.

"Q. And I think some questions were asked of you regarding your reluctance to testify, and whether or not you were telling the whole truth; do you recall that?

"A. That's correct.

"...........

"Q. BY MR. KALUSTIAN: Were you reluctant to testify?

"A. Yes, I was.

"Q. Why were you reluctant to testify?

"...........

"THE WITNESS: Well, first of all, I figured that the testimony would nullify the fact that I had the information, that I was using it as leverage.

"Q. BY MR. KALUSTIAN: You mean it would become public knowledge?

"A. It wouldn't have any street value any more."

cocked hammer on his pistol ordered Butler to interrogate Taylor; that Butler was "very seriously frightened" of Pratt and struck Taylor with his hand; that when the interrogation ceased he washed Taylor up and allowed him to stay in the room the rest of the night; and that Taylor left the next morning.[17]

---

[17]Julio Butler's testimony at the trial of the instant case in respect to *the Ollie Taylor incident* was as follows:

"Q. You have indicated there was an incident involving Ollie Taylor, and you indicated you slapped Ollie Taylor.

"A. Yes, sir.

"Q. Would you tell us the circumstances surrounding the whole incident, who was there, and the reason that was given by Mr. Pratt for the incident, if any?

"A. On the night the incident occurred, when I came home there was Elmer Pratt and approximately six or seven, eight more people in my apartment. At that time they had a key to my apartment, you know, it was two extra keys out, and they were waiting for someone who I didn't know, and they stated this fellow's name was Ollie Taylor, and I had never seen or heard from him before.

"He stated that he had seen me at Hollywood High School at a rally, but I didn't know anything about him, so they brought him in and started an interrogation.

"First he was accused of being a member of the US organization, then Geronimo jumped on him because he said he had heard that Ollie Taylor had put it out in the streets that Blue and Geronimo ran off and left Bunchy Carter at UCLA.

"Q. The day he was killed?

"A. Yes, and this is how the fight started.

"So pretty soon it quieted down. Blue was the one that struck him with the gun in the mouth. So they went in the back room out of the front room and say, [sic] 'Let's all go to the back room, and we'll sit down and talk.'

"I had an elongated, stuffed pillow approximately maybe about 12 feet long.

"Q. Feet?

"A. About 12 feet long and approximately maybe about two and a half feet wide, and this room was basically bare except for some pillows, and Pratt laid on the pillow next to the window and faced the rest of the people, at which time he had a magnum in his hand, and—

"Q. Was Ollie Taylor in the room at this time?

"A. Yes.

"Q. Okay.

"A. Ollie Taylor was sitting in the middle of the room, and I was sitting next to Ollie Taylor, and I was. trying to talk to Ollie Taylor on the basis of 'Give as much information about yourself to clear yourself,' and Geronimo stated to me that the shit he was talking was a bunch of bull shit, and I looked over and he cocked the hammer on the pistol.

"Q. Where was the pistol pointed, if at all?

"A. It was actually right between me and Ollie Taylor, because I was sitting side-by-side with Ollie Taylor.

"Then I noticed that Geronimo had an erection, and he stated, 'If you don't move, I'll blow your head off,' and he said, 'Furthermore, I think maybe you're siding with him,' so he told me to slap Ollie Taylor.

"He say, [sic] 'You interrogate,' so I did it in the pretense of trying to—at that time I was frightened of Geronimo's behavior, very seriously frightened. I had never seen a man with an erection—

"MR. HOLLOPETER: Well, we will object to this as nonresponsive.

"Q. BY MR. KALUSTIAN: At any rate you were frightened at that time, that's why

(The testimony of the victim Ollie Taylor was substantially as follows: that on approximately April 22, 1969, at about midnight he, Ollie L. Taylor, Jr. [17 years of age], was picked up at the gas station where he worked by Richard Johnson and Nathaniel Clark and taken to Julio Butler's apartment; that when he [Taylor] arrived at the apartment defendant Pratt, Blue, Long John Washington, Julio Butler and Elaine Brown were present. Taylor was placed in a chair in the middle of what appeared to be a living room and was questioned first by defendant Pratt and thereafter by Elaine Brown if he was a member of the US group. When Taylor answered that he was not, defendant Pratt said he was lying and hit him with his hand knocking him out of the chair onto the floor where several persons started kicking him. Taylor rolled himself into a ball and covered his head. He was then stood up and taken into another room and sat down on the floor facing defendant Pratt. Pratt sat on something that looked like a mattress holding a gun. Defendant Pratt asked him again if he was a US member and because his answer was not definite, Blue hit him in the head with a gun five or six times. After he had been asked several questions, Julio Butler came into the room, showed him a newspaper with some US members' pictures on it and asked him if he knew them. When Taylor replied he did not, Julio Butler hit him across the mouth with the back of his hand, knocking one tooth out and chipping another one and then gave him a towel. They went through his wallet looking for US identification and then defendant Pratt, Blue and Julio left the room. Later a man came in the darkened room and helped him lie down and took his shoes off. Since it was dark, he didn't know who the man was.[18] In the morning Elaine Brown and another "sister" took him home.)[19]

---

you struck Ollie Taylor?

"A. Yes, sir. Then I began to talk to everybody in the room, and tried to talk—

"MR. HOLLOPETER: Object to voluntary statements, your Honor.

"THE COURT: Sir, there is no question pending right now.

"THE WITNESS: Sorry.

"Q. BY MR. KALUSTIAN: Mr. Butler, where did Ollie Taylor stay that night, if you know?

"A. He stayed in the room. I washed him up and let him stay.

"Q. When did he leave?

"A. The next morning."

[18]The man who came into the darkened room could possibly have been Julius (Julio) Butler. (See fn. 17, *ante.*)

[19]The Ollie Taylor incident resulted in a criminal action entitled People v. Butler (Super. Ct. No. A245134) in which Nathaniel Clark, Ronald Freeman, Richard Johns, Roger Lewis, John Washington and the defendant herein (Pratt) were named as codefendants charged with false imprisonment (Pen. Code, § 236) and assault with a deadly weapon (Pen. Code, § 245) of Ollie Taylor as the victim. Butler pleaded nolo contendere.

*Defense*

Defense Testimony of Elmer Pratt (G or Geronimo):

Defendant Pratt[20] testified in his own defense. He denied ever being in Barbara Reed's hobby shop or in the tennis court in Santa Monica at any time including on December 18, 1968. He denied making a statement to witness Butler at any time on the evening of December 18, 1968; he further denied going out on a "mission" or later telling Butler that he had shot someone on that date or discussing with Butler on December 19, 1968, a newspaper article concerning the "tennis court murder." He denied that he ever went any place with a man named Tyrone. He knew a Tyrone Hutchison who was a Black Panther but didn't meet him until sometime in 1969.

In addition to his general denial of the crimes alleged, the defendant's main defense was an "alibi." He stated that "[he] was in Oakland, Oakland or Frisco. [He] was in the Bay Area" on December 18, 1968. He went to the Bay Area either on the 13th, 14th or 15th of December 1968, to get acquainted with the BPP program. He did not return to Los Angeles until the day after Christmas, December 26, 1968. Although he went to San Francisco by airplane, he did not remember the airline. He did not buy a ticket himself because it was given to him by Bunchy Carter and "it was a sister who got the ticket." Franco Diggs (now deceased) drove him to the airport. When he arrived in San Francisco, he took a cab to the San Francisco BPP office where he saw "two sisters." He spent the night at "a Panther pad" above a drugstore with others including Fred Bennett and Richard

---

[20]BACKGROUND: Pratt was born and raised in the State of Louisiana. In 1965 after graduating from high school he joined the United States Army* and served in Vietnam. He was honorably discharged from the Army at Fort Bragg, North Carolina, on May 27, 1968. In September 1968 he drove with his sister, Emelda Granger, to California, in his 1967 GTO Pontiac convertible (red body with a white top), bearing North Carolina license plates (later determined to be the getaway car, see *ante*). He then enrolled as a full-time student at UCLA in a special program financed by the federal Office of Economic Opportunities (OEO) majoring in liberal arts and black studies. It was at UCLA that he met Bunchy Carter and joined the BPP.

---

*During direct examination at the trial, the following colloquy occurred between defendant Pratt and his defense counsel:
"Q. What did you do after leaving high school?
"A. I joined the service.
"Q. That's the United States Army?
"A. United States *Imperialist* Army, correct." (Italics added.)

Brown. The next day he went to the National BPP office in Oakland. He met a sister "named Jackie, who [he] was with most of the time while [he] was in the Bay area." He also met David Hilliard, went to meetings, went out into the community and sold Panther papers. He also "went to a party at this pad, we went to Dr. Shapiro's. I remember his pad." About a week after he had gotten up there, he heard that Franco Diggs had been killed on the 19th of December. He testified that he was continuously in either San Francisco, Berkeley, or Oakland from the time of his arrival on the 13th, 14th or 15th of December 1968, until his return to Los Angeles on December 26, 1968, and "think[s]" that he was at David Hilliard's house on the evening of December 18, 1968.[21]

In respect to the 1967 GTO Pontiac convertible identified as the getaway car from the "tennis court murder" he admitted that he brought it into California with North Carolina license plates on it, that its original color was red and white, and that it was repainted blue but not under his direction. He stated the BPP took over the payments on the car and other Black Panthers drove it.

In respect to the .45 caliber automatic used in the killing of Caroline Olsen, he denied that it was his weapon or that he ever had possession of it including on December 18, 1968. On cross-examination he admitted that he was familiar with such a weapon from his Army training, could field strip (assemble and disassemble) it and knew that the barrel could be replaced. He denied ever carrying such a weapon.

In respect to facial hair, he stated that when he came to California in September 1968 he had a moustache and chin growth and had the same hair growth on his face on December 18, 1968, but he may not have

---

[21]The reporter's transcript contains the following colloquy with Pratt:

"Q. Where were you on December 18, 1968?

"A. 'I was in the Bay Area.

"Q. Specifically where were you?

"A. Specifically, the best of my recollection? [¶] I think I was at David Hilliard's house.

"Q. You said 'I think.' Is that your best recollection?

"A. Yes."

Defendant Pratt also testified that he went to a party on December 22, 1968, with a sister and after the party they went to a pad and slept; the two of them stayed there all the next day and went to another party on Christmas day, December 25, 1968.

had hair on his chin on that date. He recalled shaving the whiskers off of his chin for Bunchy Carter's funeral in January 1969.[22]

In respect to a safari or bush jacket, he denied having one of his own until 1969 but prior to that Bunchy Carter had one and he (Pratt) would wear Carter's bush jacket on occasion.

Defendant Pratt testified that he met "Julio" Butler in November 1968 but was never a close friend; in fact "I kind of suspected the dude all along, you know. He always seemed suspicious to me, you know"; and that when he (Pratt) became deputy minister of defense of the BPP in Southern California in April 1969 "Julio" Butler wanted his job.

THE OLLIE TAYLOR INCIDENT:

Defendant Pratt's testimony in the instant case in respect to the circumstances surrounding the Ollie Taylor incident was markedly different from that of Julio Butler and the victim, Ollie Taylor (see *ante*). Defendant Pratt's testimony essentially was that when he (Pratt) arrived at Butler's apartment with Blue (Roger Lewis), Ollie Taylor was already there as was Butler, Long John Washington and Ronald Freeman; that Ollie Taylor was sitting down and his whole face was bloody; that Butler, who had been drinking, started to justify what was done by saying Ollie Taylor "had been shot into the Party [BPP] by the US organization"; that he (Pratt) told Butler that wasn't the manner to deal with suspects of the US organization and immediately relieved Butler of his position (in charge of security and a section leader) and placed him (Butler) on house arrest.

---

[22]Following is the testimony of defendant Pratt in respect to his facial hair on December 18, 1968:

"Q. Did you have hair on your face on December 18, 1968?

"A. Yes, I did.

"Q. What hair did you have on your face then?

"A. The same hair I have on my face now.

"Q. That is, a moustache with the ends going downward below your mouth and more or less making a circle with whiskers at your chin; is that correct?

"A. Yes. You see I can't be too positive on that though.

"Q. Please keep your hand down from your face.

"A. This may have been off, you know, but to my best recollection, I had this (indicating).

"THE COURT: You mean the hair on your chin might have been off?

"THE WITNESS: Yes."

OTHER DEFENSE TESTIMONY

In addition to several local Black Panther members testifying that they did not see defendant Pratt in the Los Angeles area for a short period of time before and after December 18, 1968, three Black Panthers testified that they saw Pratt in the San Francisco-Oakland Bay Area attending a series of BPP meetings and functions from about December 12, 1968, to December 26, 1968.

Defense witness Shirley Hewitt of Oakland, California, testified that in December 1968 she was a member of the BPP and that she had worked on a book with Bobby Seale for about two weeks before she started working as a secretary at the national headquarters of the BPP in Oakland on December 1, 1968. She testified that she "thinks" she saw defendant Pratt at the BPP headquarters in Oakland on Monday, December 16, 1968, when he was introduced to her by Rosemary Gross. Defendant was wearing a powder blue suit and blue suede shoes. She "thinks" she saw defendant again the following Wednesday, December 18, 1968, at David Hilliard's house at a central committee meeting where June Hilliard (David Hilliard's brother), John Seale, Pat Hilliard, Kathleen Cleaver, Rosemary Gross and a person called "Mojo" were also present. She testified that Pratt always wore a moustache and a goatee and his facial appearance was the same at Bunchy Carter's funeral which she also attended.

Defense witness Jacqueline Wilcots from Richmond, California (in the Bay Area) stated that she was a member of the BPP, met Pratt in December 1968, took him to a birthday party for her cousin on December 16, 1968, and thereafter drove him to various BPP functions in the Bay Area including several meetings at David Hilliard's house. She took him to David Hilliard's house "a little after dark" on December 18, 1968, and the meeting lasted "all night" and on that date defendant wore a "Fu Manchu" type of moustache down the sides of his mouth but did not have a goatee to her knowledge.

On cross-examination witness Wilcots stated that she did not know until a month before she testified that Pratt was charged with murder and did not know until the previous Friday (she testified on Monday, July 10, 1972) the specific time the murder occurred. She heard about the trial from a "sister [Renee Merritt] on the street" and voluntarily came down for the trial "to help a brother out." To her knowledge Pratt did not have a goatee when he left the Bay Area in December 1968.

She further testified that defendant's facial hair was approximately the same in a photograph (defendant's exhibit (B)) as when she saw him in the Bay Area and also "basically the same" as he appeared in court.

Defense witness Kathleen Cleaver came voluntarily from Algiers, Algeria, specifically to testify at the trial. She stated in December 1968 she lived in the Bay Area and was a member of the central committee of the BPP; and that she saw defendant Pratt at a series of meetings and remembers seeing him at the home of Dr. and Mrs. Shapiro and at David Hilliard's home in Oakland where the others present were his brother, June Hilliard, his wife, Pat Hilliard, Bobby Seale, possibly Emery Douglas and members of the BSU at San Francisco State College. On cross-examination she stated that the first time she told defense counsel of her testimony was the day before she testified in the courtroom and was not even aware of the actual date of the murder until within the week before she testified.[23]

---

[23]Following is a portion of the colloquy between the prosecution attorney and witness Kathleen Cleaver during cross-examination:

"Q. ....When was the first time that you communicated to the defense lawyers what you have told us today, or essentially what you have told us today?

"A. I would say in this courtroom.

"Q. Have you talked with the defense lawyers at all about what you were going to testify to?

"A. Right, but I didn't arrive in Los Angeles until Tuesday. Was today Wednesday? I arrived yesterday, and that was the first opportunity I had to even talk with the lawyers.

". . . . . . . . . . .

"Q. Is it a fair statement that in November of 1971 you knew that he was charged with a murder, but you didn't have the slightest idea when it was supposed to have occurred?

"A. Only that he was charged with the murder in 1971, and that when this murder took place I wasn't very familiar with it, no one talked very much about that murder case. It was not considered a particularly important case at that time.

"Q. I appreciate that that murder was not very important at that time.

"A. That case. He had—Mr. Pratt had so many cases, you see.

". . . . . . . . . . .

"Q. Thank you. In November of 1971 is it fair to say you generally discussed with Mr. Mc Kissack the fact that Elmer Pratt was charged with a murder, but not when it was supposed to have occurred; is that a fair statement?

"A. That is a fair statement.

"Q. Is it a fair statement that in November of 1971 you were not aware of when the murder was supposed to have occurred?

"A. No. I was only aware of when he was charged with the murder.

". . . . . . . . . . .

"Q. Is it fair to say that nobody contacted you from the time that Mr. Pratt was formally charged around February of 1971 and until relatively recently regarding your knowledge of the events of December of 1968?

"A. That is a fairly fair statement, but one thing, you have to understand something else—

Although the defense did not dispute that the getaway car from the murder scene on December 18, 1968, was the vehicle Pratt owned and brought into California bearing North Carolina license plates, a series of defense witnesses testified that the BPP had made payments on the getaway car and that it had become a "community car" and that those members in the Los Angeles central headquarters had access to the car including Julius Butler who had driven it on occasion.

There was defense testimony to the effect that several other members of the BPP had beige safari jackets and defendant Pratt stated that he did not purchase one until early 1969 but occasionally had worn one owned by Bunchy Carter. (A safari jacket was found in defendant's possession similar in description to the one witnesses described as being worn by the shorter of the two gunmen.)

The defense in addition to extensive cross-examination of prosecution witnesses put on a vigorous defense directed at impeaching the prosecution witnesses' identification of defendant in the hobby shop with particular emphasis on his facial hair on December 18, 1968. Witness Reed had prior to trial referred to defendant as "clean looking" or "clean shaven" and also stated at trial that she never recalled whether he had a goatee or moustache. A series of defense witnesses stated that defendant was never without hair on his face consisting of a moustache and chin hair. Defendant and his sister, Emelda Granger, testified that defendant cut off his chin hair for Bunchy Carter's funeral in January 1969. Defendant's older brother, Charles E. Pratt, Sr., also a Black Panther, testified that he helped get him into UCLA and into the dormitories under a scholarship for minorities paid for by the federal OEO. He also introduced into evidence a photograph which he said was taken the weekend following Christmas 1968 showing defendant Pratt with a thin moustache and chin hair. The trial judge also permitted defense

---

"MR. COCHRAN: She can explain the answer, your Honor.
"THE WITNESS: No, I would like to put that into a proper context, because I don't think you are fully aware of the relationship that I have had to the defense of the defendant, the defense of Geronimo.
"I have been in touch with his attorneys about his cases, with his comrades on his defense committee involved in political fund raising and speech making about his cases, and maintained a considerable amount of contact with the situation as a whole situation, and not about the specific details of each particular case, so I have been in contact with the attorneys, his comrades, and people over a period of time beginning in December of 1970 up until this very minute.
"Q. And at no time up until just within the last week did you know the date of this alleged murder; is that right?
"A. That's correct."

witness Robert Buckout, an associate professor of psychology at California State College at Hayward, to testify at length to the effect that eyewitness identification is generally unreliable.

## Rebuttal

The prosecution's main rebuttal witness was Joseph Oldfield, the technical manager for Polaroid Corporation, who testified that Polaroid had a method of coding the film it manufactures to determine the date of manufacture. He testified the polaroid photograph (defendant's exhibit (B)) which defendant's brother, Charles E. Pratt, Sr., had testified was taken shortly after Christmas 1968 showing the condition of defendant's facial hair could not have been taken on that date. Witness Oldfield testified that the code number on the photograph showed that the film was manufactured May 28, 1969, between 3 and 11 p.m. He further testified that company records showed that machine No. 33 which produced defendant's exhibit (B) was not even in operation during the year 1968.

### EVIDENCE ON HABEAS CORPUS

### FBI Correspondence and Documents

Defense counsel and the deputy attorney general have supplied this court copies of considerable correspondence and FBI documents for review in connection with the defendant's petition for a writ of habeas corpus. The correspondence basically consists of letters between Congressman McCloskey and William H. Webster, director of the FBI, and between California Attorney General George Deukmejian and Lee Colwell, acting director of the FBI. In addition the record contains letters from Deputy Attorney General Michael Nash and from defense counsel to this court, as well as correspondence from Herbert D. Clough, Jr., special agent in charge of the FBI, to this court, copies of which were supplied to opposing counsel. During oral argument Deputy Attorney General Nash displayed on the counsel table stacks of FBI documents consisting of thousands of FBI reports pertinent to the Pratt case which the FBI had supplied all counsel. Defense counsel and the deputy attorney general after going through those voluminous records with a fine tooth comb furnished this court copies of those specific FBI reports each felt germane to defendant's petition for habeas corpus. These reports were screened by the FBI before release and portions which would disclose security matters and names of informants were

blotted out (deleted) in accordance with applicable federal laws and regulations.

The above records reflect that by letter dated April 6, 1979, Congressman McCloskey in his official capacity asked FBI Director Webster to "institute an internal FBI investigation of the Pratt case to determine whether there is any evidence in the files to indicate the possibility of Pratt's innocence or doubt as to Pratt's guilt." Congressman McCloskey acknowledged that he was aware that "Mr. Pratt's attorneys [are] engaged in an FOI Act lawsuit with the FBI at the present time."

Following an exchange of correspondence between Congressman McCloskey and FBI Director Webster culminating in a meeting between the two on January 23, 1980, Director Webster formed a "Special Pratt Task Force" to prepare a written synopsis of what the FBI's search of their files disclosed. By letter dated March 10, 1980, FBI Director Webster, a former federal judge, sent Congressman McCloskey a "Synopsis of Pratt Inquiry" resulting in a file review far exceeding normal file review procedures consisting of a page-by-page, line-by-line review of all files in the FBI Washington, Los Angeles and San Francisco offices relevant to the Pratt case. The 11-page synopsis concludes with the statement: "The Task Force did not uncover any information that tends to exculpate Pratt of the 1968 'Tennis Court Murder.' It found no indication that the FBI had Pratt under surveillance on December 18, 1968, the day of the murder. Nor did it find any information supporting Pratt's alibi that he was not in Los Angeles at the time of the murder. Finally, it found no evidence to corroborate Pratt's argument that his trial and conviction were the result of COINTELPRO."

FBI Director Webster's letter dated March 10, 1980, to Congressman McCloskey and the "Synopsis of Pratt Inquiry" are attached hereto as Appendix C.

This court's analysis of pertinent correspondence and reports pertaining to the Pratt case supplied by the FBI pursuant to the FOI Act and on request of counsel prior to and subsequent to March 10, 1980, is distilled below focusing on *critical dates and time frames*:

*In respect to December 18, 1968* (the date of the tennis court murder), there is no documentation indicating that defendant Pratt was

"targeted" by COINTELPRO for "neutralization." The absence of any such documentation is consistent with the evidence which discloses that Pratt had just come to California in September 1968, enrolled as a student at UCLA, met Al Prentice (Bunchy) Carter and joined the BPP. Pratt held no rank in the party hierarchy on that date although there is evidence that he was a bodyguard for Bunchy Carter.

Nor does the FBI documentation indicate that Julius (Julio) Butler had been enlisted by the FBI as an informant or that the FBI had any other contacts with him whatsoever as of that date.

*In respect to August 10, 1969* (the date Julius Butler gave the sealed envelope to Sergeant Rice containing the letter implicating Pratt as the tennis court murderer), there are no FBI reports showing that Julius Butler was an FBI informant or that the FBI had even contacted him as of that date. To the contrary the content and tenor of FBI contacts *after* that date and an affidavit of Sergeant Rice dated November 19, 1979, supplied by defense counsel indicate that while FBI agents were aware of "Julio" they had no part in his (Butler's) decision to write the letter and give it to his friend, Sergeant Rice, for safekeeping.

FBI records disclose that the FBI first contacted Butler *after* August 10, 1969. The *content and tenor* of an FBI contact with Butler on August 13, 1969 (dictated 8/14/69), indicates no *prior* FBI contacts and discloses Butler's disenchantment of the BPP, his fear of death from BPP members, and that he was questioned about his possession of a .45 caliber Thompson submachine gun in violation of the National Arms Control Act.[24]

---

[24]Following is the FBI report dated August 14, 1969, of an interview with Butler:
"Date—8/14/69

"JULIUS CARL BUTLER, 2807-1/2 Hillcrest Drive, Los Angeles, California, telephone number 731-1069, was contacted at the corner of Potomac Avenue and 29th Street, Los Angeles, California. He was informed of the identity of the interviewing agents and the purpose of the interview. He supplied the following information.

"BUTLER said that he joined the Black Panther Party (BPP) in the summer of 1968, and was an active member until he was expelled August 1969. He said that he contacted BOBBIE SEALE about the trouble he was having with the Los Angeles leaders of the BPP and stated his intention of writing a position paper stating why he had acted in a manner contrary to party policey [*sic*]. SEALE told him not to bother because the paper would not be read. BUTLER said that he could no longer relate to the leaders of the BPP because the aims and purposes of the BPP had changed and were no longer relevant to the needs of the people. He said that he had hung up on several of the Los Angeles BPP leaders which includes ELMER PRATT, also known as Geronimo and ROGER LEE LEWIS, also known as Blue, when asked to do certain things. He declined to elaborate what he was asked to do. He added that he worked for the Black cause before the BPP came into existence and intended to work for 'his people.' He added that

During the trial the evidence was to the effect that Sergeant Rice requested Butler's permission to turn the sealed letter over to his

---

he was a member of the Black Congress, Los Angeles, California, before he was a member in the BPP.

"BUTLER said that the BPP had degenerated from its original high goals and was now similar to a 'Black Mafia.' He said that the only thing that concerned the leaders of the Party was how to line their own pockets in the easiest manner. He described the Party as a group of petty criminals who would take any action necessary to further their own desires. He added that many members of the BPP feel as he does and that the Party was falling apart.

"BUTLER said that funds for the Party's activities came from sale of newspapers, fund raising rallies and donations from interested parties. He stated he did not know any of the interested parties who donated money and could not say if any of the money came from organizations outside the United States. He said that the money that is now being obtained is being used to make life easy for the leaders, instead of being used for the good of the Black community or the Party. He illustrated this by saying that the leaders would be bailed out of jail several times while the rank and file member would be left in jail. BUTLER described himself as above the rank and file but below the top leaders when he was in the BPP. He said he was currently out on bond, using his own money, in an (deletion) case involving (deletion) which comes up in court (deletion).

"BUTLER said that because he had disagreed with the BPP leaders and because he had refused to carry out some of their orders, which he would not explain further, he has received several threats on his life. The threats were implied rather than specific and were received both from known people and as anonymous telephone calls. He said that both 'Blue' and 'Geronimo' had indirectly implied that he was going to be killed. He believes that his life is in constant danger. He said that he believes he is becoming paranoid over the whole situation. He added that he usually carries a pistol on his person when he is on the street. When he is in the house, he has a barricade on his bedroom window and is unable to sleep well. He said that he believes that he will be shot or attacked from ambush when the Panthers feel the time is right.

"BUTLER said that the only white people he knows of personally that are friendly to the BPP are (deletion). He said he was at another white persons house for a social party but did not know who gave the party or where the house is located.

"BUTLER said that he has written a letter containing information relating to an involvement of BPP members in an affair that could 'put them in the gas chamber.' He said he was a witness to this affair but would not explain further. He added that the letter was given to a friend.

"At this point in the interview, BUTLER was shown a form by (deletion) on which was written his rights. He read the form and stated that he understood his rights, and was willing to answer questions. He declined, however, to sign the waiver form.

"BUTLER supplied the information as follows voluntarily:

"BUTLER said that he at one time had personal possession of a Thompson .45 caliber sub-machine [sic] gun. He said he bought this weapon some time ago from an individual he declined to name. He said he maintained this weapon at various locations, including his apartment. He said that his Thompson was being held by a friend of his in a safe place. He declined to give further detail. He would not state if the weapon had been used to commit any crime. He further declined to give a signed statement of the above information.

"When BUTLER was asked to come to the Los Angeles Office of the FBI voluntarily for further questioning, he stated that he wanted to think it over. He further stated that he would like to talk to a friend of his to determine what the best course of action is. BUTLER was told he would be recontacted."

(Sergeant Rice's) superiors to be opened because the existence of the sealed letter was known to L.A.P.D. internal security and that he (Rice) was under investigation for an unrelated matter. (See trial evidence, *ante.*)

*Defense trial counsel's objection to any questions about the circumstances surrounding the delivery of the letter was sustained.* In support of the petition for habeas corpus before this court present defense counsel have filed with the court a declaration of DuWayne Rice under penalty of perjury dated November 19, 1979, stating that FBI agents observed Butler hand the sealed envelope to Sergeant Rice and asked Rice what it was Butler had given him. Rice told the agents to ask Butler and they called after Butler using the name "Julio" but Butler did not respond and left the area.[25]

---

[25]The declaration of DuWayne Rice dated November 19, 1979, is as follows:

"I, DuWayne Rice, declare under penalty of perjury as follows:

"I was a Los Angeles Police Officer from 1955 until 1975 when I left the police force. I am presently employed by Sammy Davis Jr.

"Sometime in 1969 Mr. Julio Butler, then a friend of mine, called me and asked me to meet him at a streetcorner [*sic*] in Los Angeles; I then proceeded to the streetcorner [*sic*] where I met Mr. Butler. Mr. Butler gave me an envelope that was sealed and asked me to hold it for him as an 'insurance policy' and only open it upon his death. He did not tell me the contents of the letter. I agreed to hold the letter and do as he had asked.

"As Mr. Butler walked a short distance away I was approached by two men who identified themselves as F.B.I. agents and asked me for whatever Julio Butler had given me. I refused and told them to ask Butler for it, as he was still close by, and within sight. They yelled to him by the name Julio, indicating to me familiarity between the F.B.I. agents and Julio Butler. Julio Butler did not respond and they did not approch [*sic*] him. Butler then left and I also left soon after.

"At this time I did not give the F.B.I. agents the letter or open the letter. In fact, to this day, I have never read the letter Mr. Butler gave me. Soon after receiving the letter, I gave it to Captain Henry of the L.A. Police Department who placed it in his safe deposit box.

"Soon after this incident, The F.B.I. threatened to indict me for obstruction of justice for refusing to turn over the letter to them.

"Some time the next year I was involved in a fight with a white Los Angeles police officer. Due to this fight, and other allegations against me, I became the subject of an internal police investigation. During this investigation I was questioned by the Los Angeles Police Department regarding what Julio Butler had given me and ordered to turn it over to the police department. When I refused, I was threatened with being fired for refusing a direct order.

"I had not told anyone in the L.A.P.D. about receiving the letter except Captain Henry. Any contacts between Julio Butler and myself were never the subject of the charges brought against me by the internal investigation of the L.A.P.D.

"During this investigation F.B.I. agents came to see me and questioned me about what Julio Butler had given me in 1969. The F.B.I. agents demanded that I give them 'the letter.' I asked them how they knew it was a letter and they said Julio Butler told them he had given me a letter. I informed them if that was so, Julio Butler should ask

Three important pieces of direct and indirect evidence point to the fact that the FBI had no part in Butler's writing the letter or had knowledge of the contents thereof which implicated Pratt in the murder of Caroline Olsen on December 18, 1968.

*First*, it is noted that Julius Butler did not give the letter to the FBI but to a trusted friend (Sergeant Rice) for safekeeping only to be opened in the event of his death. Sergeant Rice's declaration dated November 19, 1979, (see fn. 25, *ante*) indicates that although the FBI agents were aware that Butler was a Black Panther and that he was called "Julio" since Butler gave the letter to a friend rather than the FBI and refused to respond that the agents did not know what was contained in the letter. Furthermore, FBI records have failed to reveal any official contact with Butler on or before August 10, 1969, the first contact being on August 13, 1969.

*Second*, logic dictates that if the FBI with the aid of local law enforcement officers had targeted Pratt and intended to "neutralize" him by "framing" him for the December 18, 1968, murder of Caroline Olsen they would not have waited over 14 months after the letter was handed to Sergeant Rice to have the contents of the sealed letter disclosed. Moreover, Butler's relationship with Pratt had changed dramatically as of August 10, 1969. Following the assassination of Bunchy Carter and John Huggins at UCLA the National BPP in April of 1969 had elevated Pratt to the top leadership position by naming him minister of defense of the southern California branch of the party. As of that date, as hereinbefore related, Butler had become disenchanted with the meth-

me to give them the letter.

"Soon after, Julio Butler called me and asked me to give the letter to the police authorities. I told him I would but asked him why he had told them about the letter since I had almost gotten [*sic*] fired for refusing to give it to the FBI and the LAPD. He said he was sorry, but the FBI was putting pressure on him, and 'jamming him' and that I should give the letter to them.

"I then asked Captain Henry to give me the letter that I had given him and he did. I then gave it to a superior in the police department.

"Soon later I was informed by police officials that I would be criminally prosecuted for withholding evidence about the commission of a felony. I told them if they looked at the envelope they could easily see that the envelope had the original seal on it, that I had never opened it, and that I did not know the contents of the letter.

"I did not give the letter to either the FBI or the LAPD prior to Julio Butler asking me to do so because I had given my promise to Mr. Butler that I would not open the letter or give it to anyone until he asked me to do so or until his death.

"I will testify in a court of law to the above facts if I am asked to do so.

"I swear that, to the best of my knowledge, the above is true and correct.

"Dated: November 19, 1979.

"/s/ DuWayne Rice"

ods used by the Black Panthers and had both quit and had been expelled from the party. In addition, Butler, in fear of Pratt who had threatened his life, had given the letter to Sergeant Rice as an "insurance policy" for his (Butler's) own protection.

*Third*, and foremost, it is inconceivable that the FBI agents could have obtained the "conspiratorial" aid of (a) the two eyewitnesses who positively identified Pratt; (b) witness Lachman who described the getaway car; (c) the officials in the Motor Vehicle Departments of North Carolina and California to establish that Pratt's car was used in the murder; and (d) the aid of ballistics expert Wolfer who identified the murder weapon in order to "frame" the defendant. Nor has the defense supplied any cognizable evidence to this court which refutes the veracity or accuracy of the above evidence, *all of which corroborated Butler's testimony.*

*From October 20, 1970* (over 14 months after the sealed envelope was given to Sergeant Rice by Butler), when the sealed envelope was opened, to and including the date of and through the trial the FBI documents supplied do not establish that Butler either "worked" for or was an "informant" (in law enforcement parlance) for the FBI. (See discussion, *infra.*)

The trial evidence showed that the letter was opened because Sergeant Rice was under investigation by internal investigators of the L.A.P.D. who knew of the existence of the sealed letter and he asked Butler if he could turn it over to the investigators. Sergeant Rice's declaration under oath dated November 19, 1979 (see fn. 25, *ante*) indicates that Butler also authorized Sergeant Rice to turn the sealed envelope over to the L.A.P.D. internal investigators because the FBI was "jamming him." It would be unnatural for the FBI not to be inquisitive about the contents of the sealed envelope once aware of its existence. The FBI reports furnished this court contain information that FBI agents contacted Butler for a period of time between August 13, 1969, and April 28, 1972, first concerning his involvement in the BPP, then in connection with his violation of the National Firearm Control Act and finally relative to the propensity for racial unrest and violence in the black community. As previously noted the FBI report dated August 14, 1969, (see fn. 24, *ante*) shows Butler was interviewed by FBI agents and told them of his disenchantment with the BPP, his fear that he was going to be killed and the fact that he had written a letter con-

taining information relating to an involvement of BPP members in an affair that could "put them in the gas chamber"—"but would not explain further" and "that the letter was given to a friend." Butler then was given his rights and questioned about a .45 caliber submachine gun for an individual who he (Butler) declined to name.

An FBI report dated September 12, 1969, indicates FBI agents again contacted Butler, gave him his rights and again inquired about a .45 caliber Thompson submachine gun Butler bought in October 1968. Butler told them he disposed of the machine gun but would not elaborate because "he [Butler] did not want to 'jam' anyone."

An FBI report dated October 30, 1969, shows that Butler was again contacted by FBI agents, given his rights, and questioned about the .45 caliber Thompson submachine gun at which time Butler "refused to admit that he ever owned or possessed" such a weapon and stated that "he was not admitting anything now" and refused to give any information concerning any possible violation of the National Firearms Act by himself.

An FBI report dated November 7, 1969, indicates that he was willing to provide information to the FBI on a confidential basis but that the FBI wished "to determine his potential as a PRI."

An FBI report dated December 1, 1969, indicates that FBI agents contacted Butler on November 24, 1969. The report states: "He [Butler] advised that he heard federal authorities were checking at the Western Surplus Store to determine if he [Butler] had been purchasing weapons." He (Butler) said if the FBI is interested, he does not even know where the Western Surplus Store was, but does own a Magnum which he purchased elsewhere.

Seven FBI reports from December 1, 1969, to April 17, 1970, with many deletions mainly referred to such matters as Los Angeles BPP membership and weaponry, e.g., that since the killing of Al Prentice Carter new memberships in the party were allowed only on special recommendation of existing members; "that the Los Angeles BPP had tried to buy silencers for rifles and pistols" and since it was "unable to purchase them they tried to make some"; and that "an unknown source" stated that "the Oakland BPP allegedly had a rocket launcher and that ELDRIDGE CLEAVER, BPP Minister of Information, had a .50 caliber

machine gun mounted on a truck." The only mention of defendant Pratt was "that Pratt had a machine gun was common knowledge in the BPP" and that "Pratt also had a caliber .45 pistol." There was no mention of Pratt in respect to the "tennis court murder" contained in these reports.

(The foregoing series of FBI contacts with Butler concerning their investigation of possible National Firearms Act violations in respect to his purchase and disposal of a .45 caliber Thompson submachine gun could explain Butler's statement to Sergeant Rice that "the FBI was" putting pressure on him, and "jamming him." [See fn. 25, *ante.*])

Monthly FBI reports for the period July 31, 1970, through April 28, 1972, except the report of January 20, 1971, show FBI contacts with Butler and each contains the following general statement: "source stated that though he believes the general propensity for racial unrest and violence to exist in ghetto areas he was unaware of intended or possible outbreaks at this time."

An FBI report dated January 20, 1971, states: "JULIUS CARL BUTLER, 2807-1/2 Hillcrest Drive, telephonically advised that he has not been affiliated with the Black Panther Party (BPP) since his expulsion in 1969. He said he knows nothing regarding an active BPP underground and has no intention of reaffiliating with the BPP.

"He stated he had furnished information implicating ELMER PRATT in a murder at Santa Monica, California, in 1968, and thought he was going to be called to testify against PRATT in the matter.

"He stated he still is employed as a beautician at 4520 West Adams, Los Angeles."

*In respect to any FBI documents indicating defendant Pratt's whereabouts on December 18, 1968 (the day of the tennis court murder),* only two were discovered which are remotely relevant to defendant Pratt's "alibi" defense.

One report *indexed under the name of Kathleen Cleaver* states: "On 12/19/68, (deletion) (reliable) reported that on evening of 12/18/68, BOBBY SEALE stated he was going to pick up some people, not identified, including KATHLEEN [Cleaver] and go to the residence of (deletion) at 7:30 PM (12/18/68)." The name of the person at whose residence the

people were going was later released as that of Dr. Shapiro. (See fn. 27, *infra.*)

The other report *indexed under the name of John Jerome Huggins, Jr.*, states: "On 12/26/68, (deletion) a highly sensitive, reliable source, whose identity must be protected at all costs, reported that as of 12/20/68, an L.A. brother known as Geronimo arrived in Oakland. Source further reported that as of 12/23/68, Geronimo was not connected with National BPP headquarters but he reported that he was still in town. He was told by the National BPP representative who talked to him that 'that's cool, stay where you are.' Source indicated that the inference was that Geronimo was hiding from someone. [¶] Los Angeles will determine if possible if Geronimo is an alias used by the Subject."

The two FBI reports quoted above and their relevancy to defendant's petition for habeas corpus are discussed *infra.*

*In respect to FBI informants in the defense camp*, by letter dated January 16, 1980, Lee Colwell, acting director of the FBI, sent a letter to Attorney General George Deukmejian of the State of California responding to a request from California Deputy Attorney General Michael Nash on January 7, 1980, enclosing 40 pages of documents setting forth contacts between the FBI and Julius Butler and 2 pages of documents in relationship to defendant Pratt's whereabouts in late December of 1968,[26] which have been previously summarized herein.

[26]The letter from Acting Director Colwell to Attorney General Deukmejian dated January 16, 1980, reads as follows:

"Enclosed as requested in a telephone conversation between Roger Cubbage, Attorney, Criminal Division, U. S. Department of Justice, and Deputy Attorney General Michael Nash, on January 7, 1980, are 40 pages of documents which set forth contacts between the FBI and Julius Butler and two pages of documents that indicate Pratt's whereabouts in late December of 1968. These documents were located through a review of files related to Julius Butler at Los Angeles, California, and FBI Headquarters. All contacts with Butler should be contained in these files. However, all references to Julius Butler's name in Los Angeles and at FBI Headquarters have not been reviewed due to time constraints and manpower and cost considerations. Therefore, while not probable, the possibility exists that additional contacts may exist that were not revealed during this voluminous review.

"In response to the question as to the reason 'Julius' appears at the top of Page 13 of a Los Angeles report dated June 2, 1969, on Pratt, which was furnished to you by Congressman McCloskey, the name appears for FBI indexing purposes. The meeting referred to on Page 13 of this report was held at the residence of Julius Butler early in 1969, and while he was not the source of the information contained on this page of the report, his name was marked for indexing at FBI Headquarters as 'Julius Carl Butler.' However, in the Xeroxing process only 'Julius' remained on the copy furnished to you.

"The FBI review of the files relating to the Pratt matter disclosed the following

By letter dated July 28, 1980, Deputy Attorney General Nash forwarded to this court, with copies to defense counsel, a copy of a letter of the same date (July 28, 1980) received from Francis M. Mullen, Jr., executive assistant director of the FBI, pertaining to two informants who were in the position to obtain information on defendant Pratt's defense strategy.[27] The letter contained an offer to submit the documents in respect to the two informants to this court for an "*in camera ex parte* inspection." This court accepted the FBI offer and conducted the *in camera* inspection on August 21, 1980. Our *in camera* inspection confirmed that the two informants did not testify at the trial and the FBI analysis of the documents inspected was essentially accurate in all respects.

---

information:

"During the period of time surrounding the murder trial and pretrial stages, the FBI had informants reporting on Pratt and his close associates as part of the FBI's investigative responsibilities concerning the Black Panther Party. These informants reported on Pratt's conversations and activities.

"Among the items reported were the following from one of the above informants:

"Item 1) Pratt was not happy with his present lawyer.

"Item 2) Problems in the details of Pratt's arrest by the FBI were discussed with Pratt's close associates, including one of his former attorneys.

"Item 3) Pratt was interested in obtaining a witness or witnesses to refute Julius Butler's testimony by showing that Butler harbored a grudge against him.

"Item 4) Information discussed in one of Pratt's former attorney's offices concerned strategies to be used for a potential appeal if Pratt were convicted.

"Item 5) The testimony of key witnesses was analyzed by individuals associated with the Pratt defense team.

"It should be understood that no record was located by the FBI review of the Pratt matter that any information received from this informant was referred to the Los Angeles County District Attorney's Office prior to, during or after the Pratt murder trial until the briefing of that Office by the Department of Justice and the FBI on December 12, 1979.

"Further, the FBI review located only one instance where any FBI informant, including this one, obtained and reported any information that could be construed as defense strategy in the Pratt trial. It should be noted in this instance that there was no indication located in FBI files that any attorney was present during the discussion. It should also be noted that this is the only instance located wherein this informant reported anything that might be construed as defense strategy in the Pratt trial. On the other occasions the informant only reported a presence at or a knowledge of the meeting.

"It should also be clearly understood that the FBI review of this matter did not locate any indication that any defense strategy information or that any information that could possibly have been construed as Pratt defense strategy was ever disseminated outside the FBI until the briefings in December of 1979. This informant did not testify at the Pratt trial, nor did any other FBI informant."

[27]The letter from Francis M. Muller, Jr., dated July 28, 1980, reads as follows:

"Reference is made to (1) prior contacts between Federal Bureau of Investigation (FBI) officials and Deputy Attorney General (DAG) Michael Nash regarding information contained in FBI files relating to Elmer 'Geronimo' Pratt, (2) our letter to you, dated January 16, 1980, wherein you were provided with copies of FBI documents for

By letter dated August 22, 1980, Deputy Attorney General Michael Nash, as a supplement to respondent's return, supplied this court and your use in responding to Pratt's Petition for Writ of Habeas Corpus in the California State Courts, and (3) the 'Synopsis of Pratt Inquiry,' dated March 10, 1980, that was sent to Congressman McCloskey, and which has been previously furnished to your office.

"In late 1979, an FBI Task Force reviewed certain documents in order to determine whether the FBI's Counter Intelligence Program had any impact on Pratt's trial and conviction for the 'Tennis Court Murder.' Referenced letter and Synopsis set forth the FBI's findings as a result of this review. The FBI has voluntarily processed the documents located by the Task Force (using Freedom of Information Act processing procedures) and released them to Pratt. We have provided a copy of these documents to DAG Nash, as well, for his use in responding to Pratt's Petition for Writ of Habeas Corpus.

"I. During review of these documents at FBI Headquarters, employees of the Freedom of Information—Privacy Acts Branch, Records Management Division, found references to two FBI informants who appeared to have had access to information about defense strategy. Accordingly, the Bureau decided to review the field office informant files on these two individuals to ensure you are aware of all pertinent information regarding this matter.

"On July 17-18, 1980, the field office informant files on these two individuals were reviewed, pertinent documents located, and the documents returned to FBI Headquarters for analysis. Based on the Task Force review we found:

"(1) Both informants were in a position to obtain information on defense strategy regarding criminal proceedings wherein Pratt was a defendant.

"(2) While they were in a position to obtain such information, the informant reports state:

"(a) during the period when Pratt was a criminal defendant, he disappeared and would be going to North Vietnam for the purpose of leading a contingent of Black Panther Party (BPP) members and sympathizers in a military offensive against American troops;

"(b) one of Pratt's attorneys was exceptionally brilliant, was caught up in the legal defense of BPP members (particularly Elmer Pratt), and had (it was believed) contacted Pratt on March 28, 1971;

"(c) there was a meeting at which defense strategy was discussed [however, Pratt was not at this meeting, the record does not establish that the informant was present during the discussion of strategy, and the files do not disclose the nature of the defense strategy];

"(d) as of May 1, 1971, a defense attorney was no longer as active in the Pratt case because of other commitments;

"(e) as of December, 1969, plans were being made by the BPP to smuggle Pratt out of the country; and

"(f) as of September 12, 1970, a bench warrant had been issued in Los Angeles for Attorney McKissack because of his failure to appear at the Pratt trial, and McKissack intended to appear before the Court.

"There is no indication in the records that the FBI disseminated any of this informant information to the local prosecutors.

"We have paraphrased rather than released the documents containing the informant information in order to protect the identities of our sources. We recognize, however, that our paraphrase may not be sufficient to enable the Court to reach a decision. We are willing, therefore, to submit the relevant documents to the Court for an *in camera, ex parte* inspection. Of course, we must be assured that the identities of our sources will be protected.

"II. In our January 16, 1980, letter to you, we released a number of documents, in-

defense counsel additional information gleaned from "the thousands of documents which have been in petitioner's [Pratt's] possession" and not filed by defendant Pratt with this court which are not exculpatory of defendant but tend to be inculpatory and refute defendant's claim that he was "framed" by the FBI. For example the additional documentation discloses:

(1) Although defense witness Kathleen Cleaver testified at the Pratt trial that she was in the San Francisco bay area from December 13 to 25, 1968, an FBI report dated January 9, 1969, states in part that "on 12/26/68, (deletion) a highly sensitive, reliable, source whose identity must be protected at all costs, advised that KATHLEEN CLEAVER reportedly went to Los Angeles, California on the night of 12/23/68 to attend a party given for her by SHIRLEY McCLAIN [*sic*], the actress."

(2) Defendant Pratt at time of trial testified that he always had facial hair consisting of a moustache and chin hair but shaved off his chin

---

cluding the document attached here as Appendix A.* As you can see, we excised the name of the owner of the residence mentioned in the document. This excision was taken pursuant to a privacy exemption in the Freedom of Information Act, and because the owner's identity—Dr. Shapiro—appeared to be of no value to Pratt. Pratt asserted in his brief that he was at the home of David Hilliard on the evening of the murder; evidence of a gathering at Dr. Shapiro's residence seemed irrelevant.

"We recently reviewed our notes from the transcript of Pratt's murder trial,[†] and as a result of that review we are releasing Dr. Shapiro's name. *See* Appendix B. The notes indicate that Kathleen Cleaver testified that Pratt was at the home of Dr. Shapiro sometime after December 13, 1968. Since the document attached at Appendix B, without Dr. Shapiro's name excised, is consistent with Kathleen Cleaver's testimony, we concluded that Dr. Shapiro's name should be released.

"The FBI Task Force review of this matter continues in response to questions posed by Congressman Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary. We are in the process of conducting interviews of current and past employees of the FBI and reviewing documents at both FBI Headquarters and field offices. It is anticipated that this investigation will be completed within 60-90 days, and while we do not expect that additional information will be discovered, if this occurs, you will be promptly notified."

---

*Appendix A to the letter read as follows:
"(deletion)AC SAN FRANCISCO 12/19/68
"SA
"KATHLEEN CLEAVER
"(deletion) W - BPP
"On 12/19/68, (deletion) (reliable) reported that on evening of 12/18/68, BOBBY SEALE stated he was going to pick up some people, not identified, including KATHLEEN and go to the residence of (deletion) at 7:30 PM (12/18/68)."

†In a footnote at this point Mr. Mullen stated: "In the Fall of 1979, as part of the Pratt inquiry, a Task Force member reviewed the transcript of Pratt's murder trial. The transcript was reviewed in Los Angeles, and notes were made summarizing the testimony of the witnesses."

hair for Bunchy Carter's funeral in late January 1969. An FBI report states that "on January 2, 1969, (deletion) advised that there was an individual by the name of 'GERONIMO' who was a member of the Los Angeles BPP 'underground' and a close associate of AL PRENTICE CARTER. The source described this individual as male, Negro, about 23 years of age, stocky build, about 5'7", single, unemployed, light complexion, and *clean shaven.*" (Italics added.)

(3) Another FBI report states that "on April 23, 1969, special agents of the Los Angeles FBI Office, located PRATT at 2506 Hillcrest Drive, Los Angeles, and attempted to interview him. PRATT denied his affiliation with the BPP and the fact that he holds the position of Deputy Minister of Defense for Southern California in the BPP. He admitted past acquaintances with AL PRENTICE 'BUNCHIE' CARTER and acknowledged he had met the Agents when they had interviewed CARTER prior to the time of his death." An FBI report dated April 25, 1969, states that Pratt "is currently the head of the BPP in Southern California" and that the "subject [Pratt] has been extremely active in assuming a leadership position in the BPP in Los Angeles area, particularly since Shermont Le Grant Banks fell from the favor of the national office of the BPP. Pratt's leadership position clearly indicates he should be included on the Security Index and the Agitator Index." These two reports reflect that the FBI apparently did not attribute significance to Pratt as a Black Panther until April of 1969, well after the "tennis court murder" which occurred on December 18, 1968.

(4) As a result of the exhaustive review of the FBI records, Deputy Attorney General Nash states that "Prior to [Pratt's] indictment in December 1970, there are no FBI documents connecting [Pratt] with the tennis court murder," attaching an FBI report dated February 17, 1971, stating that "on 2/16/71 (deletions) Los Angeles Police Department (LAPD), advised on 12/4/70 a Los Angeles County grand jury handed down a secret indictment charging captioned individual [Pratt] with the following:. . ." Thereafter the report contains a list of the charges against Pratt in the instant case and a brief description of the crime and that "formal charges were brought against PRATT on 2/16/71 in Department 100, Superior Court, Los Angeles." Another report states "will maintain liaison with the Los Angeles Police Department and at the appropriate time, reinterview ELMER PRATT"; subsequent reports indicate that the FBI followed the course of the trial and intended to reinterview Pratt because Pratt had been "reevaluated in the light of

the Security Index" and "although [Pratt was] officially expelled from the Black Panther Party,[28] continues to espouse the doctrines and philosophies inimical to this United States" as his activities included "acts of violence perpetrated in behalf of the Black Panther Party, an organization inimical to the United States."

---

[28]The following is an excerpt from an article in the January 23, 1971, issue of the Black Panther Party Magazine authored by Huey Newton:

"The Black Panther Party is informing all Chapters, Branches, N.C.C.F.'s and the mass of People that we are purging from our ranks Elmer Gerard Pratt, more commonly known as Geronimo or 'G'.

"In addition to committing flagrant violations of our Party's principles, this man ultimately showed that although he claimed allegiance and devotion to the struggle of the People from oppression and to the Black Panther Party, his devotion and allegiance was still to the ways and rules of the Pig Power Structure. When he left the Marine Corps' Special Forces (having trained Green Berets), the armed agency of the CIA, he joined the Black Panther Party. But he has proven beyond a doubt that he is as dedicated today to that Pig Agency as he was when he was in Vietnam, killing innocent Vietnamese women and children on various 'search and destroy' missions.

"It is certain that we were under an illusion that he had switched allegiances, for his lies (which he admitted he had been trained to tell) were extremely convincing. For the Black Panther Party did everything in our power to allow this man—who can no longer be considered such, for he lacks human compassion and understanding—to remain free from the vicious clutches of the pigs. As a result of our efforts, this jackanape informed the Central Committee of our Party of certain demands he had—namely money. He advised the Party that he had organized some other fools, that they were armed and that if his demands were not met, he would '*move on*' (assassinate) our Chief of Staff, David Hilliard. This nape further stated that he in fact didn't like the manner in which the Chief of Staff conducted himself or the Party's business, and that he felt he needed to be removed anyway. He also mentioned that once his forces were together, he would also 'get rid of' (assassinate) our Assistant Chief of Staff, June Hilliard.

"But, the most disgraceful, counter-revolutionary, piggish and dog-like thing this pig has done is to state openly that if the Party would not go along with his ideas, he would assassinate the Supreme Commander and Minister of Defense of the Black Panther Party, Huey P. Newton.

"As if this were not sufficient, he used money he had obtained through and in the name of the Party to purchase alcohol and narcotics for the purpose of indulging himself and his stupid cohorts in nightly bourgeois, orgiastic revelry. (Without the direct eye of the Party's leadership, he maintained a personally pleasure-seeking life.)

"During this period—that is, prior to the arrests in Dallas, Texas on last December 8th and after he left his obvious Party tasks to avoid capture by the pigs—during this period, Geronimo 1) violated many young Black sisters he met while moving from town to town, forcing them to submit to himself and the other fools; 2) left a wide trail for the pigs to follow, thereby exposing the Party to the pigs, by letting most of the people he met know he was a member of the Black Panther Party; 3) harassed and intimidated many of the people with whom he came into contact, by demanding their aid under the threat of their lives; 4) purchased 'Christmas' presents ('Christmas' being the high holiday of the pig capitalists, particularly the avaricious businessmen; and, the period during which the masses of People are exploited in the highest.), to send to his and the others' families and friends. In addition to the counter-revolutionary nature of this particular act, he would have provided additional exposure of their location—which was to have been clandestine (secret).

"Finally, Geronimo and the others who are hereby purged—Will Stafford, Wilfred 'Crutch' Holiday, and George Lloyd—attempted to organize other renegades from our

(5) FBI records regarding a propensity for violence states "(dele-tion) advised that Geronimo is among several members of the Los Angeles BPP who are conducting several armed robberies and burglaries in and around the Los Angeles area."

## ISSUES

By way of an original proceeding presenting narrower issues than those pressed in the superior court before Judge Parker, defendant seeks three alternative forms of relief based on three grounds. These, however, for the sake of clarity and ease in handling essentially boil down into two contentions as follows:

FIRST: In reliance on *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], defendant asserts that the underlying charges of which he was convicted in 1972 should be dismissed and he should immediately be released from prison because the FBI "had a spy in the defense camp" prior to and during the trial.

SECOND: Defendant urges in the alternative that he be granted either a new trial or an evidentiary hearing because (1) a key prosecution witness, Julius C. Butler, was an informant for the FBI, a fact he (Butler) denied at the original trial; (2) that Officer Naveau lied at the pretrial motion to suppress the murder weapon when he testified that a Joe Brown on the UCLA campus told him after the killing of Carter and Huggins that the Panthers were going to Huggins' home to get weapons and explosives to retaliate against the US group and to kill L.A.P.D. officers; and (3) the FBI concealed and withheld surveillance evidence, corroborative, in part, of his (defendant's) alibi defense.

---

Party and themselves into a counter-revolutionary, little rebel roving band, certainly not adhering to the Party's principles or orders, but also violating the masses of People themselves. They are like snakes who crawled into a baby's crib. And we expel them from our ranks, as we would such snakes. We have no word of good to say for them and have faith that the People will someday let these pigs like all other burn in the Fires of Reaction.

"Let it be known, then, that Geronimo (Elmer Gerard Pratt), his wife Sandra Lane Pratt or Sandra Holmes or 'Red' (who worked in concert with him), Will Stafford, Wilfred 'Crutch' Holiday and George Lloyd are forever purged and expelled from the Black Panther Party. Any Party member or community worker who attempts to aid them or communicate with them in any form or manner shall be considered part of their conspiracy to undermine and destroy the Black Panther Party. ALL POWER TO THE PEOPLE

"/s/ Huey P. Newton
Supreme Commander and
Minister of Defense
Black Panther Party"

## DISCUSSION

## I

■ *Is defendant Pratt entitled to a dismissal per se of the underlying charges pursuant to Barber v. Municipal Court, supra, 24 Cal.3d 742?*

Defendant Pratt first contends that he is entitled to a per se dismissal of the underlying charges of which he was convicted in 1972 pursuant to *Barber v. Municipal Court, supra*, 24 Cal.3d 742, because FBI—COINTELPRO informants were "spies" in defense camp prior to and during the trial.

We conclude that defendant's reliance on *Barber* is misplaced and that the *Barber* decision is factually distinguishable and clearly inapplicable.

In *Barber* the defendants/petitioners participated in a "sit-in" near the site of the Diablo Canyon nuclear power facility to demonstrate their opposition to the use of nuclear power to generate energy. They were arrested and charged with the misdemeanors of trespass and failure to disperse.

Before the date set for trial, defendants learned that one of the codefendants was an undercover police officer. There was evidence that following the disclosure of the undercover agent, the defendants became "paranoid" and reluctant to cooperate fully with their attorney. They moved to dismiss on the grounds that the presence of the police officer during confidential attorney-client meetings had deprived them of their rights to the effective assistance of counsel and due process of law.

The trial court denied the motion on the ground that there had been no evidence to show that information gained by the officer had been transmitted to the prosecution, but ruled that the People could not use any evidence obtained by the officer or the fruits thereof nor put on any rebuttal to defense evidence without first proving beyond a reasonable doubt that such rebuttal evidence was obtained independently of the activities of the undercover officer.

The state Supreme Court faced with a petition for a writ of prohibition filed by the defendants in *Barber* addressed the narrow issue as to

"the proper remedy for an accused when his constitutional right to counsel has been denied by the actions of an undercover police officer who poses as a codefendant and attends the confidential attorney-client conferences of the accused." (24 Cal.3d at p. 745.)

The majority in *Barber* held that the right to counsel guaranteed by the California Constitution embodies the right to communicate in absolute privacy with one's attorney and that right is violated when a state agent is present at confidential attorney-client conferences. In ordering issuance of a writ of prohibition the court further held that the only effective remedy was a per se dismissal of the underlying charges against the defendants. The rationale for such a drastic remedy was that an exclusionary remedy as devised by the trial court was inadequate because it would involve difficult problems of proof for the defendants and would not provide any incentive for state agents to refrain from similar violations.[29]

Some of the significant factual distinctions between the instant case and *Barber* are as follows:

*First*, here, unlike in *Barber* where an undercover police officer of the local sheriff's department posed as a codefendant, the person(s) who were present or privy to defense camp discussions were COINTELPRO informants (not police officers or codefendants) for the FBI, a federal (not a state or local) agency.

*Second*, the majority in *Barber* pointed out that the undercover officer attended as a codefendant confidential attorney-client conferences which "went into detail" on defense strategy and even volunteered to prepare and did prepare a detailed map of the fences and gates on the site for purposes of defense which did not include "the presence of an opened gate at a key location."

---

[29]In *In re Johnson* (1979) 24 Cal.3d 769 [157 Cal.Rptr. 674, 598 P.2d 834] (filed the same date as the *Barber* decision) the same majority on the state Supreme Court in *Barber*, citing *Barber*, vacated the judgments of persons convicted of trespassing and unlawful assembly and ordered them discharged from all restraints "since the facts and substantive issues [were] the same" as in *Barber*. Here, the identity of a police officer who had attended confidential attorney-client conferences was not discovered until after petitioners had been convicted.

Apparently the United States Supreme Court does not view this issue in the same light as the state Supreme Court. (See *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].) The issue in a different context, however, appears to be pending again before the United States Supreme Court in *United States* v. *Morrison* (3d Cir. 1979) 602 F.2d 529 (cert. granted June 30, 1980, 448 U.S. 906 [65 L.Ed.2d 1135, 100 S.Ct. 3048].)

In the case at bench COINTELPRO informants who were present at such conferences as invitees of Pratt and/or his attorneys only obtained and passed on to the FBI information which could be characterized as general in nature, such as that defendant Pratt was unhappy with his present lawyer; that he (Pratt) was interested in finding witnesses to show that the key prosecution witness Julius Butler had a "grudge" against him; that the testimony of defense key "alibi" witnesses was analyzed; and that discussions were conducted concerning strategies to be used on appeal in the event Pratt was convicted. As noted and as hereinafter discussed in more detail, the above information obtained by the informants was communicated to the FBI only and was not passed on to local enforcement agencies or to the prosecuting attorney.

The identity of the informants was never revealed and even their existence was not disclosed to state authorities until December of 1979. In any event even if the above general information had been passed on to the local police or the prosecuting attorney (which is denied—see *infra*) the information lacked specific detail and was of such a skimpy and generally obvious nature as not to assist the prosecution or prejudice the defense.[30]

*Third*, the majority in *Barber* noted that the undercover officers who became intimately involved with the groups prior to the demonstration which culminated in their arrest knew that it was a *nonviolent group* and the court pointed out that at all of these meetings (attended by the officers) it was strongly emphasized that the group was committed to *"nonviolence"* and *"nonviolent training"* sessions were conducted which were designed to teach the participants how to react nonviolently to stress situations.

Here, unlike the *Barber* situation where the local undercover officers infiltrated a *nonviolent group*, COINTELPRO and its use of informants were under the auspices of the federal government to serve its interest

---

[30]The record reflects that testimony in respect to any "grudge" which prosecution witness Butler may have harbored against Pratt was primarily supplied to the jury by the defendant himself. The record also shows that following the presentation of the defense which included his "alibi" witnesses the only rebuttal evidence presented by the prosecution was not directed at the "alibi" defense but was directed at attacking the photograph supplied by defendant's brother, Charles E. Pratt, Sr., which showed Pratt's facial hair shortly after Christmas in 1968. Prosecution rebuttal witness Joseph Oldfield, called to impeach that testimony, testified that the photograph could not have been taken at the time defendant's brother testified since the film used was not even manufactured in the year 1968 but in May of 1969.

as a preventive measure against an organization perceived by FBI Director J. Edgar Hoover as a *militant violence-prone hate group.*

For the sole and limited purpose of showing the *violent* nature of the group infiltrated by FBI informants in the instant case as distinguished from the *nonviolent* nature of the group in *Barber*, we take judicial notice of the opinion of this court in the case of People v. Elmer G. Pratt and Willie Stafford (Apr. 22, 1974) 2 Crim. 21638 [Super. Ct. Los Angeles Co. No. A253348 consolidated with Nos. A253349 and A254028]. The foregoing opinion heretofore unpublished is attached hereto as Appendix D.[31]

*Fourth,* the demonstrators in *Barber* crossed over two fences onto private property and while they were one-half mile from the main entrance, they were six and one-half miles from the power plant itself when they disregarded warnings to disperse and were arrested for trespass and failure to disperse (misdemeanors). The court also noted that while there were about 50 demonstrators in the group they were accompanied by 75 to 100 news media people.

Here, unlike in *Barber* where the defendants were charged with relatively minor *nonviolent misdemeanors* (trespass and the failure to disperse), defendant was not only charged but convicted, following a protracted jury trial, of the *heinous felonies of murder, assault with intent to commit murder* and *armed robbery.*

*Fifth,* of great importance here, in *Barber* the local district attorney's office was aware of the presence of the undercover officer. By contrast

---

[31]This opinion stemmed from a shoot-out between the L.A.P.D. and Black Panthers on December 8, 1969, when defendant Pratt in the instant case was the leader of the southern California chapter of the BPP with the title of deputy minister of defense.

We further note that while in *Barber* the nonviolent group was opposed to the single issue of use of nuclear power the BPP (group) was violently opposed to a broad spectrum of constitutionally constituted agencies of government as well as law enforcement officers. The opinion reflects that not only did the BPP amass an arsenal of illegal weapons and explosives but conducted training in how to trap and kill police officers, resisted by force the service of legally issued search and arrest warrants resulting in injury to three police officers (one seriously), bombed the Compton United States Post Office and submachine gunned a United States Naval Marine Reserve Armory. (See Appendix D, p. 923.)

The foregoing was not before the jury in the case at bench and again is not attached hereto for the purposes of showing the violent nature of Pratt or the guilt of defendant in the instant case. It is attached to show the militant and violent nature of the group (BPP) which was infiltrated by FBI informants for the sole purpose of distinguishing *Barber.*

there is no showing whatsoever, short of sheer speculation and conjecture on the part of defense counsel, that the prosecuting attorney in the instant case either was aware of the FBI informants in defense camp OR received or used any of the knowledge obtained by FBI COINTELPRO informants concerning defense tactics or strategy during the preparation stage or during the trial itself in 1972.

To the contrary there is an affirmative showing in the record that COINTELPRO was so highly classified, as reflected in the Church Committee Report, that "No one outside the Bureau was supposed to know that COINTELPRO existed. Even within the Bureau, the programs were handled on a 'need-to-know' basis."[32] Moreover, Acting Director of the FBI Lee Colwell in his letter dated January 16, 1980, to Attorney General George Deukmejian stressed that the FBI review did not uncover any indication that any defense strategy information or that any information that could possibly have been construed as Pratt defense strategy was ever disseminated outside the FBI until December 12 and 13, 1979. (See fn. 26, *ante.*)

In addition, Richard P. Kalustian, the deputy district attorney, the prosecutor at the trial of the case, filed a four-page declaration under

---

[32]An FBI directive dated August 24, 1968, addressed to 22 field offices nationwide during this period including Los Angeles and San Francisco captioned "Counterintelligence Program; Black Nationalist-Hate Groups; Internal Security" (later expanded to 41 field offices adding Sacramento and San Diego) stated "the purpose of this new counterintelligence endeavor is to expose, disrupt, misdirect, discredit, or otherwise neutralize the activities of black nationalist, hate-type organizations and groupings, their leadership, spokesmen, membership, and supporters, and to counter their propensity for violence and civil disorder."

"This program should not be confused with the program entitled 'Communist Party, USA, Counterintelligence Program, Internal Security-C' (Bufile 100-3-104), which is directed against the Communist Party and related organizations, or the program entitled 'Counterintelligence Program, Internal Security, Disruption of Hate Groups' (Bufile 157-9), which is directed against Klan and hate-type groups primarily consisting of white memberships."

"You are also cautioned that the nature of this new endeavor is such that under no circumstances should the existence of the program be made known outside the Bureau and appropriate within-office security should be afforded to sensitive operations and techniques considered under the program.

"No counterintelligence action under this program may be initiated by the field without specific prior Bureau authorization."

FBI memorandum dated September 27, 1968, subject "Counterintelligence Program: Black Nationalist-Hate Groups; Racial Intelligence (Black Panther Party)" states "the extremist BPP of Oakland, California, is rapidly expanding. It is the most violence-prone organization of all the extremist groups now operating in the United States. This group has a record of violence and connections with foreign revolutionaries. It puts particular emphasis on not only verbal attacks but also physical attacks on police."

penalty of perjury in the superior court dated January 7, 1980.[33] In this declaration, attached as an exhibit in response to defendant's petition for habeas corpus before that court, he stated that he had no knowledge

[33]The declaration of Deputy District Attorney Kalustian dated January 7, 1980, reads as follows:

"I am a Head Deputy District Attorney for the County of Los Angeles presently in charge of the Consumer and Environment Protection Division. I have been a deputy district attorney for almost sixteen (16) years. In early December, 1971 (December 6, 1971, I believe) I was assigned to the then—Organized Crime and Pornography Division of the office (now Organized Crime and Narcotics Division). On that day, or the day after, I was assigned the case of *People* v. *Elmer Gerard Pratt*, A 267020, to prosecute. This was my first contact with the case. I had not presented it to the grand jury or discussed the case with anybody before this. The case was then set for trial in late December or early January. It was continued from time to time and did not go to trial until on or about June 2, 1972, the day after its last scheduled trial date.

"During the above period of time, I was not contacted by the FBI nor did I contact the FBI regarding this case or the Black Panther Party. No information was supplied to me by the FBI concerning this case or the Black Panther Party. Prior to the trial of *People* v. *Pratt*, A 267020, I received another case to prepare for trial, *People* v. *Pratt*, A 245134. This case involved possession of destructive devices found in Pratt's car. Mr. Pratt was found guilty on that case on approximately August, 1972. I was not contacted by the FBI concerning that case either, nor did I contact the FBI regarding it.

"I was unaware of the FBI's COINTELPRO program during this period of time, and I believe did not know anything about it until reading about it in the newspapers. I left the Organized Crime and Narcotics Division in March, 1974, after being promoted to Head Deputy District Attorney and being assigned to the Pomona Branch Office. I believe I still had not heard of the COINTELPRO program.

"During the trial and continuing to this day, I have had no reason to believe Julius Butler ever was an informant for any agency. My first contact with Mr. Butler occurred in late 1971 or early 1972, two and one-half years after he wrote the 'insurance letter' naming Pratt as Mrs. Olsen's killer. That was almost one and one-half years after he testified before the grand jury in the tennis court murder. No information came to my attention then, or has since then, indicating he ever acted as an informant for any police agency while he was with the Black Panther Party.

"The facts of the Ollie Taylor case became important to me only insofar as it was relevant to the murder case. It became relevant to the murder case because both Julius Butler and Elmer Pratt testified to different versions of the facts. I then contacted Ollie Taylor to testify. Mr. Taylor's testimony essentially corroborated Julius Butler's version of the facts and contradicted Mr. Pratt's version.

"I eventually asked the court to reduce Julius Butler's convictions to misdemeanors for the following reasons: (1) Ollie Taylor had furnished evidence, under oath, that not only had Julius Butler participated in the assault, but all the other charged persons had, as well; (2) Elmer Pratt held the gun on Ollie Taylor and appeared more culpable than Julius Butler; (3) only Julius Butler had been convicted (on his plea), the others had not been convicted—but on the same facts; (4) almost three years had elapsed since the events, Butler was no longer a Black Panther and had appeared to have stabilized his life; (5) the fine was minimal and the failure to pay it was having no effect on his propensity to be law-abiding; (6) Julius Butler had assisted law enforcement by testifying in the murder trial; (7) there appeared to be no good reason for Julius Butler to have four or five felony convictions on his record when all other participants had escaped conviction. It was not an uncommon occurrence for a defendant's felony convictions to be reduced to misdemeanors after successful completion of probation. I deemed Butler to have accomplished the practical equivalent of that.

that the FBI or any other law enforcement agency had any informant in the defense camp until December 1979.[34]

Logic dictates that a state prosecutor cannot be held to a duty to disclose prior to trial evidence which is unknown to him and known only to federal authorities. In *Reddy v. Jones* (4th Cir. 1977) 572 F.2d 979, 982-983, the court held that where an allegedly exculpatory statement was obtained by federal authorities and was not known by state authorities until after a state trial, the state prosecutor was under no duty to disclose the statement to defense counsel prior to trial. In the instant case, at no time was Prosecuting Attorney Kalustian aware of COINTELPRO or any other FBI involvement at the time of trial.

"There was absolutely no connection with my motion to reduce Julius Butler's felonies to misdemeanors and his testimony in the murder. No promise was given and none asked for in that connection. My later request of the court to strike the 'force and violence' allegation attached to the false imprisonment charge came about as a result of Julius Butler's call asking whether he could say that he had not been convicted of a felony. He called to tell me he was going to law school. He stated that the questionnaire from the Committee of Bar Examiners required that he answer whether he had ever been convicted of a felony. In order to assist his answer, I told him I would check the district attorney file. I did so and determined that the false imprisonment charge, as alleged, was an irreducible felony. It was reducible only if the allegation concerning force and violence was stricken. For that reason, I moved to strike the allegation and reduce that charge to a misdemeanor.

"During the murder trial and the possession of destructive devices trial, I had no knowledge that the FBI or any other law enforcement agency had any informant in the defense camp. The first time I learned that any information regarding Pratt's defense or defense strategy was being conveyed to law enforcement was in December, 1979, in meetings with the FBI and Department of Justice at the District Attorney's and Attorney General's Office.

"I have read the foregoing Declaration and I declare under penalty of perjury that it is true and correct.

"Executed on January 7, 1980, at Los Angeles, California.

"/s/ Richard P. Kalustian"

[34]The record shows as previously indicated that on December 12, 1979, representatives of the United States Department of Justice and the FBI met with members of the Los Angeles District Attorney's office on December 13, 1979. A similar meeting had been held with representatives from the California Attorney General's office. At these two meetings, information was disclosed by the FBI for the first time to these agencies. Revealed for the first time was information that a confidential FBI informant was associated with Pratt while he was in jail during his trial. The informant was present at various meetings between Pratt and members of his defense team. Among other things the informant revealed to the FBI that on October 20, 1971, Pratt and various members of his team discussed various contradictions concerning his arrest by the FBI in Texas. On June 30, 1972, Pratt indicated he wanted witnesses to testify that Julius Butler had a grudge against him. On July 5, 1972, various members of Pratt's defense team discussed the case. They discussed an appeal on his prior conviction for possession of dangerous weapons. They also discussed summation arguments in Pratt's case and strategies for appeal if he were convicted. They talked about how Kathleen Cleaver's testimony tied in with the testimony of defense witness Shirley Hewitt. There was a general discussion of the trial.

*Finally*, by reason of the obvious significant factual distinctions between *Barber* and the instant case, hereinbefore outlined, the question as to whether or not *Barber* has retroactive effect is basically academic. However, it is interesting to note that the unique factual circumstances present here not only fail to supply a factual underpinning for the rationale supporting the per se dismissal rule in *Barber* but also fail to satisfy the criteria used for determining whether any particular decision should be given retroactive application. Indeed to apply *Barber* retroactively to the instant case would be a gross distortion of the facts to fit the rule.

Relying exclusively on the California state Constitution (not the federal Constitution)[35] a chief rationale underpinning the per se dismissal rule in *Barber* was to provide incentive for state agents to refrain from the conduct described. That purpose is not served by applying the rule retroactively to past instances. Moreover, it is axiomatic that such a rule would have zero deterrent effect on federal informants since a state court has no jurisdiction or authority over a federal agency, such as the FBI in performance of its duties or its COINTELPRO informants. (See discussion re Pratt's alternate request for an evidentiary hearing, *infra*.)

The criteria federal and California courts use to determine whether a decision should be given retroactive or prospective application are "(a) [T]he purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967]; see also *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 258 [158 Cal.Rptr. 330, 599 P.2d 636]; *People* v. *Gainer* (1977) 19 Cal.3d 835, 853 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]; *People* v. *Hitch* (1974) 12 Cal.3d 641, 654 [117 Cal.Rptr. 9, 527 P.2d 361].)

Criteria (a) above is of foremost importance (*Desist* v. *United States* (1969) 394 U.S. 244, 249 [22 L.Ed.2d 248, 255, 89 S.Ct. 1030]) while criteria (b) and (c) are relied on more heavily only when the purposes to be served by the new rule do not clearly favor either retroactivity or

---

[35]The United States Supreme Court in *Hoffa* v. *United States* (1966) 385 U.S. 293, 304-309 [17 L.Ed.2d 374, 383-386, 87 S.Ct. 408], seems to suggest that the intrusion of an undercover agent without more does not constitute a Sixth Amendment violation. The 1977 decision in *Weatherford* v. *Bursey* (1977) 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837], appears to support that holding. (See also *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751, 758-760 [139 Cal.Rptr. 61].)

prospectivity. (*Id.*, at p. 251 [22 L.Ed.2d at p. 256]; *In re Johnson* (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].)

Generally speaking a new rule is given retroactive application where a constitutional standard is announced which is necessary to insure the "reliability of the fact-finding process at trial" to avoid convicting an innocent person, for example guaranteeing counsel at trial (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]), or the right to confront and cross-examine witnesses giving incriminating pretrial statements (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]).

On the other hand decisions which vindicate interests collateral to or relatively far removed from the "reliability of the fact-finding process at trial" are generally denied retroactive effect and are prospective only. (*In re Johnson, supra*, 3 Cal.3d 404, 412-413.) For example, newly announced evidentiary exclusionary rules usually come under this latter category since the rules are based on the perceived necessity for an effective deterrent to unreasonable police action and that purpose would not be advanced by making the rule retroactive since prior police misconduct had already occurred and would not be corrected by releasing the defendants involved from their criminal culpability. (See *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731]; *Desist* v. *United States, supra*, 394 U.S. 244; *United States* v. *Peltier* (1975) 422 U.S. 531 [45 L.Ed.2d 374, 95 S.Ct. 2313]; *In re Lopez* (1965) 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380]; *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028].)

▮ In the instant case the knowledge obtained by the FBI informants in the defense camp did *not* impact on the "reliability of the fact-finding process at [the] trial" in California's court or assist the prosecution or prejudice the defense because the information was not transmitted by the FBI to the local prosecuting attorney. Insofar as the case at bench is concerned, the record indicates that the presence of COINTELPRO informants in the defense camp had as much effect on whether or not defendant Pratt was afforded a fair trial conducted in California's superior court as did the furniture in the areas where the discussions were conducted.

Accordingly, by reason of the foregoing, we hold that the *Barber* per se dismissal rule does not apply to the case at bench. We also conclude

as a practical matter that application of the rule to this case under its unique circumstances would be completely incompatible, irreconcilable and unacceptable to any rational system of criminal justice.

## II

*Is defendant Pratt entitled to either a new trial or an evidentiary hearing?*

### The Law

Defendant Pratt argues that he is entitled to either a new trial or an evidentiary hearing because (a) prosecution witness Butler lied at time of trial when he denied that he was an informant for the FBI; (b) Officer Naveau lied at defendant's pretrial motion to suppress the murder weapon when he testified as to statements attributed to a Joe Brown; and (c) the FBI concealed and withheld surveillance evidence which would have corroborated his alibi defense that he (Pratt) was in the Bay Area on December 18, 1968, at the time of the murder of Caroline Olsen.

■ The "petitioner in a habeas corpus proceeding has the burden not only of alleging but also proving the facts on which he relies in support of his claim for relief." (*In re Lawler* (1979) 23 Cal.3d 190, 195 [150 Cal.Rptr. 833, 588 P.2d 1257].)

In the instant case, as in *In re Wright* (1978) 78 Cal.App.3d 788 [144 Cal.Rptr. 535], defendant's asserted ground of newly discovered evidence and the ground of perjured testimony are somewhat blurred and his arguments pertaining to the two grounds are to a certain extent admixed. ■ "[W]hile, of course, the discovery of perjured testimony will almost necessarily involve the discovery of new evidence, these constitute distinct grounds for habeas corpus relief, are subject to different legal standards and must be considered separately. (See, e.g., *In re Imbler, supra*, 60 Cal.2d [554] at pp. 560-567, 569-570 [35 Cal.Rptr. 293, 387 P.2d 6].)" (*In re Wright, supra*, 78 Cal.App.3d at p. 802.)

In *In re Wright* a man convicted of rape sought a writ of habeas corpus on grounds of newly discovered evidence and false testimony by the principal prosecution witness that would tend to support his defense that the victim had consented to an act of prostitution. ■ In deny-

ing defendant's petition for habeas corpus (petn. for hg. den. by Supreme Ct. May 25, 1978, Mosk, J. was of the opn. hg. should be granted), the Court of Appeal set forth the different legal standards for asserted grounds of newly discovered evidence and that of perjured testimony as follows:

*Newly Discovered Evidence Test*

"To warrant habeas corpus relief new evidence must be such as to undermine the entire structure of the case upon which the prosecution was based; it must point unerringly to the petitioner's innocence and must be conclusive; it is not sufficient that the new evidence conflicts with that presented at the trial and would have presented a more difficult question for the trier of fact. (*In re Weber*, 11 Cal.3d 703, 724 [ . . . ]; *In re Branch, supra*, 70 Cal.2d at pp. 213-215; *In re Imbler, supra*, 60 Cal.2d at pp. 569-570; *In re Lindley*, 29 Cal.2d 709, 724 [ . . . ].) Concomitantly, the new evidence must be credible and convincing. (See *In re Weber, supra*, 11 Cal.3d at pp. 723-725; *In re Branch, supra*, 70 Cal.2d at pp. 214-215; *In re Imbler, supra*.)" (*In re Wright, supra*, 78 Cal.App.3d 788, 802.)

In *In re Weber* (1974) 11 Cal.3d 703 [114 Cal.Rptr. 429, 523 P.2d 229], cited in *Wright*, the petitioner, who had been convicted of soliciting another person to offer a bribe in violation of Penal Code section 653f, sought habeas corpus on the basis of newly discovered evidence allegedly indicating that such other person had "framed" him. Pursuant to the Supreme Court's directions, a referee conducted an evidentiary hearing with respect to the existence, credibility, and effect of such evidence, made findings, and concluded that petitioner had discovered no new credible evidence undermining the case presented by the prosecution at petitioner's trial.

The Supreme Court adopted the referee's findings, discharging the order to show cause, and denied the petition. It stated at page 724: "In the present case, the 'newly discovered evidence' offered by petitioner does not meet either of the tests referred to by this court in *In re Lindley*, 29 Cal.2d 709 [ . . . ]; and *In re Branch*, 70 Cal.2d 200 [ . . . ]. In *Lindley*, this court held that newly discovered evidence does not warrant relief unless it is of such character 'as will completely undermine the entire structure of the case upon which the prosecution was based.' (P. 723 [7] of 29 Cal.2d 709.) In *Branch*, we later indicated that newly

discovered evidence will not undermine the case of the prosecution so as to warrant habeas corpus relief unless (1) the new evidence is conclusive, and (2) it points unerringly to innocence. We there said at pages 214-215 of 70 Cal.2d: 'In both cases [*In re Imbler*, 60 Cal.2d 554 [...]; *In re Lindley, supra*, 29 Cal.2d 709] the evidence presented to establish petitioner's innocence was inconclusive. Neither case involved, as does the instant case, another person's *confession* to the crime and the question of the confessor's credibility. Obviously a confession by another party exonerating the petitioner does point unerringly to petitioner's innocence and, if credited, undermines the entire case of the prosecution.' Similarly, here there was no confession by a third person exonerating petitioner and no conclusive evidence pointing unerringly to innocence." (Original italics.)

*Perjured Testimony—False Evidence Test*

"Prior to the 1975 amendment to Penal Code section 1473, the rule was clear that to obtain habeas corpus relief on the ground of perjured testimony, the petitioner was required to establish by a preponderance of the evidence: (1) that perjured testimony was adduced at his trial, (2) that this was known to a representative of the state, and (3) that the perjured testimony may have affected the outcome of the trial. (*In re Imbler, supra*, 60 Cal.2d at p. 560; *Napue v. Illinois*, 360 U.S. 264, 269, 272 [...]; see Witkin, Cal. Criminal Procedure (1975 supp.) § 804, p. 866.)

"In 1975 (Stats. 1975, ch. 1047, § 2) Penal Code section 1473 dealing with habeas corpus relief was amended to provide in pertinent part:

"'(b) A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons:

"'(1) False evidence that is *substantially material or probative on the issue of guilt or punishment* was introduced against a person at any hearing or trial relating to his incarceration; . . .

"'. . . . . . . . . . . . .

"'(c) Any allegation that the prosecution knew or should have known of the false nature of the evidence referred to in subdivision (b) is immaterial to the prosecution of a writ of habeas corpus brought pur-

suant to subdivision (b).' (Italics added.)" (*In re Wright, supra,* 78 Cal.App.3d 788, 807-808.)

■ Following an exhaustive analysis of the legislative intent of the above mentioned 1975 amendment to Penal Code section 1473 in conjunction with *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341], and other related cases, the *Wright* court concluded that "[t]he requirement under the preexisting law that the petitioner show the false evidence may have affected the outcome of his trial was not eliminated or changed by the 1975 amendment to Penal Code section 1473 and is still required for relief under the amended statute: '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment' means false evidence of such significance that it may have affected the outcome of the trial...." (78 Cal.App.3d at pp. 808-809.)

Moreover, the *Wright* court in footnote 8 at pages 811-812 pointed out, in pertinent part, that "[t]he requirement that the false evidence be such as may have affected the outcome of the trial is a materiality requirement, whereas the 'harmless beyond a reasonable doubt' standard is generally said to be applicable to the problem of prejudice. (See, e.g., *People* v. *Ruthford, supra,* 14 Cal.3d at p. 408.) Although the concepts of materiality and prejudice are obviously related and may be overlapping, it may be theoretically possible that both are applicable. For example, it might be concluded that the petitioner must show substantial materiality (the false evidence was such as may have affected the outcome of the trial) but that relief would nevertheless be denied upon a showing by the People of a lack of prejudice (the false evidence was harmless beyond a reasonable doubt). This appears to be the applicable procedure in California in suppression of evidence cases. The court in *People* v. *Ruthford, supra,* 14 Cal.3d at page 409, stated: 'The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt.' ..."

■ Finally, "it is the practice of this court to require, substantially, that one who seeks to show that his conviction was obtained by the prosecution's knowing use of perjured testimony quote or otherwise designate specifically the precise testimony which it is asserted was perjured, state in detail what the actual facts are, and name or otherwise identify the person connected with the prosecution who knew it

was perjured and persisted in using it, stating also the circumstances establishing such person's knowledge of the facts...." (*In re Swain* (1949) 34 Cal.2d 300, 302 [209 P.2d 793].)

*Defendant Pratt's Request for a New Trial Based on Newly Discovered Evidence*

■ We turn first to defendant Pratt's assertion that he is entitled to a new trial because prosecution witness Julius (Julio) Butler perjured himself when he denied during the trial that he worked for the FBI and was an informant for the L.A.P.D. or the FBI.

Defendant Pratt has seized upon the following three questions and answers during cross-examination of prosecution witness Butler in the over 1,500 pages of reporter's transcripts from about 30 witnesses as the basis for asserting that Butler perjured himself while on the stand:

"Q. [By Mr. Cochran] And when you were working for the Black Panther Party, were you also working for law enforcement at the same time?

"A. No.

"Q. You had severed any ties you had with law enforcement?

"A. That's correct.

"Q. Have you at any time since leaving the Sheriff's Department worked for the FBI or the CIA?

"A. No."

The above referred to colloquy by the defendant has been lifted out of context. The three questions and answers immediately following the above are as follows:

"Q. [By Mr. Cochran] Are you now working for the FBI and the CIA?

"A. No.

"Q. Your sole employment is as a beauty stylist now; is that correct?

"A. Exclusively.

"Q. And it is your testimony that was your sole employment at the time of your membership in the Black Panther Party?

"A. That's correct."

We conclude that a fair reading of *all six* of the foregoing questions and answers in context indicates that both the cross-examining defense counsel and witness Butler may well have referred to the words "working" or "worked" in the common vernacular as meaning a "sustained physical or mental effort..., labor, task, or duty that affords one his accustomed means of livelihood" and as being synonymous or equivalent to "employment" which "stresses activity that fills one's time." (See Webster's New Collegiate Dict. (7th ed. 1972) pp. 1029, 271 [which we note was published the same year in which the instant trial took place].) Thus it is reasonable to conclude that witness Butler either did not give perjured testimony at all or believed that his answers were truthful within the framework of the above line of questions.

Suffice it to say that none of the documentation supplied by either defense counsel or the Attorney General's office by way of affidavit, letters or copies of FBI reports support defendant's contention that witness Butler lied in responding to the above line of questioning pertaining to "work" or "employment."

Nor does a fair reading of the entire record in context support defendant's contention that witness Butler lied about or the prosecution suppressed evidence that Butler had "informant"[36] status as distinguished from "working" for or being "employed" by the FBI. To the contrary, the declaration of Deputy Attorney General Michael Nash dated December 18, 1979,[37] which had attached to it a statement

---

[36]Black's Law Dictionary (5th ed. 1979) defines an "informant" as "A person who informs or prefers an accusation against another, whom he suspects of the violation of some penal statute. An undisclosed person who confidentially volunteers material information of law violations to officers and does not include persons who supply information only after being interviewed by police officers, or who give information as witnesses during course of investigation...." (P. 701.)

[37]The declaration of Deputy Attorney General Nash reads as follows: "I, MICHAEL NASH, am a Deputy Attorney General employed by the Office of the California Attorney General;

"I am currently preparing a response to a petition for writ of habeas corpus filed by the attorneys for Elmer 'Geronimo' Pratt;

"On December 13, 1979, I attend a meeting at the Office of the California Attorney

by Julius Butler and a "factual summary" prepared by the FBI dated November 9, 1979, for delivery to Congressman Paul N. McCloskey, Jr., pursuant to his inquiry appears to be consistent with the entire record and FBI documents uncovered and supplied defense counsel and this court (see also Appen. C) negates defendant's contention.

General located at 3580 Wilshire Boulevard in Los Angeles. The following persons were present at the meeting in addition to myself: S. Clark Moore, Assistant Attorney General with the California Department of Justice; William R. Pounders, Deputy Attorney General with the California Department of Justice; Richard P. Kalustian, Deputy District Attorney, Los Angeles District Attorney's Office; Roger Cubbage, attorney from the United States Department of Justice; Tony Adamski, an agent from the Federal Bureau of Investigation and Chris Mazella, a legal counsel from the Federal Bureau of Investigation.

"The subject matter of the meeting was Elmer 'Geronimo' Pratt. The representatives from the FBI stated that the information was first disclosed to the District Attorney's Office on December 12, 1979. The information had not been disclosed to the California Department of Justice prior to the meeting on December 13, 1979. The following information was disclosed by the representatives from the Federal Bureau of Investigation:

"1. A document consisting of two pages herein attached to this declaration. The first page consists of a statement signed by Julius C. Butler authorizing the FBI to release page 2 which is a factual summary dated November 11, 1979, to be given to Congressman Paul N. McCloskey, Jr., pursuant to his inquiry regarding Elmer Pratt;

"2. A document was shown to us, which, to the best of my recollection, indicated that the FBI received information (purportedly through a wiretap) that on or about December 20, 1968, Elmer Pratt was in the Oakland area and that he was hiding from someone. Further, that on December 18, 1968, Bobby Seale or Kathleen Cleaver picked some persons up at the airport;

"3. A document was shown to us which, to the best of my recollection, stated that a confidential FBI informant, who is no longer an informant for the FBI, was associated with Elmer Pratt while he was in jail during his murder trial. On November 3, 1971, there was a report of a visit by Kathleen Cleaver and Luke McKissack with Pratt in county jail. Luke McKissack, an attorney, represented Pratt in the 'LA 13 Shootout.' Mr. McKissack was associated with Johnnie Cochran who represented Pratt in his trial. The confidential informant became Kathleen Cleaver's associate. On November 16, 1971, he reported that on October 20, 1971, Mrs. Cleaver, Mr. McKissack and Elmer Pratt discussed various contradictions concerning Pratt's arrest by the FBI in Texas. On June 30, 1972, Pratt indicated that he wanted witnesses to testify that Julius Butler had a grudge against him. On July 20, 1972, the informant advised that on July 5, 1972, Kathleen Cleaver and a bodyguard, Roland Freeman, met Johnnie Cochran. Also present at that meeting were Charles Pratt (Elmer Pratt's brother) and Gayle Andrea Bell. All went to court for the proceeding which was set for 2:00 p.m. Following the trial that day, Mr. Cochran, Mrs. Cleaver, Charles Pratt, Mr. Bell and Mr. Freeman discussed Elmer Pratt's case. They discussed an appeal on his prior conviction for possession of dangerous weapons. They also discussed summation arguments in the present case and strategies for appeal if he were convicted. That group also visited Pratt at jail. Afterwards they went to the home of Charles Pratt. They talked about how Kathleen Cleaver's testimony tied in with the testimony of a trial witness for the defense, Shirley Hewitt. There was also a general discussion of the trial.

"We have formally requested copies of the documents containing this information from the FBI.

"I declare under penalty of perjury that the foregoing is true and correct.

"Executed on December 18, 1979, at Los Angeles, California

"/s/ Michael Nash"

The FBI "factual summary" sheet attached to Deputy Attorney General Nash's declaration dated November 9, 1979, is as follows:

"11/9/79

"A substantive case file was opened in January, 1969, on Julius Butler and others, some of whom were arrested by the Los Angeles Police Department, at a Black Panther Party house where numerous weapons and explosives were found. During the initial contact in August, 1969, Butler expressed his dissatisfaction with current BPP leadership and stated that he feared for his life and that he had provided a letter to an individual, unnamed, who would hold this as an insurance policy against threats against him. He advised that this letter contained information which would put individuals in the gas chamber. He was subsequently contacted on several other occasions regarding the BPP, but supplied no information on Pratt or the tennis court murders.

"In view of the fact that the FBI thought this individual had the potential for being a productive informant, a potential source file on racial neighborhood activities was opened in July, 1970. He was contacted on several occasions concerning the potential for racial violence in Los Angeles. This file was closed in May, 1972, because of the lack of productivity. He was not directed to gather information regarding the BPP or Elmer Pratt and there is no information in that potential source file or anywhere else indicating receipt of information other than stated above.

"Because of the casual relationship with the FBI, Butler probably never suspected that he was being evaluated as an informant or that he considered himself to be an informant of the FBI. In fact, he testified in court that he was not an FBI informant during Pratt's trial. He was never paid as an informant."

The statement made, signed and dated on November 14, 1979, by Julius Carl Butler attached to Deputy Attorney General Nash's declaration is as follows:

"STATEMENT

"I, JULIUS CARL BUTLER, having been apprised of the identities of Federal Bureau of Investigation (FBI) Special Agents JOHN F. KELLER

and RICHARD A. SCHUSSLER and the nature of their inquiry as it concerns ELMER PRATT and my past contacts with the FBI in regard to him and the Black Panther Party, hereby make the following free and voluntary statement:

"I hereby authorize the FBI to release the attached statement, prepared by the FBI and dated November 9, 1979, to Congressman PAUL N. MC CLOSKEY, JR. for the purpose of his inquiry into the matter involving ELMER PRATT.

"I have read this statement and concur with the FBI's position that I have never been an FBI informant, nor was I ever aware that I was being evaluated as a 'potential informant' and carried as such in an FBI file on me.

"Signed: /s/ Julius C. Butler
JULIUS CARL BUTLER

11/14/79
Date"

The foregoing statements corroborate the truthfulness of witness Butler's statement at the time of trial that he was not "working" for the FBI. Moreover, the information supplied the FBI by Butler on several occasions as hereinbefore described certainly does not make him an "informant" within the accepted legal context. (See fn. 36, *ante*; Appen. C, p. 920, fn. 3.) Of importance also is the fact that the FBI was merely evaluating Butler as a "probationary (racial) informant" and only *after* Butler had delivered the sealed envelope to Sergeant Rice containing the letter which, when opened, pointed the finger at defendant Pratt as being the "tennis court murderer." Nor did Butler consider himself an "informant" (snitch). (See Butler testimony, *infra.*) Also of no little significance is the uncontradicted statement in the declaration under oath of the prosecuting attorney, Richard Kalustian, that he had "no reason to believe Julius Butler ever was an informant for any agency." (See fn. 33, *ante.*)

We turn now to defendant's contention that prosecution witness Butler lied in respect to his status as an informant for the L.A.P.D.

The question as to whether or not Butler was an informant for the L.A.P.D. was presented to the jury under direct and cross-examination of the following witnesses in the following manner.

During the rebuttal portion of the prosecution's case on cross-examination the following colloquy occurred between defense counsel and Officer DuWayne Rice:

"Q. Was Julio Butler, did he give you information about the community from time to time?

"A. I don't know in what context you mean that, sir.

"Q. Didn't he inform on people from time to time?

"A. No, sir, he didn't.

"Q. Didn't he tell you about any crimes, any problems going on?

"A. No, sir. We discussed some of the problems in general, but he didn't come to me as an informant.

"Q. He didn't act as an informant for you?

"A. Not during the time of our relationship prior to the time of my getting that letter, sir.

"Q. Well, I am not sure I understand. Did he act as an informant after he gave you the letter?

"A. I would have to clarify. It is hard to answer that yes or no, sir. Because of a lot of things, I will have to qualify my answer.

"Q. Let me put it this way: Did he ever act as a police informant for you?

"A. Yes, he did, sir.

"Q. Did he do that before August 10th or after August 10, 1969, or both before and after?

"A. I would say for approximately a week or so prior, and I never saw him very much after he gave me the letter.

"Q. But for a week prior to August 10, 1969 he did give you information as a police informer?

"A. Yes, I think that is a fact.

"Q. Was he paid for that information?

"A. No, sir."

Also on rebuttal the following colloquy occurred between defense counsel and witness Butler:

"Q. Now, you had, of course, given him information on groups prior to that time, had you not, prior to August 10, 1969?

"A. Information?

"Q. Yes. You'd been an informant for Sgt. Rice?

"A. No.

"Q. You were never an informant for Sgt. Rice?

"A. Not an informant, no.

"Q. You told us that before, in fact, that you have never been an informant; is that right?

"A. "No, I haven't."

On redirect, the following colloquy was had with the prosecutor:

"Q. BY MR. KALUSTIAN: You have indicated that you said you had never been an informant for Sgt. Rice?

"A. That's correct.

"Q. Did you ever supply Sgt. Rice information?

"A. You mean about the Party?

"Q. Well, any kind of information.

"A. Sgt. Rice was a confidante of mine. But it was not in the sense of policeman and public relations, sir, a citizen and police relationship.

"Q. Why did you say, use the words you'd never been an informant?

"A. Well, the connotation 'informant' means a snitch and I have never been in the world a snitch."

Finally, on recross-examination, the following questions and answers occurred:

"Q. Now, with regard to this information that you may or may not have furnished Sgt. Rice, you said that he was a confider or you confided in him.

"A. Yes, sometimes personal, sometimes relevant to party business. Sgt. Rice was a community relations officer and he was a liaison between the US organization, the Panthers, and all the other organizations, black so-called organizations in the community.

"Q. Now when you confided in him—first of all when was the first time you ever confided in him.

"A. On what level, counsel?

"Q. Well, on the party business level?

"A. I would say on the party business level, it would date back to November of '68, somewhere along there.

"Q. In other words, you knew DuWayne Rice before you became a Black Panther, didn't you?

"A. That's correct.

"Q. You had been police officers about the same time?

"A. Yes, that's correct.

"Q. So you gave him some information in November of '68 and would you say it was—

"A. I did not say I gave him information in November of '68.

"Q. Well, what did you give him?

"A. With Bunchy's permission, he came to the 3A office, he and Lt.—Sgt. Greene from downtown, to discuss the party's complaints about alleged harrassment from Wilshire station officers.

"Q. You said alleged harrassment?

"A. Yes.

"Q. These weren't true.

"A. I am not saying whether they were true or not. [¶] I wasn't instituting—only acting as a liaison between party members and Sgt. Rice and the communication relations officer.

"Q. Did you ever give him any information that you didn't clear through Bunchy Carter, or some other Black Panther Party member prior to August 10, 19—

"A. Of what nature because when you are narrowing down information like that, my conversations would falsify one thing, but when you say what nature, if you specify, what nature counsel, then I will answer you, counsel.

"Q. Did you ever inform on anybody?

"A. No.

"Q. You never did that?

"A. No."

The foregoing line of questioning is self-explanatory. It does not in our view establish by a preponderance of the evidence that Butler perjured himself. Nor does any additional documentation furnished this court establish that Butler perjured himself. (See Pen. Code, §§ 14, 118, 1103a.) At best the above questions and answers indicate that Butler in his own mind equated the word "informer" to a "snitch" which he

did not consider himself to be[38] and was evidently unaware that he was being evaluated as a "potential informant" by the FBI. While Butler supplied information to FBI agents, he was not an "informant" in law enforcement lexicon because the information supplied was after being interviewed by FBI agents or during the course of an FBI investigation. (See fn. 36, *ante*.) In FBI vernacular an "informant" label refers to reliable persons actively engaged in obtaining and furnishing information to the FBI, who are assigned symbol numbers and usually paid. The FBI did not consider Butler an "informant," did not assign him a symbol number or pay him. (See Appen. C, p. 920, fn. 3.)

Finally, the time of occurrence of the various events previously listed in itself supplies strong indirect evidence that Julius Butler was neither an FBI nor L.A.P.D. informant in the law enforcement sense of the word. The murder of Caroline Olsen occurred on December 18, 1968. The investigation did not focus on defendant Pratt as a suspect in that murder until October 20, 1970, the day the Julius Butler letter was finally opened which was over 14 months after Butler handed the letter to Sergeant Rice and over 22 months after the murder. It was not until then that the photographs of Pratt were shown to Kenneth Olsen and Barbara Reed, the defendant's car traced, and the .45 caliber automatic pistol, which was seized along with the BPP arsenal of weapons on January 17, 1969, booked into evidence and checked by a ballistics expert.

In view of the foregoing, we conclude that defendant Pratt in his petition before this court has not met the criteria or test required for relief as previously discussed in *In re Wright, supra*, 78 Cal.App.3d 788, and *In re Swain, supra*, 34 Cal.2d 300. He has not established by a preponderance of the evidence any of the requisite elements to entitle him to relief. Specifically, (1) he has not shown that perjured testimony was in fact adduced at his trial; (2) he has not demonstrated that if witness Butler did lie that it was known to a representative of the state; and (3) the perjured testimony, if any, was of such significance as to have affected the outcome of the trial in respect to guilt or innocence.

In any event, considering all the evidence and circumstances in this case, we further conclude that failure to disclose to the jury the extent

---

[38]The fact that Butler specifically stated that defendant Pratt had told him on December 18, 1968, that he (Pratt) was going out on a "mission" and later made statements indicating that he was the "tennis court murder(er)" is not considered as an "informer" in the classical sense or within the context of this case. Butler placed this information in a sealed envelope to be opened only "upon my death" as an "insurance policy" as a matter of personal survival.

and nature of the FBI contacts with witness Butler as hereinbefore described was nonprejudicial and harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra*, 14 Cal.3d 399.) In fact to disclose what witness Butler told the FBI contacts as hereinbefore discussed would not be exculpatory. That information is consistent with and corroborative of Butler's testimony in court and it would, therefore, have been detrimental to Pratt's defense.

■ Defendant Pratt also asserts that he is entitled to a new trial because Officer James F. Naveau lied, not at the trial but when he testified at the pretrial motion pursuant to section 1538.5 to suppress the death weapon (the .45 caliber automatic pistol) seized from the Huggins residence at 806 West Century Boulevard on January 17, 1969, following the killing of Alprentice "Bunchy" Carter and John Huggins on the UCLA campus. Officer Naveau, as previously noted, testified that a Joe Brown had told him, following the killings, that the Panthers "had split to go to John's [John Huggins'] pad to get the shit [weapons and explosives] and a lot of US people and a lot of L.A.P.D. pigs were going to get blown up that night."

The defendant relies upon an affidavit dated November 12, 1979, of an individual by the name of Joe Brown who is currently a lawyer in Memphis, Tennessee, denying that he provided the information attributed to him by Officer Naveau at the section 1538.5 hearing. We summarily reject this argument as entitling defendant to a new trial on the basis of this newly discovered evidence.

*First*, there is no showing by a preponderance of the evidence that the Joe Brown who filed the above affidavit some 10 years later is the Joe Brown or the same individual from whom Officer Naveau received the information. (See *In re Wright, supra*, 78 Cal.App.3d 788, 807; *In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].)

*Secondly*, the information communicated by Officer Naveau to the L.A.P.D. was apparently completely accurate and true because when the officers went to the Huggins' residence following Officer Naveau's report, they saw individuals moving in and out of the house carrying weapons and ammunition just as Officer Naveau indicated was going to happen as reported to him. Thus, even assuming that contrary to the limitations imposed by the Supreme Court in *In re Terry* (1971) 4 Cal.3d 911 [95 Cal.Rptr. 31, 484 P.2d 1375], this court can review by

habeas corpus the claimed error in the suppression ruling, defendant has failed to establish that Officer Naveau's testimony is false.

*Finally*, again ignoring the limitation in *Terry*, it appears that the petitioner had the opportunity to present the alleged true matter in the trial court. (See *In re Waltreus* (1965) 62 Cal.2d 218, 222 [42 Cal. Rptr. 9, 397 P.2d 1001]; *In re Kirschke* (1975) 53 Cal.App.3d 405, 408-409 [125 Cal.Rptr. 680].) Here, the Joe Brown from whom defendant recently obtained an affidavit was available at UCLA and subject to a defense subpoena during the entire time of the trial and at his motion for a new trial. Moreover, in defendant's appeal where he unsuccessfully contended that the search of the Huggins' residence was an illegal search and seizure (see Appen. B), he did not raise any issue about the falsity of Officer Naveau's testimony.

■ We next turn to defendant Pratt's contention that newly discovered evidence shows that the FBI concealed and withheld surveillance evidence which would have corroborated his alibi defense that he (Pratt) was in the Bay Area on the evening of December 18, 1968, when Caroline Olsen was murdered which entitles him to a new trial.

In support of this contention the defendant points to *only two* FBI reports gleaned from the thousands of documents recently furnished by the FBI to the Attorney General and defense counsel.

One of these documents, as previously discussed, revealed that as of December 20, 1968, "an L.A. Brother known as 'Geronimo' arrived in the Oakland area; that he was hiding from someone and that a National BPP representative told him 'that's' cool, stay where you are."

The other document as previously noted revealed that on December 18, 1968, Bobby Seale was going to pick up some people and go to the residence of a Dr. Shapiro at 7:30 p.m.

Neither of the above documents warrant relief on the ground of newly discovered evidence because separately or in combination it cannot be said that they "completely undermine the entire structure of the case upon which the prosecution is based," are "conclusive" and "point unerringly to innocence." (See *In re Weber, supra*, 11 Cal.3d 703; *In re Wright, supra*, 78 Cal.App.3d 788.)

The first mentioned document was indexed under the name of John Jerome Huggins, Jr., a BPP leader from Los Angeles, which indicates that the FBI was unaware of the identity of the "Geronimo" as of that time repudiating Pratt's contention that he was under surveillance by the FBI prior to April 1969 when he assumed a position of leadership in the BPP. The document is also significant in that it indicates that "As of 12/20/68...Geronimo arrived in Oakland." December 20, 1968, is two days after the murder of Caroline Olsen and as Butler testified a day after he talked to Pratt the following day, December 19, 1968. It is common knowledge that an airplane flight from Los Angeles to the San Francisco area only takes about one hour. Moreover, the notation that Pratt was still in town on December 23, 1968, hiding from someone, possibly Los Angeles and Santa Monica police officers looking for Caroline Olsen's murderer, is more consistent with guilt than innocence. There is, therefore, nothing in this document which supports defendant Pratt's alibi that he was in Oakland on December 18, 1968.

There is also nothing in the second mentioned document indexed under the name of Kathleen Cleaver to indicate who was going to be picked up on December 18, 1968. In fact, defendant Pratt's testimony at the time of trial was that he went to San Francisco by airplane several days earlier and went from the airport to the BPP headquarters by taxi cab. Defense testimony was that while he was in the Bay Area he was driven to the BPP functions by Jacqueline Wilcots.

As previously noted in addition to the circumstantial evidence presented by the prosecution in respect to defendant Pratt's ownership of the getaway car and access to the murder weapon, witness Barbara Reed positively identified him in the area of the tennis court prior to the murder and surviving victim Kenneth Olsen positively identified him as one of the two gunmen. The defendant's alibi defense consisted of his testimony that he was in the Bay Area at the time attending a BPP function; the principal corroboration was testimony of three BPP female members (sisters) who said they saw him in the area at that time. The evidence presented to the jury was in sharp conflict and the jury in resolving the credibility issue found against the defendant. It is not sufficient that "the new evidence conflicts with that presented at the trial and would have presented a more difficult queston for the trier of fact." (*In re Wright, supra*, 78 Cal.App.3d 788, 802.)

For the foregoing reasons we conclude that habeas corpus relief on the ground of newly discovered evidence is not warranted.

*Defendant Pratt's Request for an Evidentiary Hearing*

Defendant Pratt requests that if a new trial is not granted under the current state of the record an evidentiary hearing be held in a California state court directed at the FBI to uncover evidence that the FBI "concealed and withheld surveillance evidence corroborative, in part, of Petitioner's alibi defense." By such an evidentiary hearing (discovery) he ostensibly seeks to uncover corroborative evidence to his alibi defense which he argues may be available by reason of the FBI surveillance of the BPP and the defendant himself (as a "target" defendant) through a wiretap of the Los Angeles BPP headquarters and FBI agents and informants in the San Francisco-Oakland area on December 18, 1968, the night Caroline Olsen was murdered in Santa Monica. He also ostensibly seeks to uncover FBI evidence that it (the FBI) conveyed to the L.A.P.D. information it obtained concerning the second suspect (Tyrone) and to establish that Julius Butler was an "informant" prior to and after the times hereinbefore discussed.

Here, defendant Pratt by seeking an evidentiary hearing is requesting this court to refer the matter to the trial court in order to utilize that court for purposes of conducting postconviction discovery seeking to obtain the names of FBI informants in the Bay Area allegedly in an effort to show that the informants would support his alibi defense that he (Pratt) was in the San Francisco-Oakland area on the evening of December 18, 1968, when Caroline Olsen was murdered on the tennis court in Santa Monica.

■ A defendant's motion in a criminal case for *pretrial* and *preconviction discovery*, unlike a civil case, is addressed solely to the sound discretion of the trial court, which has inherent power to order such discovery in the interest of justice to insure a defendant his right to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information. (*People* v. *Municipal Court (Runyan)* (1978) 20 Cal.3d 523 [143 Cal.Rptr. 609, 574 P.2d 425]; *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]; *Hill* v. *Superior Court* (1974) 10 Cal.3d 812 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820].) ■ The requisite showing for discovery in the pretrial and preconviction phase of a criminal case may be satisfied by general allegations which establish some cause for discovery *other than* ""a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.""" (*Robinson*

v. *Superior Court* (1978) 76 Cal.App.3d 968, 973 [143 Cal.Rptr. 328].)

 In the postconviction stage of criminal proceedings, reviewing courts undoubtedly possess the inherent power to refer a matter for an evidentiary hearing when the interests of justice demand, but the requisite showing must at least be equivalent to that necessary for a referral following a claim of incompetency of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859].) In no event is an evidentiary hearing warranted when based on sheer speculation and pure conjecture that there may be some evidence out there some place in the hands of federal authorities that may allegedly corroborate an "alibi" defense. In the instant case in order to justify relief, defendant Pratt must be able to point to something in the record amounting to "a demonstrable reality and not a speculative matter." (*People* v. *Stephenson* (1974) 10 Cal.3d 652 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Pope, supra*, 23 Cal.3d 412.) This he has failed to do. The mere fact that the FBI's COINTELPRO was operational between 1967 and 1971 is insufficient to justify relief by way of an evidentiary hearing. Nor is there any mention or suggestion in the Church Committee Report that the techniques employed in COINTELPRO included the "framing" of a target defendant or members of violent militant groups of a criminal offense.

Furthermore, we agree with Judge Kathleen Parker, after an exhaustive review of the record made available to us, that a referral for an evidentiary hearing would serve no useful purpose for either the defendant or the court.

Federal courts, not state courts, provide the appropriate forum for additional discovery of FBI files. We have no reason to believe that defendant cannot conduct any discovery he may be entitled to in his two federal actions now pending in the federal courts: one under the FOI Act in Washington, D.C. and the other a civil rights action in San Francisco.

Moreover, a subpoena duces tecum issued from a California state court directed at the FBI to obtain the name(s) of FBI informants planted in the BPP in the Bay Area on December 18 and 19, 1968, would undoubtedly be a futile act for the defendant. It is fundamental that courts do not engage in futile acts or make orders compelling the production of evidence which it cannot enforce with a contempt order.

In *People* v. *Cowans* (1980) 111 Cal.App.3d 121 [168 Cal.Rptr. 498], defendant, a member of the Black Guerrilla family, was charged and convicted following a jury trial of two counts of murder, two counts of assault with intent to commit murder and two counts of robbery. On appeal defendant Cowans, amongst other contentions, asserted that the trial court erred relative to the FBI's claim of privilege and refusal to answer regarding their contacts and relationships with other law enforcement agencies relating to the case. This court in rejecting this argument and affirming the judgment of conviction pointed out that the law is well settled that a trial court does not have jurisdiction to order a federal agent to testify beyond the scope allowed him by the United States Attorney General since such an order of the Attorney General of the United States is valid and has the force of federal law. (*People* v. *Parham* (1963) 60 Cal.2d 378, 381 [33 Cal.Rptr. 497, 384 P.2d 1001].) We further pointed out that the law is equally well settled that a trial court of this state cannot impose sanctions on a federal agent for asserting the privilege since the privilege would be absolute and not conditional. (*Saulter* v. *Municipal Court* (1977) 75 Cal.App.3d 231, 245 [142 Cal.Rptr. 266].)

The futility of such a course of action is made apparent in *People* v. *Parham, supra,* 60 Cal.2d 378. In *Parham* a defendant convicted of three counts of first degree robbery appealed on the grounds that he was denied a fair trial because he was denied the right to inspect the signed statements of several witnesses obtained by FBI agents.

The Supreme Court in *Parham* in affirming the judgment of conviction held that an order of the Attorney General of the United States to an FBI agent not to produce the investigative file "[i]s valid and has the force of federal law. (*United States* ex rel. *Touhy* v. *Ragen,* 340 U.S. 462 [ . . . ]; *Jackson* v. *Allen Industries, Inc.,* 250 F.2d 629.) The trial court was therefore bound by the executive order and properly refused to hold Agent Buchanan in contempt. (See *Boske* v. *Comingore,* 177 U.S. 459 [ . . . ]; *Appeal of United States Securities & Exchange Com.,* 226 F.2d 501, 516-520; *Ex parte Sackett,* 74 F.2d 922; *In re Valecia Condensed Milk Co.,* 240 F. 310; *Stegall* v. *Thurman,* 175 F. 813; *In re Weeks,* 82 F. 729; *In re Huttman,* 70 F. 699; *Hubbard* v. *Southern Ry. Co.,* 179 F.Supp. 244.)" (*People* v. *Parham, supra,* 60 Cal.2d at p. 381.)

The *Parham* court also rejected the defendant's contention that because the signed statements were not produced he was deprived of a fair

trial by the denial of his motion to strike the witnesses' testimony, stating that "[I]t does not follow, however, that the use of the witnesses' testimony even though their prior statements were unavailable deprived defendant of a fair trial. The prosecution did not withhold the statements, but on the contrary made every effort to obtain them from the F.B.I. The prosecution cannot be penalized because those efforts failed. The prosecution is not penalized if, through no fault of state officials, a material witness for the defense is unavailable at trial. (*People* v. *Wade*, 118 Cal. 672, 673 [ . . . ]; *People* v. *Williams*, 168 Cal.App.2d 624, 626-627 [ . . . ]; see *People* v. *Collins*, 195 Cal. 325, 333 [ . . . ].) It does not appear that the statements were unavailable because of any improper activity by state officials. The police were under no compulsion to take statements from the witnesses. (See *People* v. *Tuthill*, 31 Cal.2d 92, 97-98 [ . . . ].) There is nothing to show that the police conspired with the federal agents to deprive defendant of the statements. The prosecution was therefore entitled to use the testimony of the witnesses even though their signed statements were unavailable." (*People* v. *Parham, supra*, 60 Cal.2d at p. 382.)

There is no showing that the prosecuting attorney in the instant case withheld evidence or that the L.A.P.D. conspired with the FBI agents to deprive defendant Pratt of any evidence to which he may be legally entitled.

CONCLUSION

The Church Committee Report "is based on a staff study of more than 20,000 pages of Bureau documents, depositions of many Bureau agents involved in the programs, and interviews of several COINTELPRO targets." (P. 3.) *Nowhere in the report is listed as a technique the "framing" of a target of a criminal offense in order to "neutralize" an individual perceived as a threat.* Nor does the report suggest that state governments were involved with COINTELPRO and its techniques, except for the mutual dissemination of information, which is highly desirable between law enforcement agencies at all levels of government. Nor does our independent analysis of the FBI documents supplied this court to date in conjunction with a review of the entire court record support a finding that such a technique was employed by COINTELPRO agents to falsely procure defendant Pratt's conviction.

Accordingly, we conclude that defendant Pratt's contention that FBI's COINTELPRO agents conspired with local law enforcement au-

thorities and the prosecuting attorney to "frame" him by illegally manufacturing, manipulating and withholding evidence in order to insure his conviction is based on rank speculation and sheer conjecture which does not justify the relief sought. Nor does the mere existence of COINTELPRO and its activities as it related to the BPP or to defendant Pratt in and of itself in any way constitute exculpatory evidence. In short, defendant Pratt has not proven the facts on which he relies in support of his claim for relief. (*In re Lawler, supra*, 23 Cal.3d 190, 195.)

*Uncontradicted trial evidence* of ballistics expert Wolfer shows that a .45 caliber automatic pistol seized by the police, along with the arsenal of Black Panther weapons, at 806 West Century Boulevard on January 17, 1969, in an effort to prevent additional bloodshed following the assassination of Bunchy Carter and John Huggins on the UCLA campus, was *the specific weapon* used in the cold blooded shooting of Caroline Olsen on the tennis court in Santa Monica on December 18, 1968.

*Undisputed trial evidence* further shows that the car used to get away from the "tennis court murder" scene on December 18, 1968, was the 1967 Pontiac GTO convertible, white top over red body, owned and brought into California by defendant Pratt on September 16, 1968, bearing a North Carolina license plate with a white background. *The defense's only exculpatory evidence consisted of the claim that other Black Panthers had access to the car.*[39]

The fact that the murder weapon was found in the Black Panther arsenal of weapons (to which defendant Pratt had access)[40] and for purpose of analysis accepting as true defense testimony that Black Panthers, other than defendant Pratt, had access to the getaway car the jury could have concluded beyond a reasonable doubt that *"A" Black Panther murdered Caroline Olsen.*

---

[39]We note that the getaway car owned by Pratt was accessible to other Black Panthers who frequented the Black Panthers Los Angeles headquarters and since the Panthers were a relatively small closeknit group defendant Pratt surely knew or could have ascertained the names of the two Black Panthers who used his car on the evening of the murder of Caroline Olsen on December 18, 1968, *if* in fact he was in the Bay Area. The names of any such individuals were not disclosed during the trial by the defense. By failing to disclose the names of those Black Panthers who had possession of his car on the night of the murder, *if* such existed, then Pratt, in essence, "framed" himself.

[40]All of the weaponry in the BPP's arsonel "belonged to the party, none to the individual member." (See Appen. D, p. 933.)

The positive in-court identification of defendant Pratt as the murderer by victim Kenneth Olsen (see fns. 6, 7, *ante*) and witness Barbara Reed (see fns. 8, 9, *ante*)[41] in conjunction with the testimony of former Black Panther member Julius C. Butler (Julio) that defendant Pratt had admitted to him that he (Pratt) had committed the "tennis court murder" while out on a "mission"[42] constituted overwhelming evidence which would amply justify the jury concluding beyond a reasonable doubt (defined in the jury instructions as "An abiding conviction, to a moral certainty, of the truth of the charge") that defendant Pratt was in fact *"THE" Black Panther* and *specific person* who murdered Caroline Olsen.

Although the defense alibi witnesses[43] contradicted the prosecution witnesses Kenneth Olsen, Barbara Reed and Julius Butler, the jury ver-

---

[41]Of special significance in Barbara Reed's identification testimony was a prominent feature on defendant Pratt's face consisting of a small round-shaped scar or indentation on his lower forehead above the bridge of his nose. As a matter of practicality and probability it would be extremely coincidental and highly improbable for any other light complexioned male Black Panther in the Southern California chapter or any other male black in the greater Los Angeles area or any place at all to have an identically shaped and sized scar in the same position on his face.

[42]We note that Julius Butler's testimony naming defendant Pratt as the "tennis court murderer" was corroborated by the direct and circumstantial evidence pertaining to his (Pratt's) identification by two eyewitnesses, the identification of the murder weapon to which he had access and the identification of the getaway car belonging to Pratt. The fact that a slug removed from Caroline Olsen's body could not be identified, while the shell casings could be identified, is consistent with and corroborates Butler's testimony that Pratt told him he had discarded the barrel of the automatic.

[43]Defense alibi evidence in the main could be characterized as somewhat equivocal. Defendant Pratt "thinks" he was at David Hilliard's house on the night of December 18, 1968. Defense witness and BPP member Shirley Hewitt "thinks" she saw defendant Pratt at David Hilliard's house at a central committee meeting on the evening of December 18, 1968. Defense witness Jacqueline Wilcots stated she drove him to David Hilliard's house after dark on December 18, 1968. Black Panther Kathleen Cleaver testified that she remembered seeing Pratt at Dr. Shapiro's and at David Hilliard's house at meetings during the time frame in question. (The FBI report dated Dec. 19, 1968, indicates that Bobby Seale, Kathleen Cleaver and others were going to Dr. Shapiro's house at 7:30 p.m. on Dec. 18, 1968.)

Conspicuously absent from defense alibi witnesses, at time of trial, and affidavits subsequent to trial, is the testimony of the hosts at whose homes defendant Pratt and defense witnesses say he was at the time the "tennis court murder" occurred, namely, Mr. or Mrs. David Hilliard or Dr. and Mrs. Shapiro. Also absent is the testimony of the numerous other persons who allegedly were present at those meetings on the night of the murder of Caroline Olsen.

Even though some of these witnesses may or may not have been fully cooperative with Pratt since his expulsion from the BPP in January 1971 (see fn. 28, *ante*), there were legal mechanisms available to obtain their testimony under oath at trial.

It would appear that such sworn testimony by the Hilliards, the Shapiros and others at the meetings would have been more accessible to defendant at the time of trial and now and more persuasive of his position than any FBI informants who were in the Bay

dict demonstrates that the jury believed the prosecution witnesses and disbelieved the defense witnesses. We are, of course, bound by the jury's determination of credibility. (*People* v. *Campbell* (1978) 87 Cal.App.3d 678 [151 Cal.Rptr. 175].) Again, of importance is the fact that the prosecution evidence pertaining to (a) the murder weapon, (b) the get-away car, (c) the positive identification testimony of Kenneth Olsen and Barbara Reed, and (d) that of victim Ollie Taylor in the Ollie Taylor incident *all essentially corroborated Julius Butler's testimony either directly or indirectly.*[44]

The record discloses that defendant Pratt was afforded his full day in court. His jury trial was presided over by Judge Kathleen Parker, one of the fairest and most competent and experienced trial judges in the state. He was represented by competent and experienced trial counsel, who during the pretrial phase moved the court to discharge the petit jury panel, to suppress the murder weapon as evidence, and to suppress as evidence the in-court identification of Barbara Reed, all of which were denied. During the course of the month-long trial, defense counsel protected defendant's constitutional rights and vigorously cross-examined prosecution witnesses and had wide latitude in presenting the defense including his "alibi" defense.

Pratt's conviction by a unanimous vote of 12 jurors was unanimously affirmed by the appellate court and his petition for a hearing was unanimously denied by the state Supreme Court. A trial judge on his motion for a new trial and on review a total of 10 justices have upheld the legality of his conviction.

A defendant is only entitled to a fair trial, not an absolutely perfect trial. Defendant Pratt has failed to demonstrate that either the FBI's COINTELPRO or any California state agency separately or acting in con-

---

Area at the time whose identity defendant seeks to have disclosed. In view of the foregoing it could reasonably be concluded that defendant is seeking the disclosure of the identity of the FBI informants (knowing that the disclosure of the identities of the informants will not be forthcoming) for the purpose of gaining some technical legal advantage for failure to disclose or for some other purpose separate and distinct from obtaining evidence as to the truth of his guilt or innocence.

[44]Defense counsel argues that defendant Pratt has always maintained his innocence and that if he was in fact guilty, by admitting his guilt and showing remorse, his sentence could be shortened. The other side of the coin is that the prisons are full of convicted felons maintaining their innocence. Once a convicted felon admits his guilt, he not only loses stature with a large portion of the prison inmates but also loses outside sympathetic support of those individuals and groups (see fns. 2, 5, *ante*) who will continue to seek his release through the courts.

cert has deprived him of a fair trial or denied him due process of law. The record furnished this court on defendant's petition for habeas corpus does not show that he was unfairly tried or unjustly convicted.

## DISPOSITION

The order to show cause is discharged and the petition for writ of habeas corpus is denied.[45]

---

[45]For the sake of completeness, we are not unaware of two actions defendant Pratt has pending in federal courts, one of which is in Washington, D.C. under the FOI Act seeking further disclosure of FBI files pertaining to COINTELPRO and the defendant herein. The other action is in a prison civil rights suit in the United States District Court in San Francisco in which FBI files have been subpoenaed from August 1968 to August 1972 pertaining to Pratt.

Our conclusions and holdings herein are based on the information and documentation supplied this court by defense counsel, the California Attorney General's office and the FBI as of the date of filing this opinion. Should additional evidence be uncovered in the future from the above sources which adequately and legally support defendant's contentions, our determinations herein do not, of course, preclude the filing of a new petition seeking appropriate relief. (*In re Swain, supra*, 34 Cal.2d 300.)

*Re Dissenting Opinion*: The dissenting opinion concludes that defendant Pratt should be granted an "evidentiary hearing" because he was not afforded "due process of law" in that his trial in 1972 was not fundamentally fair. Such a conclusion clearly is not supported by the record and is predicated on a selective reading of the record and misconstruction and misapplication of controlling law.

"Due process," simply stated, requires notice and an opportunity to be heard by an impartial tribunal under applicable rules of general law. The in-depth and exhaustive analysis of the total record in conjunction with the application of settled rules of law which govern original habeas corpus proceedings as discussed in this majority opinion amply demonstrates that defendant Pratt's conviction was in full accordance with "due process" requirements and that he has simply failed to make a sufficient showing to justify any relief whatsoever.

The dissenting opinion has bought hook-line-and-sinker defendant's arguments in his petition which when dissected and analyzed have as little substance as a handful of fog. Reliance on some nebulous concept that a fair trial was denied defendant based solely on allegations which are wholly speculative and conjectural and admittedly unproven not only defies logic but ignores the standards set by the Supreme Court in *In re Imbler, supra*, 60 Cal.2d 554. Again, mere allegations of "governmental improprieties" based on pure surmise and speculation sans supporting facts are insufficient to support the granting of relief. (See *In re Lawler, supra*, 23 Cal.3d 190.)

Defendant's petition for habeas corpus in an original proceeding before this court is primarily directed at "governmental improprieties" on the federal level by the FBI. Inquiry at an evidentiary hearing into the nine items listed at the end of the dissenting opinion would be nothing more than a "fishing expedition" into state waters burning up additional court time and resulting in an unnecessary expenditure of public funds. Defendant already has two "lines" into federal waters by way of an FOI Act case and a civil rights action in federal courts in Washington, D.C., and San Francisco. As previously noted if those "fishing expeditions" uncover evidence of a sufficient quantity and quality to adequately and legally support his contentions, he is not precluded from filing a new petition seeking appropriate relief. (*In re Swain, supra*, 34 Cal.2d 300.)

*The dissent's items 1, 2 and 3* listed for inquiry at an evidentiary hearing pertain to FBI informants in the defense camp during the trial. The dissent's argument in relation

Lillie, Acting P. J., concurred.

DUNN, J.*—I respectfully but vigorously dissent from the judgment of my colleagues. In my view they misperceive the essential issue raised by

to *Barber v. Municipal Court, supra,* 24 Cal.3d 742, is unintelligible. We need not repeat here the total of six major distinguishing factors and reasons listed in the body of this majority opinion demonstrating that *Barber* is clearly inapplicable to the instant case. In response to the dissent's reliance on *Barber,* we add that such a hearing would be useless since it would be held to answer questions with a presently known answer and a known result. There is no dispute that FBI informants (as distinguished from local law enforcement informants) were in the defense camp and no doubt that the FBI would refuse to disclose their identities in order to protect the FBI informants' lives. Moreover, *Barber*'s sole remedy is a per se dismissal of the underlying charges. This in no way authorizes a *carte blanche* evidentiary hearing on matters unrelated to the issue of informants in the defense camp being privy to discussions between defendant and counsel concerning defense trial strategy or tactics. Nor does the dissent explain how California can constitutionally apply to a federal agency its ruling in *Barber* which admittedly is at odds with the United States Supreme Court's decision in *Weatherford v. Bursey, supra,* 429 U.S. 545. Again, critical here is the fact that while the FBI informants may have had access to defense strategies the information obtained was of such a general nature as to be of no aid to the prosecution and was not detrimental to the defense; in any event it was *not* transmitted to the local prosecuting attorney for use during the trial.

It would appear, therefore, as indicated in footnote 43, *ante,* that the only purpose in seeking to have a California court order the FBI to disclose the names of its informants is a tactical maneuver by Pratt's counsel to attempt to obliterate the distinction between federal and state informants and to persuade some trial court to blaze a new trial by dismissing the underlying murder charge against Pratt and thus gain his release from prison irrespective of his jury conviction of the "tennis court murder."

*The dissent's item 4* pertains to prosecution witness Julius (Julio) Butler which is discussed in great detail in the body of this majority opinion and needs no further amplification except that, as noted, Butler did not consider himself an informant (snitch) and Sergeant Rice testified that Butler furnished information to the L.A.P.D. Moreover, assuming, arguendo, that Butler did lie in respect to his informant status, the case of *People v. Ruthford, supra,* 14 Cal.3d 399, relied on in the dissent was an appeal case as distinguished from a case arising out of a petition for habeas corpus, it does not stand for the proposition that *any* false testimony is reversible error. Furthermore, if on appeal a defendant must establish the substantial materiality of the suppressed evidence, which was not established here, a lesser standard certainly should not be applied to a habeas corpus postconviction proceeding. Nor does the dissenting opinion explain how Butler's denial of the fact that he was an FBI informant (if he was one) relate to Butler's interest in testifying truthfully or falsely as to Pratt's admissions to him, the truth of which was corroborated by other prosecution witnesses.

*The dissent's item 5* poses the question: "Was the petitioner a subject focused on for 'neutralization' by COINTELPRO prior to trial in 1972?" Of course, he was.

There is no question that Pratt became the subject of COINTELPRO's efforts to "neutralize" him after his assumption of a leadership position in the LA BPP in April 1969. However, there is no showing whatsoever, either in the Church Committee Report or before this court, that COINTELPRO's counterintelligence measures and techniques for "neutralization," the use of leaflets and fake letters which were employed "to deny unity of action in the effort of the LA BPP" by splitting the BPP and turning the leaders against each other included a technique of "framing" Pratt of the "tennis court mur-

*Assigned by the Chairperson of the Judicial Council.

this petition. Whether or not the evidence which was presented at the trial points unerringly to the defendant's guilt is not the fundamental is-

---

der." In fact the Church Committee Report states that *all COINTELPRO activities were officially terminated on April 27, 1971,* over a year before Pratt's trial in 1972.* Nor does the dissent otherwise establish how the fact that Pratt was an object of COINTEL-PRO as described in the body of this majority opinion was at all relevant to the "tennis court murder" of which he was convicted.

*As to item 6,* it is common knowledge that law enforcement agencies at various levels of government (city, county, state and federal) share or pass along information about *specific crimes* and criminal activity to each other. Such a procedure not only conforms to long accepted practice and is completely proper in all respects but is highly desirable in the war against rampant criminal activity. Here, there is no showing by defense counsel that the prosecution failed to supply any information at its disposal to which the defense may have been legally entitled.

In addition, although it is somewhat unclear for what purpose the dissent relies upon *People* v. *Mejia* (1976) 57 Cal.App.3d 574 [129 Cal.Rptr. 192], such reliance is misplaced as there is no showing that the FBI or the prosecution separately or in concert deported, hid or failed to produce any material witnesses. The Court of Appeal in *Mejia* (57 Cal.App.3d at p. 581) stated: "If the federal government, unilaterally and without the knowledge and aid of state authorities, deports aliens who later turn out to be material witnesses in state court criminal proceedings, the distinction urged by the People might well be valid. That is not the case presented here. There can be no question but that state action initiated and was at least partially responsible for the fact Velasquez and Arce became unavailable as witnesses...."

*The dissent by its item 7* refers to a matter not properly before this court in these original proceedings. It apparently refers to an intelligence report from the L.A.P.D. dated March 28, 1971, which had been sealed at the defense request. This document was viewed *in camera* by this panel on its own motion on August 27, 1980. The portion which the dissent evidently refers to pertains to the second suspect in the "tennis court murder" (presumably the person named "Tyrone" who was introduced to Butler by Pratt on the evening preceding the robbery-murder). This report was supplied Judge Kathleen Parker by Pratt's defense counsel for purposes of the defendant's previous petition for habeas corpus. Presumably to avoid public exposure of the contents in the report which shows conduct inconsistent with Pratt's claimed innocence, defense counsel Stuart Hanlon obtained an ex parte protective order from Federal Magistrate Frederick J. Woelflen releasing the document for an *in camera* inspection by Judge Parker only. The order contained the request by Magistrate Woelflen that his court be contacted "before releasing said document to the prosecution or to any other persons." This court, in view of the dissent's reference to the second person involved in the Santa Monica shooting to which the FBI and the L.A.P.D. had some knowledge, requested permission telephonically of Magistrate Woelflen to disclose the contents of the protected document. This request was granted by Magistrate Woelflen as it would have no effect on the pending federal case.

The above referred to intelligence report dated March 28, 1971, contains a brief statement that "(source deleted) advised that a brother named (deleted), last name unknown, assisted Elmer Pratt in the robbery and murder on the Santa Monica tennis court." The source recalled that the second suspect had been arrested in a stolen Cadillac but the cases were dismissed, mentioned the area in which the suspect hung out and

---

*The Church Committee Report states that "all COINTELPROs were officially terminated on April 27, 1971." The Committee requested that the FBI provide it with a list of any *"COINTELPRO-type" actions since April 28, 1971.* The Bureau located and furnished the Committee two instances of posttermination COINTELPRO-type operations. One instance involved an FBI contact with the editor of a Southern newspaper to ar-

sue, because in any trial if an effective defense is throttled there can be no conclusion other than one of guilt. The basic immediate question be-

a girl friend but ends with the statement: "*When Pratt was indicted for the shooting, (deletion) received orders to split from Los Angeles.*" The balance of the lengthy intelligence report refers to another murder "on order from National Headquarters, Berkeley, California" because the victim had been "screwing around with (deletion) and because he was dropping too many 'Bennies,' screwing up him [*sic*] mind, and a security risk to the Black Panther Party." The main portion of this lengthy report, in addition to the mention of the murder of a special officer and bombings by Black Panthers (names deleted), contained information of elaborate plans between defendant Pratt and others outside the jail to effect Pratt's and other Black Panthers' escape from the county jail, included the use of weapons against police officers if necessary and for a switch to "cold" cars (other vehicles) a short distance from the area of escape to "hideout pads"; although there was evidence of a "dry run" prior to the date scheduled for the jail break, the escape plan was never executed. The report also includes information from informants indicating a plot to kidnap public officials to be "released upon receipt of a one-way ticket via Airline Algeria for (names deleted)."

Since the second suspect (presumably Tyrone) had "*split from Los Angeles,*" there is no showing that the prosecution knew how he could be located. As the evidence is undisputed that two male Black Panthers were involved in the "tennis court murder," defendant Pratt would be in a better position than the police to locate the other suspect who "split." In addition, it is obvious that the information contained in the report is indicative of Pratt's guilt rather than of his innocence in that he made plans to escape from jail.

*The dissent's item 8* selects one question addressed to victim Kenneth Olsen and his answer out of the lengthy reporter's transcript and refers to a declaration by Deputy Public Defender Laurence E. Rivitz indicating that Mr. Olsen had previously identified two other suspects in a lineup.

The dissent acknowledges that the issue of the Rivitz declaration was raised in 1972 at defendant's motion for a new trial and rejected by the trial court. The issue was not specifically raised on appeal (see Appen. B) but was apparently before Judge Parker again on defendant's recent petition for habeas corpus before her court which was denied. Defendant has not included that issue in his *original proceedings* before this court. The dissent has, therefore, resurrected the issue although it is not properly before this court. In any event, this information was known to Pratt at the time of his appeal and was not raised. Habeas corpus is not a vehicle for raising contentions which could have been made on appeal but which were not. The burden is upon the defendant to give a satisfactory reason for not raising the issue on appeal (*In re Walker* (1974) 10 Cal.3d 764 [112 Cal.Rptr. 177, 518 P.2d 1129]) and even if the allegations could be considered under the rules applicable to habeas corpus the defendant's unreasonable and unexplained delay in raising the issue precludes relief. (See *In re Wells* (1967) 67 Cal.2d 873 [64 Cal.Rptr. 317, 434 P.2d 613].)

*As to the dissent's item 9,* see footnote 43, *ante.*

A basic concept built into our Constitution is that if changes are to be made in our

range to have reporters interview KKK members and write an article based on those interviews while furnishing information on Klan use of the polygraph to "weed out FBI informants." The result of the subsequent publication of the Klan activities resulted in a number of Klan officials ceasing their activities. The other instance involved an anonymous letter and derogatory newspaper clipping sent to a BPP officer in the Northeast to discredit a Panther leader's activities. The committee discovered a third instance where an attorney's political background was furnished to a friendly newspaper intended to discredit an attorney and his client. (P. 13.) None pertain to the BPP on the west coast and none pertain to Pratt and none involve "framing" anyone.

fore this court is whether the petitioner was afforded due process in his trial; that is, was the conviction procedure, when examined as a whole, fundamentally fair?

A trial which is not fundamentally fair is no trial at all. It is a non-sequitur to argue that a defendant is obviously guilty if it is an estab-

---

form of government and its major duly constituted institutions that such changes are to be brought about only by peaceful legitimate means through the political process at the ballot box and not by bullets and bombs. The record before us reflects that the FBI perceived the BPP as a violence-prone black (racist) hate organization whose means of revolutionary changes included the use of bullets and bombs and literally at war with law enforcement officers (see Appen. D ). As the Church Committee Report indicated, the FBI had few if any guidelines to go by and took the initiative by putting into place COINTELPRO to meet that internal threat.

Defendant Pratt's petition in the instant case is hollow. It follows the too often typical pattern in today's upside-down system of criminal justice where a defendant himself charged with or convicted of such "illegal acts," such as murder, attempted murder and robbery in the instant case, seeks to focus attention on the alleged "illegal acts" of law enforcement officers. Without commenting on the propriety of the techniques and measures used by COINTELPRO, *relevant here is the fact that there is no showing that FBI's COINTELPRO techniques included the "framing" of defendant Pratt for the "tennis court murder."*

In the case at bench defendant Pratt was only entitled to a fair trial, not a perfect trial. The record reflects that he was fairly tried and justly convicted by due process of law.

Finally, the dissent by referring to selective portions of the record instead of the total record and ignoring controlling precedent has apparently succumbed to the discredited "ideal of perfectibility" which is "the concept that with the expenditure of sufficient time, patience, energy, and money it is possible eventually to achieve perfect justice in all legal process." Such a "noble ideal has consistently spawned results that can only be described as pandemoniac" in our criminal justice system.

"[I]n our pursuit of the will-o'-the-wisp of perfectibility, we necessarily neglect other elements of an effective procedure, notably the resolution of controversies within a reasonable time, at a reasonable cost, with reasonable uniformity, and under settled rules of law.

". . . . . . . . . . . . . . .

"The ideal of perfectibility denies the existence of price and cost, and, at least, in criminal procedure, relies heavily on the argument that no sacrifice is too great when human life or liberty is involved. Better that a hundred guilty men should go free than that one innocent man be convicted, is the rallying cry of the perfectionists. But this slogan gets us no further than does its obverse—better that one life should be sacrificed that a hundred others may be saved. The plain fact of the matter is that in human affairs we balance the cost of human life against other considerations in almost everything we do, and it is incorrect to say that the sacrifice of human life to attain particular ends is never justified. The real question is one of relative values—is the end in view worth the price it is likely to cost?

"But, the perfectionists argue, no sacrifice is too great to assure that in a given case perfect justice will be done. Ignored is the sacrifice of the legal order itself and of the life, liberty, and property of those that the legal order is designated to protect. Ignored also is the necessity that the procedure we follow lend substance to the moral and ethical idea that those who take up the sword shall perish by the sword." (Fleming, The Price of Perfect Justice—The Adverse Consequences of Current Legal Doctrine on the American Courtroom (1974) pp. 6-9.)

lished fact that the defendant was not afforded a fair trial. This case, like all cases, invites the question, can any defendant feel assured, no matter how apparent his guilt may appear from an examination of the prosecution evidence that he is, under our system, afforded due process? If the answer is not affirmative, if the procedural methodology adopted in our trials lacks fundamental fairness, then the price we pay for a conviction is more costly than we may surmise—the loss of the foundation of any free society—untarnished administration of justice.

By a petition for writ of habeas corpus the petitioner herein challenges his conviction of July 28, 1972, asserting that it was gained in violation of his constitutional rights in that: (1) a key prosecution witness, Julio Butler, committed perjury at the trial by denying his status as an informant, (2) the government has concealed and withheld evidence which is relevant and in part, corroborative of petitioner's alibi defense and, (3) the government was privy, by unlawful means to communications concerning defense strategy during the trial. These allegations, in my view, if true, constitute a denial of due process which would mandate relief. Petitioner seeks, by way of relief a dismissal or, in the alternative a new trial or an evidentiary hearing. For the reasons which follow I am of the opinion that an evidentiary hearing should be granted.

I

*The Record Before the Court Indicates That There Were Informants in the Defense Counsel's Environs During the Trial Who Had Access to All Information and Strategy Utilized by the Defendant.*

The record before the court, which includes a review of certain documents at an ex parte *in camera* hearing of this court on August 21, 1980, reveals that prior to and during the trial there was more than one person who had access to the information the defense had and any strategies that it would utilize and that these persons acted as informants to the Federal Bureau of Investigation. The information before the court reveals that these informants were present at several conferences between petitioner and his attorney during the trial. The existence of one such informant was revealed to the petitioner for the first time in December 1979.

The majority apparently find no due process flaw in this revelation. They take the position that since the informants did not testify and

since the FBI states that the informants only obtained general information which was not transmitted to the prosecution this constitutes no basis upon which to grant relief to the petitioner.

It is now well established that a defendant has an *absolute* right to effective counsel which includes the *absolute* right to communicate with his counsel in private. The intrusion of an informant into the attorney-client relationship when a defendant is preparing for trial or is in trial is a violation of the constitutional guarantees contained in the Sixth Amendment to the United States Constitution and in the California Constitution, article I, section 15. Moreover, our Supreme Court has recently explicitly enunciated this right in *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 759-760 [157 Cal.Rptr. 658, 598 P.2d 818], a case involving intrusion into the attorney-client relationship through the use of informants: "The intrusion, through trickery, of the law enforcement agent in the confidential attorney-client conferences of petitioners cannot be condoned. The right to confer privately with one's attorney is 'one of the fundamental rights guaranteed by the American criminal law—a right that no legislature or court can ignore or violate.' *In re Rider, supra,* 50 Cal.App. at p. 799 [195 P. 965].)" (See also *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].) Two arguments against relief which have been presented in this case are nullified by the *Barber* decision. The court said that it is immaterial that the purpose of the intrusion is to detect future crimes rather than to discover defense strategy. Moreover, it was argued in *Barber,* as here, that there was no evidence present that the information was transmitted to the prosecution. The Supreme Court held that, nonetheless, the only effective remedy was dismissal of the charges. The rationale of this ruling is that people are entitled to be assured of confidentiality whether their communications be with the attorney alone or in a conference setting. An exclusionary rule is inadequate because the use of illegally obtained evidence would be difficult to prove and because an exclusionary rule would not provide the necessary incentive to deter state agents from such violations.

The majority see a distinction between the fact that in *Barber* the informant was a sheriff posing as a codefendant whereas, in this case, the informants were acting under the auspices of the federal counterintelligence program (COINTELPRO). I see no distinction. Informants in this case were in a position to report to a state agency and, if that is a crucial point, an evidentiary hearing seems appropriate to resolve the issue since there are no affidavits in this record from the Los Angeles Police

Department-criminal conspiracy section (LAPD-CCS) to indicate that they did not receive the information uncovered. In any event, such a distinction is artificial inasmuch as the principle involved is to guard against government removal of the effective right to counsel. One either has absolute privacy with counsel or one does not. If the rule begins to be eroded by factors such as making distinctions between governments or agencies of governments, or by evaluating whether the information obtained was "specific" or "general," skimpy and obvious or substantial and obscure, then soon there is no rule. Similarly, it is an exercise in artifice to say a principle of law that is applicable to one category of people is inapplicable to another because that group is perceived by the agency which perpetrates the infiltration to be a "militant, violence-prone hate group." Is this or any court to permit the establishment of a rule which is dependent upon the perceptions of the director of an agency? How often must we remind ourselves that it is illegal acts which must be curtailed, not deviate thought? We must not surreptitiously curb variance in thought, no matter how extreme, for this bodes ignorance of the contributions of our most severe critics and ignores that such curbs are the first step in generating a climate of conformity and neutrality. Nor may we distinguish the situation in *Barber* from this one on the basis that the offenses involved here are brutal in nature. The issue is not whether we permit dismissal as to misdemeanants versus violent felons. The essential issue is, do we adhere to principles which resist degradation of judicial procedures which insure fairness no matter how petty or how serious the offense at issue? It is of no moment that this governmental intrusion was discovered subsequent to trial and conviction. There is no duty upon the defendant to discover government misconduct prior to trial. (See *In re Johnson* (1979) 24 Cal.3d 769 [157 Cal.Rptr. 674, 598 P.2d 834], the companion case to *Barber, supra.*) The retroactive effect of *Barber* or extension of its principles to other factual situations is of no concern here inasmuch as I do not at this point urge *per se* dismissal and inasmuch as the petitioner has met his limited burden of establishing prima facie evidence in support of his contention. Whether or not the information obtained by the informants was disseminated to the prosecutor, it is clear that there was sufficient denial to petitioner of due process to warrant relief.

## II

*The Record Before the Court Indicates That the Prosecution Witness Butler May Have Been an Informant and May Have Perjured Himself Regarding This Fact.*

Julio Butler was the principal witness for the prosecution. At trial he testified that petitioner had orally confessed to shooting the Olsens. Butler testified he had been a sheriff for Los Angeles County but resigned to operate a beauty shop and that he had severed all ties with law enforcement. He was specifically questioned and answered as follows:

"Q. And when you were working for the Black Panther Party were you also working for law enforcement at the same time?

"A. No.

"Q. You had severed any ties you had with law enforcement?

"A. That's correct.

"Q. Have you at any time since leaving the Sheriff's Department worked for the FBI or the CIA?

"A. No.

"Q. Are you now working for the FBI and the CIA?

"A. No."

Petitioner contends that Butler committed perjury and that this circumstance necessitates a reversal of his conviction. The record before the court contains a statement by Butler (not made under penalty of perjury) dated November 17, 1979, denying that he was ever an FBI informant. Also before us is a letter dated January 16, 1980, written by Acting Director Lee Colwell of the FBI to our Attorney General transmitting to that office what is described as "40 pages of documents which set forth contacts between the FBI and Julius Butler." The letter, of course, is not in affidavit form nor are the single-page reports of the contacts furnished by the Bureau anything but hearsay. There is apparently, however, no dispute that these pages were produced by the FBI from their files. These memoranda establish initial contact by the FBI and Butler on August 14, 1969. The memoranda show that there was discussion regarding the possession of a Thompson machine gun by Butler and FBI interest in maintaining contact with Butler. The major

subject of conversation was the Black Panther Party and these memoranda show some 33 contacts between Butler and the FBI from August 14, 1969, to April 28, 1972, during which he supplied information to the FBI about the Black Panther Party in Los Angeles.

Of additional interest is a Los Angeles FBI document summarizing a five-month surveillance of petitioner between *January 29*, 1969, and May 23, 1969, which includes a report (pp. 12-13) of a Black Panther Party meeting in Gardena. The informant's name has been blacked out but the word "Julius" is handprinted at the top of page 13. The explanation of the reference to "Julius" is provided in a letter dated January 16, 1980, from acting director of the FBI Lee Colwell to the State Attorney General, George Deukmejian.

"In response to the question as to the reason 'Julius' appears at the top of Page 13 of a Los Angeles report dated June 2, 1969, on Pratt, which was furnished to you by Congressman McCloskey, the name appears for FBI indexing purposes. The meeting referred to on Page 13 of this report was held at the residence of Julius Butler early in 1969, and while he was not the source of the information contained on this page of the report, his name was marked for indexing at FBI Headquarters as 'Julius Carl Butler.' However, in the Xeroxing process only 'Julius' remained on the copy furnished to you." From these documents it is apparent that Butler supplied the FBI with information about the Black Panther Party in Los Angeles from at least August 14, 1969. While there may be semantic distinctions regarding what criteria defines an "informant" and about what constitutes "working for" the FBI, the memoranda indicate that Butler was, in some instances, described therein as a "PRI" which, translated, means a probationary racial informant.

In my view, Butler's status as an informant was a material fact which could have affected his credibility at the Pratt trial. His status as determined at an appropriate evidentiary hearing would be relevant as to his *interest* in testifying truthfully or falsely. (See *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341], where the court reversed the conviction of the defendant because the fact that the key prosecution witness had a motive to lie was kept from the jury. The court felt this was not harmless beyond a reasonable doubt.)

There is no evidence before this court that the prosecutor Deputy District Attorney Richard Kalustian knowingly suppressed Butler's re-

lationship, whatever it was, with the FBI. He has denied, under oath, that he had any knowledge of FBI involvement in the Pratt prosecution. Good faith, however, is immaterial here. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218-219, 83 S.Ct. 1194].) And, as was explained in *People* v. *Ruthford, supra,* 14 Cal.3d 399, 407, quoting *Napue* v. *Illinois* (1959) 360 U.S. 264, 269 [3 L.Ed.2d 1217, 1221, 79 S.Ct. 1173]: "'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.'"

Petitioner has, in my view, made a sufficient prima facie showing of possible perjury on the part of Butler to warrant further inquiry.

### III

*The Record Before the Court Indicates That Certain Information Which May Have Affected the Jury's Decision Was Not Revealed to Petitioner.*

#### A. *The Petitioner May Have Been a Target of COINTELPRO*

During the period of petitioner's arrest and trial it appears that he may well have been, as petitioner contends, a principal target of the FBI's counterintelligence program (COINTELPRO). That program was covert and aggressive and utilized informers and secret campaigns with the objective it seems, of discrediting the petitioner. Three documents serve to illustrate the point. A memorandum from the special agent in charge (SAC) of the Los Angeles field office to the FBI director, with the date January 28, 1970, is captioned, "COUNTERINTELLIGENCE PROGRAM, BLACK NATIONALIST—HATE GROUPS, RACIAL INTELLIGENCE, BPP." The memorandum proposes the creation of an anonymous underground newspaper "to attack, expose, and ridicule the image of the BPP in the community and foment mistrust and suspicion amongst the current and past membership." It also proposes the creation and distribution of two fake leaflets, one of which was to be directed at petitioner. On page 2 the memorandum states: "Operation Number One is designed to challenge the legitimacy of the authority exercised by ELMER GERONIMO PRATT, BPP Deputy Minister of Defense for Southern California."

The second document is a report regarding the petitioner's activities from May 6, 1969, to June 21, 1970, which states: "Constant consideration is given to the possibility of the utilization of counterintelligence measures with efforts being directed toward neutralizing PRATT as an effective BPP functionary."

The third document is an Airtel from SAC Los Angeles to the FBI director dated August 10, 1970, which recommends that the FBI send fake letters to Huey Newton upon his release from prison charging that during Newton's absence BPP members were "brutalized and mistreated" by Pratt and one David Hilliard, the BPP national chief of staff. The objective of the letters proposed was to split the BPP and to turn Newton against Pratt and Hilliard.

If, in fact, the petitioner was an object of such a program as COIN-TELPRO that information would have been relevant and material to the jury. At the time of trial, if this information had been made known to the petitioner, it might have profoundly affected the outcome of the trial. An evidentiary hearing might well determine the truth or falsity of the charge that petitioner was a target and, if so, determine if that information was, in fact, suppressed.

**B.** *The Percipient Witness Olsen May Have Made a Prior Positive Identification of Other Subjects.*

Petitioner alleges that Kenneth Olsen prior to trial positively identified a man named Ronald Perkins, who had no facial scar, as the man who shot his wife and identified another man named Vance as his accomplice. This purported identification took place on December 24, 1969, at a police lineup. This assertion is based upon the declaration by Los Angeles County Deputy Public Defender Lawrence E. Rivitz who was representing Perkins. Allegedly the witness slip which was signed by Olsen to this effect was withheld from petitioner.

Inasmuch as the only percipient witness, Kenneth Olsen, positively identified petitioner at the trial as the shorter of his two assailants, such a witness slip, it seems to this observer, if it existed was material, and relevant evidence which the prosecution should have provided the de-

fense during discovery. Its importance is emphasized in that Olsen's partial testimony at trial regarding the lineup was:

"Q. Were you able to identify anybody at that lineup?

"A. ...I didn't feel I could really make an identification of that person, because I didn't feel, really, that it was the person." This testimony directly contradicts the strong statement by Rivitz in his declaration that the Olsen identification of Perkins and Vance was positive. An evidentiary hearing is required to make a factual determination regarding the event. Since the jury of necessity had to evaluate the credibility of Olsen's identification, such information regarding a prior identification would have been material. Denial of an evidentiary hearing by this court has the effect of a finding that if Mr. Olsen did make the identification as alleged, this ID is not substantially material evidence, or is substantially material evidence which was harmless beyond reasonable doubt. In my view such a finding is erroneous. We note parenthetically that the issue of the Rivitz declaration was raised in 1972 at a motion for new trial in the context that Kenneth Olsen had perjured himself at the trial. The motion was denied on the basis of due diligence because defense counsel should have known that Rivitz was present at the lineup [under the authority of *United States* v. *Wade* (1967) 388 U.S. 218 (18 L.Ed.2d 1149, 87 S.Ct. 1926),] and had an opportunity to ascertain if he would controvert Mr. Olsen's version of the identification. The issue posed here is different. The declaration raises an issue not previously litigated that the state, through the police department and, or the district attorney's office, suppressed material evidence; to wit, the witness slip. It is, therefore, not res judicata nor the subject of collateral estoppel.

C. *The Name of a Second Suspected Assailant May Have Been Uncovered, Revealed to the Los Angeles Police Department, but Not Revealed to Petitioner.*

Before the court also is a document which indicates that on or about March 29, 1971, the FBI provided to the Los Angeles Police Department the name of a person (deleted) that the FBI apparently believed was the second person involved in the Santa Monica shooting. The defense attorney Johnnie Cochran, by his declaration of July 18, 1980,

asserts that he was never provided this information and that Richard Kalustian, the prosecutor, advised him that he possessed no information regarding the second assailant. There is no question but that evidence regarding a second assailant's identity is evidence directly bearing upon the issue of guilt or innocence. The precise nature of the information regarding this second suspect, whether or not it was provided to the district attorney and whether further investigation regarding that suspect was undertaken is, at this time, unknown to petitioner. It is manifest, indeed, that an evidentiary hearing directed at discovering the specifics of the information and its materiality is in order. If the information is substantive and material and was withheld from the petitioner, then due process was denied him. The majority by ruling against an evidentiary hearing hold as a matter of law that whatever the evidence regarding the other possible assailant may be, it cannot constitute substantially material evidence which, if suppressed, would be grounds for reversal. Such a position defies logic inasmuch as knowledge of the identity of the second assailant would in most probability provide insight into the identity of the other assailant, be it petitioner or someone else.

> D. *Exculpable or Inculpable Evidence May Have Been Uncovered by Telephone Surveillance and Not Revealed to Petitioner.*

Petitioner further charges that the government "has concealed and withheld" evidence "corroborative, in part, of petitioner's alibi defense." Pratt's defense at trial included his assertion that he was in the San Francisco Bay Area from December 13th, 14th or 15th, 1968, to December 26, 1968. He testified that while in northern California he called the Los Angeles Black Panther Party's main office on a daily basis. Clearly, reliable evidence regarding petitioner's whereabouts on December 18, 1968, is the most compelling evidence that petitioner could obtain. Before the court are two documents indicating radio and telephone surveillance of BPP headquarters from November 15, 1968, to December 20, 1968. There are two other pages of memoranda which show that the FBI maintained an interest in the activities of Black Panthers in Oakland, California in December 1968. The memoranda have been released with the usual deletions which render the information contained therein practically unintelligible. If, however, telephones were tapped, it is conceivable that the records will either confirm or refute

the petitioner's contention that he was in northern California at the time of the murder. Certainly, in my view, this potentially exculpable or inculpable evidence should have been provided to the petitioner's defense counsel. The FBI has indicated (not by affidavit) that the transcripts of the conversations recorded by these telephone taps have been lost or destroyed. An evidentiary hearing will provide an opportunity to determine if they are inextricably lost, or if they can be produced or reconstructed. It seems most apparent that such information is relevant and material.

In summary, from the evidence presented to this court one can conservatively and reasonably conclude that (1) Mr. Olsen may have positively identified other people as his assailants prior to the trial and that this information may have been kept from the petitioner; (2) the LAPD probably were given the name of a person suspected of being one of the assailants of the Olsens and this was not revealed to the petitioner; (3) telephone and/or radio "taps" on BPP headquarters in Los Angeles and/or Oakland were in existence for a month prior to and including the date of the murder and this information was not provided to petitioner, and (4) the FBI may have targeted the petitioner for " neutralization" prior to his trial.

Suppression of evidence favorable to an accused by conduct which is attributable to the state is sufficient ground for reversal of a conviction. *People* v. *Ruthford, supra*, 14 Cal.3d 399. The rule of *Ruthford* is that if evidence which bears directly upon the question of guilt or innocence is suppressed, the defendant is not required to establish prejudice to himself due to the denial of the opportunity to present the evidence, and reversal of the conviction is mandated. (*Id.*, at pp. 406-407.) It is apparent that the alleged suppression of information relating to the possible identity of the second assailant and the knowledge of the LAPD, if indeed they had such knowledge, of the existence of the telephone taps would come under this rule. *Ruthford*, further holds that if the suppressed evidence bears upon the credibility of a key prosecution witness (Kenneth Olsen and Julius Butler) then the defendant must establish substantial materiality and, in addition, that he was prejudiced by his lack of ability to present the evidence at trial. (*Id.*, at p. 408.)

I am not dissuaded at this point by the argument that acts by federal agents, if unknown to state authorities, cannot fall under the umbrella of *Ruthford* because it is not conduct attributable to the state. In my

view an evidentiary hearing is required to determine the degree, extent and nature of the relationship and cooperation which existed, if it did, between the state authorities and the federal authorities with regard to each of the issues raised herein. Upon a showing of a federal-state liaison as to any of the issues, knowledge of information in the possession of one should, in fairness, be imputed to the other, whether or not actual knowledge was possessed by the prosecuting authority. (See *United States* v. *Antone* (5th Cir. 1979) 603 F.2d 566, 569-570; *People* v. *Mejia* (1976) 57 Cal.App.3d 574, 581-582 [129 Cal.Rptr. 192].) In the *Mejia* case the defendant was arrested concurrent with two Mexican nationals. The latter were turned over to immigration and were deported. The defendant's motion to dismiss on the ground of unavailability of the deported witnesses who, by the facts of the case, were in a position to testify to matters material to the defense was granted and upheld on appeal. The reasoning of the court was that had the state authorities informed Mejia of the pending deportation of the witnesses before it occurred, he could have subpoenaed them and held them available for trial. The court rejected the argument that the state was in no way involved with the deportation of the witnesses. The court held that where there was cooperation between the state and federal authorities the responsibility for the deprivation of a constitutional right had to be shared. (*Id.*, at pp. 581-582.)

Being cognizant of the many problems inherent in the position that an evidentiary hearing should be granted, but being equally mindful of the crucial issue of assuring that due process was exercised in this case, I urge that further exploration is required here. For it is due process which protects not only the personal freedom of each individual, but the collective rights of those in a free society.

The petitioner having made a prima facie case for the alternative relief requested by his writ of habeas corpus, a judge of the superior court should be appointed as referee to hold an evidentiary hearing including the taking of evidence and allowance of such discovery as is necessary and fair in the exercise of sound discretion. (See *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 535-536 [113 Cal.Rptr. 897, 522 P.2d 305]; Pen. Code, § 1474.) Inquiry should be made and findings of fact rendered regarding, but not necessarily limited to the following issues:

1. Did any government entity have an informant or informants present during any communication between petitioner and his attorney

or any other individual regarding petitioner's defense either before, during or subsequent to the trial?

2. If such an informant or informants existed, is the government agency prepared to disclose the identity of such informant, and, if not, why not?

3. If the said informant's identity is disclosed and the informant is examined under oath, under what conditions, at what places and on what dates was the informant present and what information was reported regarding the communications and to whom and when?

4. Was Julius Butler an informant for the Federal Bureau of Investigation prior to giving testimony at petitioner's criminal trial? Did Butler testify accurately or falsely at petitioner's trial with regard to his status or relationship with the FBI, and if not, what constituted his motivation for false testimony?

5. Was the petitioner a subject focused on for "neutralization" by COINTELPRO prior to his trial in 1972?

6. Was there a state-federal relationship of any kind regarding the prosecution of petitioner? If so, what was the nature of that relationship? What information, if any, was transmitted by any federal agency to any state agency regarding the petitioner?

7. Was there another individual suspected of involvement in the crime of which petitioner was accused? If so, was any information regarding such person transmitted to any state agency? What steps, if any, were taken to pursue to a resolution this information? If no investigation was undertaken, why not?

8. Did the witness Mr. Olsen identify any other person or persons as the assailant(s) prior to his testimony at trial? If so, what were the particulars of that identification?

9. Has any governmental agency withheld from petitioner evidence regarding petitioner's whereabouts during the period December 18, 1968, through December 26, 1968? Is there presently in the possession of any governmental entity information regarding petitioner's whereabouts during these dates?

The procedure of an evidentiary hearing must be taken to resolve the question of whether there was governmental impropriety which resulted in a denial of due process to the petitioner herein.

A petition for a rehearing was denied December 30, 1980. Dunn, J.,* was of the opinion that the petition should be granted.

---

### APPENDIX A

Following is a typed copy of the nine-page letter handwritten in red ink which was contained in the sealed envelope given by witness Julius C. Butler aka "Julio" to Sergeant Duwayne Rice on August 10, 1969, but which was not opened until October 20, 1970 (grand jury exh. No. 32). The envelope had written on the back "Attn: Sgt. Rice." Across the sealed portion of the envelope was printed in capital letters by hand: "ONLY TO BE OPENED IN THE EVENT OF MY DEATH" followed by the initials "J.B.".

"Aug 10, 1969

"To All Concerned Persons;

"At the time of this writing I've been working and living under the threat of assination [sic] by Local and National Leaders of the Black Panther. Namely Bobby Seale, (Chairman of the Black Panther Party) Elmer G. ('Geronimo') Pratt, (Dep. Minister of Defense, So. Calif. Area), John ('Long John') Washington (So. Calif. Field Sec., Rank of Major), Rodger ('Blue') Lewis (Body-Guard and Assasin, Rank of Capt.) Omar (In Charge of Goon Squad, Locally).

"At one time I held the position of So. Calif. Security Lt. (Responsible for safe-guarding Lives of Persons Attending Rallys [sic] and Events.

"During the year of 1969 I began to notice the party changing its direction from that set forth by Huey P. Newton, and dissented with some theorys [sic] and practices of the So. Calif. Leadership. During the months of June and July 1969 I more strongly critisized [sic] these Leaders, because I felt they were carelessly, and foolishly doing things that didn't have a direction benificial [sic] for the people. I also critisized [sic] the Physical Actions or threats to Party members who were attempting to sincerly [sic] impliment [sic] programs that oppressed people could Respond to. First I was Relieved of all duties and offical [sic] working capacities. The following week, Just Prior to the Oakland Conference for a United front, while I was drinking and talking to four male friends, the door bell rang, at which time I let in Geronimo, Long John and Omar. A Heat [sic] discussion grew out of the fact I still Refuse [sic] to Adhere to this New gang Like Direction and was order [sic] shut up, at which time Long John Drew a Rugers Black Hawk 357 magnum and cocked it to full cock and pointed it at my Head, then Geronimo shouted several times 'shoot him, if you don't shoot him, I'll shoot you.' At this time my four visiting male friends told them, If they shot me they would have to deal with them and other people in the building who had seen them arrive.

"They then withdrew from the Building.

"I immediately set about arming myself for the crisis I knew wasn't over. I then telephone [sic] the main office and informed them I was immediately withdrawing from the Black Panther Party. I attempted on several occasions to contact the Northern Leadership and inquire if they had knowledge of the situation here in Los Angeles. The first time I was able to contact any one I was answered By John Washington ('Long John') who was answering the Phone at the Residence of David Hillard [sic] (Chief of Staff). Almost immediatly [sic] I Received Death threats from Long John and Geroni-

---

*Assigned by the Chairperson of the Judicial Council.

mo, also persons on the streets (who Had Relationships with the party) who advise [*sic*] me of a [*sic*] impending Danger to my life, their Knowledge came from hearing Long John, Blue, Geronimo say I was just like Capt. Franko and that the party was going to kill me. On one occasion I Listened in on a phone conversation from my second Phone while a disgruntled·member or I should say supporter of·the Party asked 'Long John' why the Party was going to kill Julio.

"I heard 'Long John' state 'Julio is a pig., He is Receiving '$1,200.00 per month from the C.I.A. and the Los Angeles Police Dept., That they Had evidence proving my badge number and Rank in the C.I.A.' He Also stated I was the man who killed Capt. Franco, and I was the man Responsible for the Deaths of 'Bunchy' Carter and John Huggins at UCLA And that the order was out to Kill me, to save the people's Liberation struggle. And that I Had put the 'Feds' on Omar's trial [*sic*] and He was in Hiding (which I had *no* Knowledge of.)

"I've Continually Received calls by persons unknown 'such as you're a Dead man,' 'you know too much and must die.

"I call [*sic*] Bobby seel [*sic*] in Oakland and was unable to talk to Him, several Hours later He called my Home and said that I was foul for Hanging up the Phone on Geronimo, I stated to Him I was writing a position paper directing His attention to the situation Here in Los Angeles and the Death threats I Received from Geronimo and others. And that I was a man dedicated to principles and not gang-land Activities. He told me that any paper I wrote would be put in the Trash can. And I was ordered to get $18.00 together, catch a plane and bring my *ass* to Oakland. I declined by stating if he understood and condoned what was going on in Los Angeles, the whole conversation was futile and why a one-way Airline ticket. He simply Laughed and said 'you got the message' and I hung the phone up.

"The Following Day I contacted Sgt. D. Rice of the Los Angeles Police Dept. Community Relations Sec. I met with Him and I informed Him of the situation and that [*sic*] was also advised by Geronimo that [*sic*] I went to Jail or the Penitentery [*sic*] They would get me there.

"The following Reason I feel the Death threat may be carried out. Through Listening to Breggado [*sic*] conversation with these men, myself and other persons Have Reasonable cause to believe these persons were Responsible for Acts of murder they carelessly Bragged about. [¶] No. 1: Geronimo for the Killing of a White School Teacher and the wounding of Her Husband on a Tennis Court in the City of Santa Monica some time during the year of 1968. [¶] No. 2: Geronimo and Blue being Responsible for the Killing of Capt. Franco (Black Panther Party) in Jan 1969 and constantly stating as a threat to me that I was just like Franco and gave them No Alternative but to 'Wash me Away.'

"I can not [*sic*] Afford to testify to this in court because this Letter Represents the only Real Protection I have for my family.

"All the Above Statements Are True and done by my own Hand, and of my own free will.

> "Julius C. Butler
>
> "AKA: Julio
>
> "/s/ Julius C. Butler"

(Original italics.)

## APPENDIX B

(Not for Publication)

[Crim. No. 22504. Second Dist., Div. Four. Feb. 1, 1974.]

THE PEOPLE, Plaintiff and Respondent, v. (Super. Ct. No. A-267020)
ELMER G. PRATT, Defendant and Appellant.

---

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Parker, Judge. Judgment of conviction, affirmed; sentencing procedure reversed, and case remanded for resentencing.

Saltzman and Goldin and Martha Goldin for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

DUNN, J.—By Grand Jury indictment, defendant was charged with five felonies, *i.e.*: (Count I) murder of Caroline Olsen on December 29, 1968,[1] in violation of Penal Code section 187, (count II) robbery of Kenneth Olsen on December 18, 1968, in violation of Penal Code section 211, (count III) robbery of Caroline Olsen the same date, in violation of the same code section, (count IV) assault on Kenneth Olsen the same date, with intent to commit murder, in violation of Penal Code section 217 and, (count V) conspiracy to commit robbery the same date, in violation of Penal Code section 182, subdivision 1. As to this latter crime, three overt acts were alleged; as to the first four counts, it was alleged that, in committing the crimes, defendant used a firearm, namely, a revolver and an automatic pistol. Defendant was apprehended and arraigned, pleading "not guilty." During the trial, count V was dismissed on the prosecution's motion. A jury found defendant guilty of murder, fixing it in the first degree; found defendant guilty of both robbery counts, fixing each in the first degree, and it also found defendant guilty of assault with intent to commit murder, as charged in count IV. As to each count, it was found that defendant used a pistol. Defendant's motion for a new trial was denied and defendant was sentenced to state prison on each of the four counts, the sentences on counts II, III and IV to run concurrently with that of count I and the sentence on count III to be stayed, the stay to become permanent if defendant's conviction is sustained on appeal.

Defendant's notice of appeal states that his appeal from the judgment is on three grounds, *i.e.*: (1) Penal Code section 1181, (2) insufficient evidence,[2] and (3) error of law. The statutory ground stated relates only to new trials and to requests for modification of the verdict or judgment. No separate appeal lies from a court's ruling denying a new trial motion (Pen. Code, § 1237), although the ruling may be "reviewed" on appeal from the judgment. (Pen. Code, §§ 1237, 1259.) Accordingly, any separate appeal, if such is intended, based upon the court's ruling on the section 1181 motion, is dismissed.

---

[1]Mrs. Olsen apparently died this date, having been shot on December 18, 1968.

[2]Defendant abandons this ground, his brief stating, "Appellant's challenge is not to the sufficiency of the evidence but to errors...."

I. *Error Claimed in the Court's Denial of Defendant's Motion to Discharge Petit Jury Panel*

Defendant's first contention is that the trial court erred in denying his motion, heard June 1, 1972, to discharge the petit jury panel. This motion attacked the method by which trial juries were selected in the central district of the Los Angeles County Superior Court. The crimes charged against defendant all occurred in the City of Santa Monica; the prosecution offered and moved to have defendant's case transferred there for trial (the Los Angeles superior court's "west" district) but defendant resisted the motion and declined the offer. The prosecution's motion was denied by the court which then heard defendant's motion. It was agreed between counsel that defendant is a Negro and that, in deciding the motion, the court would read the transcript of a similar motion made by a Negro in another case, namely, People v. Adams, Los Angeles Superior Court No. A-276392, the evidence received in that case on that motion to be considered as received here.

Although defendant attacks the court's ruling, he does not provide us with the transcript mentioned; its content does not appear in the record before us nor was it marked as an exhibit. However, the Adams case was considered by a sister division of this court in *Adams v. Superior Court* (1972) 27 Cal.App.3d 719 [104 Cal.Rptr. 144] and its opinion summarizes the evidence there received. That case involved a jury selected county-wide to try a Negro defendant for crimes committed in the central district. In our case it should be noted, the crimes occurred in another district but, since defendant insisted that his trial take place in the central district, no question of "vicinage" (*People v. Jones* (1973) 9 Cal.3d 546 [108 Cal.Rptr. 345, 510 P.2d 705] is raised. Indeed, since the petit jury here apparently was selected county-wide, there is no reason to conclude that prospective jurors from the Santa Monica area were excluded.

Defendant argues the petit jury selection method was arbitrary, denying him his constitutional rights to equal protection and due process. However, the appellate decision in *Adams v. Superior Court, supra*, 27 Cal.App.3d 719, determined these issues directly contrary to defendant's contentions. Defendant's only response to such outcome is to say that the court was wrong. We do not think so nor, apparently, does our Supreme Court which denied a hearing in that case and in two companion cases, all on November 9, 1972. (*Sandoval v. Superior Court* (1972) 27 Cal.App.3d 741 [104 Cal.Rptr. 157]; *People v. Superior Court (Bowen)* (1972) 27 Cal.App.3d 738 [104 Cal.Rptr. 159].) Accordingly, defendant's contention is rejected.

Defendant made two other pretrial motions, namely, a motion under Penal Code section 1538.5 to suppress evidence, and another motion to suppress an in-court identification of defendant, expected to be made by Barbara Reed. Both motions were heard out of a jury's presence and both were denied; defendant contends these rulings were erroneous.

II. *Error Claimed in the Denial of Defendant's Motion to Suppress Anticipated In-court Identification of Defendant by Barbara Reed*

Regarding the second motion Mrs. Reed testified, out of the jury's presence, that on December 18, 1968, she was alone in her hobby shop in Santa Monica. Shortly before closing time at 8 p.m. o'clock, two Negroes entered her store and were in there approximately five to eight minutes. Defendant Pratt, who was in court, was identified by Mrs. Reed as the shorter of the two men who entered. She described him as being about 5'-6" tall, weighing approximately 155 pounds, being clean shaven, having a

short haircut and having a depressed scar above the bridge of his nose. She stated that he wore brown pants, light brown shoes and a long, loose, tan jacket which she called a "safari" jacket. She talked to him face to face.

On two occasions before coming to court she had been shown collections of photographs by the police, which collections included two pictures of defendant. She testified: "Q. .·. tell us whether...not seeing those photographs you could have identified Mr. Pratt today? A. Yes. ...I could have identified him today."

Defendant objected in the trial court (and objects here) that the photographic identification procedure was impermissibly suggestive and not fair. Mrs. Reed gave testimony to the effect that, nearly two years after the incident and just before she testified in front of the grand jury, Santa Monica police officers showed her approximately 16 photographs in an album. Toward the end of the book were two photographs which she identified. Defendant Pratt was the person shown. Prior to showing her the photographs the police told her only that they had some photographs they would like her to look at, to take her time and see if she might recognize the man or men in her store that night.

Approximately a month before that meeting with Santa Monica police, she had seen police in downtown Los Angeles. She had told them about the incident, described the defendant and was shown a photograph album, preceded by similar admonitions. The men in these photographs were not all Negro: "Some were mixed. It was a mixture of pictures." She testified that, before seeing these, she had "retained a general impression of the appearance of the men that had been at [my] store," but, as to the "short one, I could just picture his entire face, his entire person in my mind." He had a deep, round scar above the bridge of his nose which directed her attention to his face. Of the two photographs of defendant shown to her, one was a profile view and thus did not show the scar. The other photograph was full view, but the camera was too far away to show the scar. She did not identify defendant in the photographs by the scar.

The two photographs of defendant shown to her in Los Angeles were identical with the two photographs shown to her in Santa Monica. She testified she did not recognize the other photographs in the Santa Monica album as having been seen before in Los Angeles.

The photographs exhibited to her at the grand jury hearing depicted a number of male Negroes. A height chart appeared in each photograph. These apparently showed that defendant and only one other man were under six feet tall, but Mrs. Reed testified she had paid no attention to the height charts when she was shown this group of photographs.

Portions of our opinion in *People* v. *Adair* (1969) 2 Cal.App.3d 92, 96 [82 Cal.Rptr. 460] are pertinent. There, we referred to *People* v. *Pettersen* (1968) 268 Cal.App.2d 263, 267-268 [73 Cal.Rptr. 693], which quoted from *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967] as follows: """Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that

each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.""" (Also see *People v. Lawrence* (1971) 4 Cal.3d 273, 278-279 [93 Cal.Rptr. 204, 481 P.2d 212].)

The procedure used here was not "impermissibly suggestive" as contended by defendant. We conclude the trial court neither abused its discretion nor ruled erroneously on defendant's motion.

### III. *Error Claimed in Denial of Defendant's Motion to Suppress Evidence*

Defendant's motion to suppress evidence, directed toward a pistol, a photograph of it and "everything that was obtained from the search of that house," was based upon a contention that such prospective evidence was obtained by means of an illegal search and seizure. It was stipulated that no search warrant had been issued. Five witnesses testified for the People. None were called by defendant.

John Naveau, a California state policeman, testified that he was assigned to duty on the campus of UCLA, in an undercover capacity to penetrate subversive groups there. He was a member of "SDS" and "Friends of the Black Panther Party," two such groups. Joe Brown, a member of the "Black Panther Party," previously had informed him reliably regarding various campus activities. On January 17, 1969, John Huggins and "Bunchy" Carter, two "Black Panthers," were shot and killed·on the campus. Joe Brown told Naveau they had been killed by members of "US," a group with an outlook similar to that of the Black Panthers. He also told Naveau that Black Panther members were going to Huggins' house to get weapons and retaliate against not only US but also against Los Angeles police officers, whom they believed "had set this murder up." The house was located at 806 Century Boulevard. Naveau telephoned to give this information to his immediate superior, to the Los Angeles Police Department and to the state C.I.I.

Former Los Angeles police detective lieutenant Keel testified he was present about 4 p.m. on January 17, 1969, when information was received about the killings and about the Black Panthers going to the two-story rear house at 810 Century Boulevard to gather weapons to retaliate (806 and 810 were on the same lot).

Police officers Lucy, Baker and Finn testified, in summary, that at about 4:10-4:15 p.m., the afternoon of January 17, 1969, Lieutenant Keel informed them of the double-murder of the two Black Panther members and that other members were going to the rear house, at 806 West Century Boulevard, to get guns stockpiled there in order to retaliate. The officers went to the premises.

A blue Volkswagen was seen to arrive and a female alighted; she went up the stairway and entered the second floor of the rear house. A station wagon drove up, stopped in the driveway and someone alighted. Next, a man and the same female emerged from the top of the stairway, the man carrying a large cardboard box and an army ammunition box. The woman carried a rifle partially concealed under a coat, its stock protruding. They put these things in a Chevrolet automobile and drove off, but were stopped a few blocks away by the police. Just before the car stopped, its driver had intentionally ignored the display by an officer of his badge and his command to stop; the officer finally produced his service revolver. The car stopped; these two persons got out of the car and were given a pat-down search. The woman had a loaded .45 caliber

automatic pistol tucked into her waistband, together with two loaded pistol clips of .45 caliber ammunition in her purse. The rifle was seen on the automobile's floor. The cardboard box also was there. It had no top on it and observation of it showed that it contained additional ammunition cans. A search of the vehicle disclosed another rifle, considerable ammunition, gas masks, medical supplies and miscellaneous equipment.

The three officers returned to the house. A woman came down the stairs, apparently saw one of the officers, screamed and ran back upstairs. A male Negro (Nathaniel Clark) was observed standing by the open driver's door of the station wagon, holding a rifle and a suitcase. Defendant Pratt was seen on his hands and knees on the ground on the passenger's side of the vehicle, apparently hiding and trying to "sneak down past the side of the car to the door." The police asked him if there was anyone in the house and he replied, "Yes"; he then was asked, "'Do they have guns in there?'" and again answered, "Yes." Defendant Pratt and Clark were handcuffed and laid on the ground. Thereafter, Clark was observed reaching toward a .45 caliber automatic pistol which was seen tucked into his waistband. The officers took this gun away from him. People in the house then were ordered to come out and four women emerged, one with a young child. The officers were not at all certain that no more people were inside, or if they were armed. Officers entered the house; officer Finn explained, "Well, my reason for entering was to insure the safety of myself and the other officers in that immediate area. This building being a two-story building, being used for the apparent purpose that it was, and being occupied by militant people, members of a militant organization, it was only reasonable for me to be in fear and assume that there were other people still there, and that the location did contain arms and ammunition."

A room at the bottom of the stairway was first entered and was found to be empty of people. Upstairs, rooms were searched for people and, again, no one was found. However, a gun and its clip (subjects of the motion to suppress) were seen in plain view on top of a table, as shown in the photograph (also involved in the motion). Officer Finn testified on cross-examination that he did not know any of the persons he saw; that from the conduct of Pratt and Clark, he believed they intended to attack the officers; that "previous occurrences with this organization made me very fearful"; that although he did not know of any of the persons, "I know many members of the Black Panther Party and what they are capable of doing." In general, he testified, he was fearful of persons in this organization. He believed that the women who came out of the house, after the police order, were involved in a "conspiracy to commit ADW against another militant organization."

A warrantless search is prima facie unreasonable, requiring the prosecution to justify it. (*Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1]; *People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].) Defendant contends the police were bound to seek and to obtain a warrant and they did not do so, rendering their entry into the house unreasonable. We disagree. Defendant's theory is that some of the officers could have gone for a warrant, leaving other officers in place to prevent entry into or exit from the establishment. In retrospect, perhaps, the officers could have done this, but it did not reasonably so appear to the officers whose presence there had become known to the suspected occupants of the house. So far as the officers knew, militant, armed and dangerous persons remained inside; indeed, there was testimony that officers sought concealment and protection against weapons which might be fired from inside. To demand that an officer expose himself to possible fire in order to go and secure a warrant, under these circumstances seems unreasonable, not only as to any departing officers but, also, as to any officers remaining.

Entry into the house without a warrant was not unreasonable. True, entry was not justified as being incident to the arrest of the two persons in the Chevrolet several

blocks away. Likewise, the arrest of Clark and of defendant did not justify entry, inasmuch as they were arrested at a place remote from the interior of the house. However, *entry does appear justified by circumstances of emergency*, i.e.: there had been a double-murder; immediate, violent retaliation was in prospect; there was more than reasonable ground to believe that any persons remaining inside the house were planning retaliatory action. Quick action by police was required reasonably to prevent this impending violence. We conclude the police acted properly. *People v. Block* (1971) 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961], although factually distinguishable, expresses reasoning which is applicable to the present case, as does *People v. Sommerhalder* (1973) 9 Cal.3d 290, 305-306 [107 Cal.Rptr. 289, 508 P.2d 289]. Although no one actually shot at the officers here, they had reason to believe this could occur; they knew weapons were being transported and they had been told weapons were stored there; they had been told retaliation against "US" was planned and also was planned against Los Angeles police officers. Penal Code section 844 is inapplicable under the circumstances.

The pistol was not discovered in the house as the result of a search. It was in plain sight. (*Dillon v. Superior Court* (1972) 7 Cal.3d 305, 310 [102 Cal.Rptr. 161, 497 P.2d 505].) The only question is: was its seizure justified? We recognize that no law prevents a person from possessing a loaded pistol in his home. (Pen. Code, § 12026.) A pistol is not "contraband" in the same sense, for example, that illegal narcotics are. Here, however, the police officers reasonably believed the persons who appeared when ordered out of the house and any persons remaining inside had conspired to commit assault with a deadly weapon—a felony (Pen. Code, § 182) committed in the officers' presence. Inasmuch as such expected assault was to be committed with deadly weapons, seizure of the pistol and its photographing were lawful. If any persons were in the house, it would have been foolhardy for the officers to permit them access to the pistol.

The order denying defendant's motion to suppress evidence was properly within the court's legal discretion.

IV. *Defendant's Contention that Barbara*
 *Reed's In-court Identification of*
 *Defendant Was Inherently Improbable,*
 *Depriving Defendant of a Fair Trial*

Mrs. Reed's testimony before the jury parallels the testimony she gave outside of their presence, as already summarized. She positively identified defendant in court, describing him as the shorter of the two men, approximately as she had before. In addition, she testified that about 8 p.m. the night of December 18, 1968, she was busy in her hobby store addressing Christmas cards, and waiting for her husband to arrive. It was near closing time. Defendant and another man entered the store. She walked over to serve them. Defendant asked if she had any materials with which to build a doll house for his wife and she said she did not as she and her husband were just moving into the premises. The men were in the store about five to seven minutes altogether, then went outside. Mrs. Reed closed and locked the door, turning an "open" sign so as to read "closed." Soon she heard voices outside and observed the two men again, standing just outside the door. The taller man had a gun; the shorter man rattled the doorknob and said, "Let us in." She immediately went toward the rear of the store intending to telephone the police but the two men departed.

Mrs. Reed's husband testified that he drove toward the store that night at approximately 8 p.m. and stopped for a traffic signal located at the intersection nearest to it. While stopped there, he observed two Negroes shaking the handle of the shop's door.

He drove on, circling the block and, while doing so, saw the same two Negroes hurrying along the street and turning into a parking lot. He did not see them again. Although he could not identify either of the two men, one of them wore a "safari" jacket, from which fact he concluded the men were the same he had seen in the doorway of his hobby store.

Kenneth Olsen testified that the night of December 18, 1968, he and his wife went to the Lincoln Park tennis courts in Santa Monica at about 8 p.m. to play tennis with another couple whom they expected to meet there. No one else was at the courts when they arrived. (It was stipulated the hobby store is about four blocks south of the tennis courts. They put a coin in the light meter there and it turned the court lights on. Two male Negroes, armed with a .45 caliber automatic pistol and with a .38 caliber snubnose police revolver, walked up, pointed the pistols at them and told them to put up their hands, demanding their money "or we're going to burn you." Olsen positively identified defendant Pratt in court as one of the two men. These two men told the Olsens to lie down on the court surface, took from them a wallet and purse containing money and started out the gate of the tennis court. They then turned and fired their pistols at the supine Olsens. Mr. Olsen was struck five times by bullets; his wife also was struck several times. The two men then left, having been there about five minutes. Both Olsens were conscious. Olsen went to get help. His wife died in the hospital about 10-11 days after the assault. (See fn. 1.) Olsen thereafter was shown photographs by the police on a number of occasions also attending lineups.

Although defendant contends the identification evidence was inherently improbable and should be disregarded for that reason, no motion to strike the testimony was made. No objection was made in the trial court to its relevancy nor was it made a ground of defendant's motion for new trial. Accordingly, we are not asked to review any trial court action and determine if any rulings were erroneous. We are asked to find that the evidence was inherently so improbable as to merit no credence. We have reviewed all of the evidence relating to identification and have concluded it was not so improbable as to require, as a matter of law, that it be disregarded.

V. *Defendant's Contention the Court Had a*
*Duty, and Failed in Its Duty, to Instruct*
*the Jury, Sua Sponte, That the Eyewitness*
*Identification Testimony Should Be*
*Viewed With Caution*

Defendant argues that, despite the language of Penal Code section 1096a,[3] whenever a defendant justifiably requests an instruction outlining an area of specific doubt it must be given in a proper case. Defendant relies upon *People v. Roberts* (1967) 256 Cal.App.2d 488 [64 Cal.Rptr. 70] wherein the court stated (p. 493): "However, it has been held that where an additional reasonable doubt instruction which points up the theory of the defense is requested, it is error (notwithstanding Pen. Code, § 1096a) to refuse to give it." In our case, although no such instruction was requested, defendant would make it the trial court's duty to prepare and read such an instruction to the jury. Defendant cites us to the many cases requiring a court to instruct, *sua sponte*, on "the general principles of law relevant to the issues raised by the evidence" (see, e.g. *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [86 Cal.Rptr. 166, 463 P.2d 390] and defendant contends that the inherent improbability of the identification testimony, coupled with the alibi testimony of his witnesses, made such an instruction a requirement. How-

---

[3]Penal Code section 1096a reads: "In charging a jury, the court may read to the jury section 1096 of this code, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given."

ever, it is our view that the identification testimony, although subjected to the usual attack on cross-examination, nevertheless was clear and positive. It was not, as defendant claims, a "general principle" in this case that the identification testimony was suspect. If defendant had desired such an instruction it was incumbent upon him to request it. Its absence does not create reversible error and defendant's contention in this respect is rejected.

VI. *Defendant's Contention That the .45 Caliber*
 *Automatic Pistol Found at Huggins' House*
 *Was Not Connected With Defendant and Was*
 *Irrelevant, Its Admission Into Evidence*
 *Being Prejudicial*

Defendant contends there was no evidence that the .45 caliber automatic pistol, seen on the table at 806 Century Boulevard and seized by the police, was his gun; and, therefore, evidence of ballistic comparisons between test cartridges fired in it and shell casings and bullets found at the tennis court should have been excluded. At the trial, defendant voiced a similar objection and was overruled after the People had made an offer of proof.

Defendant contends the overruling of his objection was prejudicially erroneous. He correctly points out that a motion made under Penal Code section 1538.5 goes only to claimed unlawfulness of a search and seizure, so that he need not earlier have objected on the ground of claimed irrelevance.

We examine the evidence. If, as defendant claims, the gun should not have been admitted, we may ask if defendant was prejudiced by the ruling, or is defendant arguing that, absent the gun, the evidence was insufficient to support his conviction? If the latter is what defendant is arguing, then his professed abandonment of the ground of insufficient evidence seems to stand in the way. (See fn. 2.) Be that as it may, we conclude there was sufficient circumstantial evidence to justify the drawing of the inference that the gun was one used by defendant.

Thus, Mitchell Lachman testified that on the night of December 18, 1968, at 8:15 p.m., he saw a couple enter the tennis courts. A short time thereafter he heard shots fired and observed two "youthful" Negro men run very fast from the tennis courts and enter a dark red convertible automobile, with a white top, which sped away. He did not notice the autombile's license number but did observe that its license plates had dark numerals on a white background. He testified that these plates were similar to North Carolina plates for the year 1968 which were admitted into evidence and shown to him in court, and that the car was similar in appearance to one shown to him in the photographs, also received in evidence. He testified that he saw the man, whom he had seen earlier walking into the courts with a female, leave the courts holding his head and trot into the Broken Drum restaurant across the street. Lachman followed him into the restaurant and also went back to the tennis courts where he saw the woman again.

Police officer Plasse testified he went to the tennis courts the night of December 18, 1968, observed Mrs. Olsen lying there, saw considerable blood and recovered spent shell casings on the courts, also recovering "slugs" (i.e., bullets) from the surface underneath and near Mrs. Olsen.

Police officer Higgins testified he had stopped defendant on April 12, 1969, when he was driving a red Pontiac automobile with a white convertible top and equipped with a California license plate. It was stipulated that: records of the states of California and North Carolina showed that on October 3, 1967, Pratt had purchased a 1967 Pontiac convertible automobile in North Carolina, being assigned a North Carolina license

plate; the automobile had a red body and a white top; it entered California on September 6, 1968; on March 27, 1969, California issued license plates for the car and new plates again were issued for it on September 4, 1969. It was further stipulated that photographic exhibits Nos. 11 and 12 showed the same car. It was further stipulated that a slug removed from Mrs. Olsen, together with spent shell casings found at the scene by police officer Plasse, were delivered to the crime laboratory of the Los Angeles police department.

On January 17, 1969, John Huggins and "Bunchy" Carter were shot and killed at UCLA; police officer Lucy testified that he was sent that day to 806 or 810 West Century Boulevard. There he saw a Pontiac station wagon, which appears in photographic exhibits Nos. 23 and 24, and there he first saw defendant Pratt sprawled on the ground on the passenger side of that vehicle. He asked Pratt if there were people in the house and if there were guns in there and Pratt answered, "Yes" to both questions. Police officer Finn testified that, on that same date, he entered the house where he observed the loaded .45 caliber automatic pistol lying on a table top next to a loaded clip.

Julius Butler, a hair stylist, testified that he became a member of the Black Panthers in early 1968 and knew defendant Pratt, who was a bodyguard for "Bunchy," holding the "rank" of "lieutenant." (Pratt became a "Deputy Minister of Defense" after Carter was killed.) Defendant Pratt usually was called "Geronimo" by his fellow Black Panthers. On the night of December 18, 1968, Pratt told Butler he was "going out on a mission" and introduced Butler to another Negro, "Tyrone," who was taller than Pratt. Butler next saw Pratt later on that night, after midnight. Pratt was nervous. He told Butler he had shot some people in Santa Monica but didn't know if he had killed them. Butler read a newspaper account of the shooting in Santa Monica the next day. Later that same day he saw defendant Pratt, showed him the newspaper and Pratt said that was what he had told him about the night before. In response to Butler's questions Pratt said his car, which Butler described as a red Pontiac convertible with a white top, was "hid out," that he was the one who had shot the people as Tyrone "couldn't shoot" and that he had destroyed the barrel of the gun; Butler testified Pratt did not say what kind of gun he used but that Pratt "usually carried a .45 automatic." Later on, Butler told Pratt that a newspaper article reported a .45 caliber gun had been used. Pratt replied that he wasn't worried as he had disposed of the gun barrel. Butler testified that several, but not many, other members of the Black Panthers carried .45 caliber automatic pistols.

DeWayne Wolfer, a ballistics expert, testified that, on comparing test cartridges fired in the .45 caliber automatic with the casings found at the tennis courts, it was his opinion both were fired from the same gun, and only from that gun. As to the bullets or "slugs," however, he could not fully match striation marks on them, leading him to conclude either that the gun barrel had been changed or the gun had been fired excessively since its firing on the tennis courts.

We think the foregoing evidence, summarized as it must be so as to favor the judgment, is adequate to justify all inferences necessary to establish that defendant used the .45 caliber automatic pistol found at the West Century Boulevard address in shooting the Olsens.

VII. *Defendant's Contention That a "Prejudicial Atmosphere" Prejudiced the Jury and Deprived Him of a Fair Trial*

Defendant insists that "outside influences" precluded the jury from acting fairly, arguing that a "repressive atmosphere" surrounded the trial. Defendant cites us to no

instance wherein he requested a mistrial because of such an alleged situation. Indeed, on the one occasion mentioned in his brief, defense counsel merely requested the court to admonish the jury and the court did so, leaving us to speculate what further action, if any, defendant now has in mind. Although defendant's brief argues in florid and imaginative terms about an "armed camp" and about the possible effect upon the jurors of alleged news reports of other criminal trials then, or shortly before then, in progress no record of such appears. We reject defendant's contention.

VIII. *Defendant's Contention That the Court*
 *Made Erroneous Rulings on Evidence, to*
 *His Prejudice*

Defendant contends that police testimony, regarding his presence at the house on West Century Boulevard, was admitted over his objection and tended only toward proof of "guilt by association." We disagree and reject the argument.

He further contends the trial court erred in admitting, over his objection, testimony regarding Butler's delivery of a letter to a friend, police officer Rice, the envelope containing which said "To be opened only in case of my death." Rice testified Butler told him he felt he was "going to be killed." There was no evidence of the letter's content. The testimony was admitted by the court as falling within Evidence Code section 1250, subdivision (a)(2).

Whether the court's ruling was, or was not, error we need not decide since we conclude defendant has not shown that any miscarriage of justice resulted from the testimony's admission (Cal. Const. art. VI, § 13; Evid. Code, § 353).

IX. *Defendant's Contention That the Court's*
 *Denial of His Motion for a New Trial Was*
 *an Abuse of Its Discretion*

Defendant contends the trial court was required to grant his motion for a new trial because he had discovered two new witnesses whose expected testimony would tend to impeach the testimony of two prosecution witnesses, Julius Butler and Kenneth Olsen. We have reviewed the record in this respect and disagree. The trial court did not, as a matter of law, abuse its discretion.

X. *Defendant's Contention the Trial Court*
 *Failed to Use Its Discretion in Sentencing Him*

Defendant's argument here is that he was under 23 years of age when the crimes were committed on December 18, 1968, (although he admittedly was 24 years old at the time he was sentenced) and the court erred in refusing to exercise the discretion given to it by Penal Code section 1202b.[4]

The record shows that defendant's attorney asked the court to consider sentencing defendant pursuant to this code section, but the prosecutor argued against use of the

---

[4]Penal Code section 1202b states: "In any criminal proceeding in which defendant is convicted of a felony or felonies and is committed to the custody of the Director of Corrections, if defendant was, at the time of commission of the offense or offenses, or of the apprehension from which the criminal proceeding resulted, under the age of 23 years, the court may, notwithstanding any other provision of law fixing or affecting the penalty for the offense or offenses, specify that the minimum term of imprisonment for the offense or the offenses cumulatively shall be six months. This section does not apply to any offense punishable by death."

section, contending that the section excluded "offenses which carry life or death punishment." The court commented "I think, Mr. Cochran [one of defendant's attorneys], that the court's hands are pretty well tied as far as sentence is concerned in this matter."

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], our Supreme Court earlier that year, on February 18, 1972, had decided that California's death penalty statute was unconstitutional under California's Constitution. It appears from the Penal Code that first degree murder is also punishable by life imprisonment (Pen. Code, § 190). There is parole eligibility after seven years (Pen. Code, § 3046), but use of a firearm (Pen. Code, § 12022.5) adds another five years' minimum to the seven years just mentioned. Accordingly, if the trial court had seen fit to fix a cumulative minimum term of six months, as allowed by Penal Code section 1202b, defendant could have benefited from it.

The trial court did not expressly state that its hands were tied because of the wording of the code section, although that may be inferred. While, under the evidence as established by the verdicts in this case, we find it difficult to conceive that any trial judge would exercise the discretion granted by this code section, we cannot substitute ourselves into the trial judge's robes.

The judgment of conviction is affirmed; as to the sentencing, the case is reversed and remanded, the trial court being directed to resentence defendant giving due consideration to the prerogative given to it by Penal Code section 1202b.

NOT FOR PUBLICATION

Jefferson (Bernard), Acting P. J., and Kingsley, concurred.

---

## APPENDIX C

### UNITED STATES DEPARTMENT OF JUSTICE

### FEDERAL BUREAU OF INVESTIGATION

### WASHINGTON, D.C. 20535

March 10, 1980

Honorable Paul N. McCloskey, Jr.
House of Representatives
Washington, D. C. 20515

Dear Congressman McCloskey:

At our meeting on January 23, 1980, you asked for copies of certain documents. In addition, you requested permission to inspect all FBI files reviewed by our Pratt Task Force, and to interview certain current and former Bureau employees. Finally, you asked us to prepare a summary of the January 23 briefing. This letter responds to your requests.

First, you asked for the following documents:

* the portion of the Pratt trial transcript setting forth Butler's denial that he worked for FBI;

* portions of FBI manuals setting forth the operative definitions of probationary racial extremist informant during 1969-1972;

* the quotation from the January 23, 1971, article in the Black Panther Party (BPP) Magazine that was read to you during our meeting (we do not have copies of the magazine); and

* the FD-302 report on the August 19, 1969, interview of Dwaine [*sic*] Rice by FBI Agents.

I have enclosed all of these documents, except for the FD-302 report on Dwaine [*sic*] Rice. Since the release of that document may vilate Mr. Rice's rights under the Privacy Act, we cannot furnish it to you at this time. We have reviewed the document, however, and it does not support Mr. Rice's allegations.

Next, you asked for authority to inspect all of the files that were reviewed by our Task Force (thousands of pages, located at Headquarters and the Los Angeles and San Francisco Field Offices), and to interview all current and former Agents who were involved in the Pratt case or the counterintelligence program (COINTELPRO). Although I appreciate your interest, long-standing Department of Justice policy precludes consideration of such broad requests unless they are the result of formal Committee action.

Finally, in response to your request, I asked the members of our special Pratt Task Force to prepare a written synopsis of the material disclosed to you in the January 23 briefing. I have enclosed a copy of that synopsis.

Sincerely,

/s/ William H. Webster
Director

Enclosures (4)
1 - Honorable Don Edwards (Enclosures 4)
1 - Honorable Richardson Preyer (Enclosures 4)
1 - Counsel (Enclosures 4)
 Office of Professional Responsibility
1 - Assistant Attorney General (Enclosures 4)
 Office of Legislative Affairs
1 - Assistant Attorney General (Enclosures 4)
 Criminal Division

UNITED STATES DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF INVESTIGATION

WASHINGTON, D.C. 20535

SYNOPSIS OF PRATT INQUIRY

*History of Task Force*

On April 6, 1979, Congressman McCloskey wrote to the Director expressing an interest in the case of Elmer "Geronimo" Pratt, a former BPP member who was convicted of a 1968 murder. His letter asked the Director to "institute an internal FBI investigation of the Pratt case to determine whether there is any evidence in the files to indicate the possibility of Pratt's innocence or doubt as to Pratt's guilt?"

Pursuant to Congressman McCloskey's request, a search for records was conducted at FBIHQ, Washington, D. C., and at the Los Angeles and San Francisco Field Offices. The search followed regular FBI searching procedures, which rely to a very large extent on a card index. The records retrieved by this search and information received from certain Special Agents, constituted the factual basis upon which a July 12, 1979, letter to Congressman McCloskey was prepared. This letter was a good-faith effort to respond to his inquiry based upon the information received as a result of our normal retrieval process.

In a letter dated September 21, 1979, Congressman McCloskey expressed dissatisfaction with the July 12, 1979, letter.[1] The Director met with him on September 26, and agreed to take a new look at the impact of COINTELPRO (the counter-intelligence program) on the Pratt case. Accordingly, the Director ordered the formation of a special Task Force.

*Task Force Methodology*

The Task Force reviewed all FBIHQ files relating to Elmer Pratt and his known associates to determine if the FBI had any information concerning Pratt's trial and conviction for the "Tennis Court Murder" that should have been made available to the court. This file review far exceeded normal file review procedures. Ordinarily, as in the initial Pratt inquiry, a search covers only indexed references. Here, however, the Task Force reviewed, page-by-page, line-by-line, all files that may have contained relevant information, even if there were no indexed references to Pratt. A similar file review was conducted by the Task Force at the San Francisco and Los Angeles Field Offices. In addition, the Task Force reviewed the Los Angeles County prosecutor's files and the trial transcript in the Pratt case.

*Events Leading to Conviction*

On December 18, 1968, Dr. Kenneth Olson and his wife Caroline were robbed and shot on a Santa Monica, California, tennis court. Caroline Olson died as a result of the wounds she received.

---

[1]The FBI released thousands of pages of documents to Pratt as a result of a Freedom of Information Act request he filed in 1976. Congressman McCloskey's dissatisfaction is apparently based on his reading of some of those documents.

In January of 1969, Alprentice Carter and John Huggins, members of the BPP, were shot and killed while attending a meeting of the Black Student Union at the UCLA campus. Afterwards, members of the BPP congregated at John Huggins' house. The Los Angeles Police Department (LAPD) conducted a search of the Huggins' home and found numerous weapons and explosives. As a result, the LAPD arrested many of the persons found inside the house (including Pratt) and interviewed many others who had been congregated outside (including Butler).

In view of the mandate from the Attorney General to the FBI to "use the maximum resources" in the investigation of civil disorders,[2] the Los Angeles Office of the FBI opened a substantive investigation on each of the individuals present at the Huggins' house. As was the standard procedure in this type of case, the Field Office investigated each subject's background and then secured Bureau (FBIHQ) authority to interview him. In April of 1969, Pratt was interviewed. He was uncooperative and denied any BPP affiliation.

In August of 1969, FBIHQ authorized an interview of Julius Butler. After being advised of his rights and refusing to sign a waiver of those rights, he was interviewed. Butler stated the reasons for his resignation from the BPP. He further stated that on resigning from the BPP, "Geronimo" Pratt threatened him, telling him that his (Butler's) life was in danger. Butler said he hung up the phone on Pratt and was not afraid because he (Butler) had written a letter that would put certain members of the BPP "in the gas chamber." He said the letter was in the hands of an unnamed friend of his. The Los Angeles FBI determined Butler had a friend named Dwaine [sic] Rice, a Community Relations Officer for the LAPD, who had received an envelope from Butler containing a letter to be opened in the event of Butler's death. Agents of our Los Angeles Division interviewed Rice in August of 1969. He admitted he had the letter but did not turn it over to the FBI. The FBI did not receive a copy of the letter until November 1970, when the LAPD opened it and sent a copy to our Los Angeles Field Office.

Pratt became the subject of an FBI Unlawful Flight to Avoid Prosecution investigation in September of 1970, because of his failure to appear in local court on charges stemming from a BPP shootout with the LAPD on December 8, 1969.

On December 4, 1970, a local sealed indictment was returned at Los Angeles, California, charging Pratt with the "Tennis Court Murder." This indictment was apparently based on Butler's letter and additional investigation.

Pratt was arrested by FBI Agents in Dallas, Texas, on December 8, 1970, on the Unlawful Flight to Avoid Prosecution charge.

Pratt's conviction for the "Tennis Court Murder" was apparently based on the following evidence:

* The victim's husband, Dr. Olson, who was shot during the robbery, identified Pratt as the murderer.

* A shopkeeper testified that Pratt was in the vicinity of the tennis courts where the murder occurred, at the time of the murder, with a gun.

---

[2]Memorandum from Attorney General to the FBI Director September 14, 1967, *quoted in* Select Committee to Study Governmental Operations, *Final Report, Book III: Supplementary Detailed Staff Report on Intelligence Activities and the Rights of Americans*, S.Rep. 94-755, 94th Cong., 2d Sess. 492 (1976) [hereinafter *Church Committee Report*].

* A vehicle fitting the description of Pratt's vehicle, as to make, model, color, and color of out-of-state license plates was seen in the vicinity of the tennis courts at the time of the murder.

* Julius Butler testified that Pratt admitted committing the murder.

* LAPD firearms analysis matched shell casings found at the murder scene with a weapon found near Pratt at the time of his arrest at John Huggins' house in January of 1969.

* The State's identification witnesses said the murderer was clean shaven. The defense contended that at the time of the murder Pratt had a beard, and it produced a Polaroid photograph of Pratt with a beard to prove the point. The State countered with an expert from Polaroid who testified that the film in question was not made until six months after the photograph was supposedly taken.

*Notification of California Authorities*

On November 20, 1979, Pratt filed a writ of habeas corpus in California state court. The Task Force's review of FBI files identified three pieces of information uncovered during the inquiry that are arguably relevant to that petition.

1. Pratt contended that Julius Butler, a primary prosecution witness, was unreliable because he was an FBI informant, and that Pratt was denied a fair trial because the jury was not aware of Butler's relationship with the FBI. The Task Force found documents delineating Butler's connection with the FBI.

2. Pratt asserted that the FBI knew he did not commit the murder because he was under constant FBI surveillance at the time. The Task Force found documents containing information derived from an apparently illegal local wiretap indicating Pratt's whereabouts a few days after (but not on the day of) the murder.

3. The Task Force found indications that an FBI informant(s) may have been present at meetings at which Pratt's attorneys and associates discussed legal defense strategy.

These matters were promptly discussed with the Office of Professional Responsibility and the Criminal Division of the Department of Justice (DOJ). The Department's Office of Professional Responsibility did not consider this a matter for their attention. The Criminal Division advised, after review, that California authorities prosecuting the Pratt matter should be advised of the information recently located by the FBI. Two FBI Agents and a DOJ Attorney traveled to Los Angeles and gave oral briefings on all three issues to Andrea Ordin, United States Attorney, on December 11, 1979; John Van De Kamp, Los Angeles District Attorney, on December 12, 1979; and Michael Nash, Deputy State Attorney General, on December 13, 1979. Each of these briefings was given after the Bureau received assurances that the material disclosed would remain confidential (except for *in camera* disclosures to the California court). The California State Attorney General's Office advised that it was handling Pratt's habeas

corpus petition, and in view of the new information contained in the FBI briefing, it would need time to decide on a course of action. On December 17, 1979, Michael Nash contacted the FBI and made a formal request for all FBI documents on which the briefing was based; he indicated that the California State Attorney General's Office planned to oppose Pratt's petition despite the new information. Mr. Nash was informed that some of these documents may not be available because they are classified, but that the FBI had no objection to an *in camera* inspection of the documents by the Judge.

Subsequently, Mr. Nash was told that certain FBI documents, including forty (40) pages setting forth FBI contacts with Julius Butler, and two (2) pages indicating Pratt's whereabouts in late December, 1968, could be made available to him. In order to protect the identities of any FBI informants, Mr. Nash agreed that a summary concerning the defense camp information would suffice. These documents were provided to Mr. Nash and the California court for review, prior to Pratt's habeas corpus hearing on January 18, 1980. Following the hearing, the court denied Mr. Pratt's petition.

*Julius Butler*

Both Pratt and Congressman McCloskey maintain that Julius Butler was an FBI informant, that this taints Butler's incriminating testimony, and that Pratt was denied a fair trial because the jury was not aware of Butler's relationship to the FBI. The Task Force determined that for a time Butler was evaluated as a "probationary informant."[3] More important, FBI files establish that the Bureau neither paid nor otherwise compensated Butler for testifying against or providing information about anyone. Butler's letter incriminating Pratt was delivered to Sergeant Rice of the LAPD *before* Butler had any contact with the FBI, indicating that the FBI had nothing to do with Butler's testimony in the Pratt trial.

Finally, the assertion that Butler was a law enforcement informant is not new. Defense counsel was aware that Butler was a Los Angeles Sheriff's Deputy before he

---

[3]There has been some confusion about whether Julius Butler was an FBI informant. This confusion is understandable in light of the contrast between the broad dictionary definition of informant and the precise law enforcement usage of that term. These semantic differences—briefly addressed below—should not divert attention from the primary issue, which is whether Pratt is entitled to a new trial because the jury was unaware that Butler supplied information to the FBI.

*Webster's New Collegiate Dictionary* (1977) defines "informant" as "one who gives information." Of course, under that broad definition Butler would be considered an informant, for he supplied information to the FBI.

In FBI Manuals, however, "informant" does not merely mean "one who gives information." Rather, "informant" is one of several kinds of person "who gives information" to the FBI. The "informant" label refers to reliable persons actively engaged in obtaining and furnishing information to the FBI. Traditionally, "informants" are assigned symbol numbers; ordinarily, they are paid. Butler was not assigned a symbol number or paid, and he was not considered an "informant." The FBI regularly receives, on a confidential basis, information from individuals who are not considered informants.

Bureau documents show that Butler was considered a "probationary (racial) informant." This term refers to a person being cultivated as an informant, but whose reliability and willingness to cooperate are not yet established.

Therefore, while Butler falls within the dictionary definition of informant because he supplied information, he was not an "informant" as it is defined in FBI Manuals. Again, however, this definitional question is not particularly important. The crucial issue is whether Pratt was denied a fair trial because the jury was not told that Butler supplied information to the FBI. As noted above, the California court considered Pratt's claim on this issue (in his habeas corpus petition) and rejected it.

joined the BPP, so at the trial he asked Butler whether he "severed [his] ties...with law enforcement" and whether "since leaving the Sheriff's Department [he] worked for the FBI or the CIA?"[4] Butler responded that he had severed his ties with the Sheriff's Department, and he denied "working" for the FBI or the CIA. In the new trial motion, defense counsel again raised the issue, contending that Butler was a paid LAPD informant and part of a LAPD conspiracy against Pratt. The motion was denied. And still again, in Pratt's recent habeas corpus petition, defense counsel alleged that Pratt was denied a fair trial because of Butler's role as an informant. After reviewing pertinent FBI documents, the court denied Pratt's petition.

*Local Wiretap*

Pratt contends he was under FBI surveillance at the time of the murder, and that Bureau records show that he was not at the scene of the crime. Pratt was not under surveillance by the Bureau. However, FBI records include information about Pratt's whereabouts based on an apparently illegal local wiretap. These records indicate that "Geronimo" arrived in Oakland on December 20, 1968, was still there on December 23, and was hiding from someone.[5] Thus, while FBI records place Pratt in the Oakland area in late December, 1968, they do not establish an alibi for him on December 18, 1968.[6]

These records were not previously located because they were not indexed to Pratt at FBIHQ. In fact, it appears that at the time the records were made our San Francisco Division was unaware of Pratt's identity as "Geronimo."

*Defense Meetings*

In the late 1960's and early 1970's, the FBI conducted a substantive investigation of the BPP. As part of this investigation, a number of informants reported on activities of BPP members including Pratt and his close associates. The Task Force discovered that on a few occasions an FBI informant(s) *may* have been present at meetings in which the following subjects were discussed:

* Pratt's unhappiness with one of his lawyers;

* alleged problems with the FBI's arrest of Pratt in Texas;

* Pratt's interest in finding witnesses who would testify that Butler had a grudge against him;

* possible approaches to the defense summation in the Pratt trial, and possible strategies in an appeal if Pratt were convicted; and

* the effectiveness of the testimony of certain trial witnesses.

The significance of this discovery must be placed in perspective. First, the Task Force was unable to determine whether the FBI informant(s) was actually present at these meetings or merely heard about the discussions later. Second, the records indicate that attorneys were actually present at these meetings on only a few occasions. Third,

---

[4]This quotation is found on the enclosed page of the trial transcript.

[5]These records also indicate that on the evening of December 18, 1968, "Bobby Seale stated he was going to pick up some people, including Kathleen and go to" a private residence.

[6]The travel time between Los Angeles and Oakland is only a few hours.

and most important, while a number of reports refer to meetings at which strategy was discussed, the reports do not—with one exception—elaborate on the nature of the strategy. The reports merely state that the topic of defense strategy was discussed. The one exception is the report that Pratt wanted witnesses to testify that Butler had a grudge against him, and in that case, there is no reason to believe that the report was based on a meeting involving an attorney. Finally, there is no indication in the records that the Bureau disseminated any of this information (to the local prosecutors or otherwise) until the December, 1979, briefings of California authorities.

Because these findings suggested the possibility that FBI informants may have been involved in meetings at which defense strategy was discussed, however, the Bureau immediately notified the Department of Justice and appropriate California authorities.[7] The California authorities, in turn, notified the court hearing Pratt's habeas corpus petition. The court, after reviewing this information, rejected Pratt's petition.

COINTELPRO

Pratt's attorneys assert that "Pratt was a target and a victim of the FBI's counterintelligence program,"[8] and that as a result of COINTELPRO, he was denied a fair trial. The Task Force found no evidence of any COINTELPRO action designed to influence Pratt's trial. Nor is there any evidence—Pratt's attorneys' cited none—establishing that the Bureau framed Pratt or anyone else.[9] Instead, Pratt's attorneys argue that the Bureau's attempt to alienate Pratt from other BPP members[10] (as part of a general effort to "foment mistrust and suspicion among the current and past membership"[11]) "directly led to the loss of witnesses at his trial."[12] Pratt's attorneys are unable to produce any witnesses who were dissuaded from testifying, however, and their contention is belied by the trial transcript, which establishes that BPP members and leaders testified in behalf of Pratt. In any event, this wholly speculative contention was presented to the California court that denied Pratt's petition for habeas corpus.

*Miscellaneous*

1. A typed June 2, 1969, report on Pratt's efforts at a meeting to encourage BPP members to retaliate against "US" contains the handwritten notation "Julius" at the top of the page. This led Congressman McCloskey to the mistaken conclusion that Julius Butler was the source of the information. The meeting referred to was held at Julius Butler's residence in early 1969, and his name was marked on the page for indexing purposes. But Julius Butler was *not* the source of the information contained in the report.

2. Johnnie Cochran, Pratt's former defense attorney, and now an Assistant District Attorney for Los Angeles County, has represented that he believes Pratt is innocent of the "tennis court" murder. Mr. Cochran's views, however, are diametrically opposed to the official opinion of the Los Angeles County District Attorney's Office. District At-

---

[7]Letter, Acting Director to California Attorney General, January 16, 1980.

[8]Petition for Habeas Corpus, 46.

[9]The Church Committee Report describes the DOJ's "Special Review Committee" assigned to notify COINTELPRO victims who were harmed. *Church Committee Report*, 76, cited at fn. 2, *supra.* DOJ advised the Task Force that it did *not* notify Pratt.

[10]*See, e.g.*, Airtel, LA to Director 2 (January 28, 1970); LA Report on Pratt, cover page C (June 26, 1970).

[11]Airtel, LA to Director, January 28, 1970, *quoted at Id.* 47.

[12]Petition for Habeas Corpus, 49.

torney John Van De Kamp stated in a December 21, 1978, letter to the State of California Community Release Board (responding to Cochran's letter):

> It is disconcerting to me that apparently competent professionals are considering the possibility of Mr. Pratt's innocence...unless they possess information not furnished to me, this office, or the Marin County Deputy District Attorney assigned to Mr. Pratt's hearing.

> In closing, I wish to make it clear that this office does not concur in Mr. Cochran's personal views in this matter. On the contrary, we are of the firm belief that Mr. Pratt should not be released.

*Task Force Conclusions*

The Task Force did not uncover any information that tends to exculpate Pratt of the 1968 "Tennis Court Murder." It found no indication that the FBI had Pratt under surveillance on December 18, 1968, the day of the murder. Nor did it find any information supporting Pratt's alibi that he was not in Los Angeles at the time of the murder. Finally, it found no evidence to corroborate Pratt's argument that his trial and conviction were the result of COINTELPRO.

---

## APPENDIX D

### Not to Be Published

[Crim. No. 21638. Second Dist., Div. One. Apr. 22, 1974.]

THE PEOPLE, Plaintiff and Respondent, v. (Super. Ct. Nos. A-253348 consolidated with A-253349 and A-254028) ELMER G. PRATT and WILLIE STAFFORD, Defendants and Appellants.

---

APPEALS from judgments of the Superior Court of Los Angeles County. George M. Dell, Judge. Affirmed.

Marvin Zinman, under appointment by the Court of Appeal, for Appellant Elmer G. Pratt.

Albert D. Silverman, under appointment by the Court of Appeal, for Appellant Willie Stafford.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Respondent.

---

OPINION

LILLIE, Acting P. J.—Following a protracted trial a jury found Pratt guilty of conspiracy to violate Penal Code sections 12220 (possession of machine gun), 12303

(possession of destructive devices [bombs, grenades and tracers]) and 452 (possession of firebombs); and Stafford and others not here involved guilty of conspiracy to violate Penal Code sections 12303 (possession of destructive devices) and 452 (possession of firebombs) as charged in count III of a 12-count information. Pratt and Stafford appeal from the judgments.[1]

Around 5:30 a.m. on December 8, 1969, police with search and arrest warrants, entered the Central Avenue and Exposition Boulevard headquarters of the Black Panther Party and seized a large amount of illegal weaponry. All defendants moved to suppress the evidence (Pen. Code, § 1538.5). At the conclusion of an extensive hearing de novo, the motions were denied as to all but three items and granted as to them. Again Pratt and Stafford challenge the order denying their motions on the ground police unlawfully entered the headquarters.[2] The search warrant included a "no knock" provision inserted by the magistrate which the trial court correctly ruled was improper. (*Parsley* v. *Superior Court* (1973) 9 Cal.3d 934, 940 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191].)[3] As to the entry, the trial court found there was no compliance with Penal Code sections 844 and 1531 at either location although at Central Avenue headquarters there was an attempt to comply (there was no substantial compliance because of insufficient time delay between the warnings and break in); and as to the legality of the entry, it found that police were excused from complying with Penal Code section 1531 at both locations because the circumstances existing at each at the time of entry were such as to lead police to reasonably believe they would meet with physical resistance, and for their own protection it was necessary to enter without knocking. We find sufficient substantial evidence on the motion to support the trial court's finding that exigent circumstances made an immediate police entry imperative, and compliance with section 1531 was excused. (*People* v. *Gale* (1973) 9 Cal.3d 788, 792 [108 Cal.Rptr. 852, 511 P.2d 1204]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Waters* (1973) 30 Cal.App.3d 354, 359 [106 Cal.Rptr. 293].)

---

[1]Nine defendants appealed seven of whom failed to file a brief on appeal, and their appeals were dismissed pursuant to rule 17a, California Rules of Court; two appellants remain, Pratt and Stafford.

[2]Defendants petitioned this court for writs of mandate and prohibition; both were denied. As to the three items, the People filed petition for writ of mandate on which an alternative writ issued. (*People* v. *Superior Court* [*Young, et al.*] (1970) 13 Cal.App. 3d 545 [91 Cal.Rptr. 699].) In ordering the superior court to set aside its order granting the motion to suppress the three items as evidence, the court said at page 547: "Defendants' petitions for writs of prohibition and mandate have previously been denied by this court. The petition for writ of mandate particularly raised the issue of unlawful search and seizure by the police, the contention being made that the police had unlawfully entered the premises of the defendants. We ruled against the contention. The Supreme Court of this state has now denied hearing to the defendants on each of these petitions. It is therefore unnecessary to reopen that question upon the instant petition. *We assume the police were legally on the premises.*" [Italics added.] Appellants have had appellate review of their contention but by virtue of Penal Code section 1538.5, subdivision (m), Penal Code, the decisions on the petitions are not res judicata (*People* v. *Medina* (1972) 6 Cal.3d 484, 491-492 [99 Cal.Rptr. 630, 492 P.2d 686]) although *People* v. *Superior Court* (1970) 13 Cal.App.3d 545 [91 Cal.Rptr. 699], could be "law of the case on an appeal from a judgment of conviction. . . ." (*People* v. *Medina* (1972) 6 Cal.3d 484, 492.) However, we do not predicate our decision on the former appellate writ determinations.

[3]It does not follow, and appellants do not contend, that the inclusion of the "no knock" provision operated to invalidate the entire warrant. (*Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 797 [13 Cal.Rptr. 415, 362 P.2d 47].)

Based on defense testimony that the occupants were asleep on the morning of December 8 and police did not identify themselves, Pratt and Stafford argue that they could not assume that those entering were officers in the performance of their duties, and they should have been given time to act upon an official demand for entry. A lengthy hearing at which numerous witnesses testified was had on the motion, and the evidence shows that a great body of information relating to activities of Black Panther members and maintenance of the Central Avenue and Exposition headquarters in latter November up to December 8, was amassed by the criminal conspiracy section, Los Angeles Police Department, through personal observations and surveillance by numerous officers; it established that at the time of entry on December 8 each headquarters was a veritable fortess manned with weaponry and explosives, and that Black Panther members literally were at war with police.

From the latter part of November up to December 8, police were aware of extensive sandbagging and barricade work being done at both Central Avenue and Exposition Boulevard headquarters—they were heavily barricaded with sandbags, plywood and bed springs were nailed across the windows, and gun ports revealed military fortifications. Police also knew that Black Panther members were becoming more and more militant and antipolice, and several recent attempts to assassinate police officers had been made; tensions with law enforcement officers were building up; Black Panther members were engaged in activities designed to result in confrontation with police who according to their propaganda literature were "pigs" to be killed; and police had seen "coloring books" which illustrated for children ways in which to kill a police officer.

Various confrontations between police and Black Panther members had been reported,[4] among them a November 28, 1969, incident between Lieutenant Morton and George Young and Paul Redd. Around 1 p.m. on November 28 Lieutenant Morton in plain clothes visited Central Avenue headquarters at the request of Lily Smith, owner of a clothing store next door, on her complaint that Black Panthers were using a loudspeaker in a loud and offensive manner that could be heard in her store and disturbed her customers, and to ask them to turn down the volume; he opened the screen door to what appeared to be a place of business, entered, identified himself as a police officer to Young seated at a desk and asked to speak to him; Young picked up a .45 automatic pistol and pointed it at him ordering him to "get out"; Redd moved to a corner where he picked up a shotgun, and again Lieutenant Morton identified himself and said he would like to talk about the loudspeaker; Young said, "Get out or I will shoot" and Redd said, "Yeah, yeah," holding a shotgun; Young then thrust the .45 automatic toward Lieutenant Morton approaching within eight feet and said, "Get out or I will shoot"; again he identified himself and stated his purpose but Young said he would count to three and shoot; Young counted to "three" whereupon he said, "Don't shoot, cool it," and left. That night (Nov. 28) police passing Central Avenue headquarters reported they observed Elmer Pratt at a window on the second floor pointing a machine gun at them. In early 1969 Pratt had been arrested twice—one case involved a pipe bomb and stick of dynamite, the other, a handgun growing out of a killing of two Panthers at UCLA; Pratt told police he was going to get even with them for causing him to be handcuffed and was going to kill them.

---

[4] A gun battle between four Panthers and police took place at University Police Station; a gun battle between an active Panther, Fitzgerald, and a highway patrolman resulted in injuries, and later Fitzgerald shot and killed a special officer who was eating his lunch in Willowbrook; an altercation occurred between Panthers and police over the sale of Panther newspapers which interfered with traffic, and when police followed them to Central Avenue headquarters they heard someone say "Get the gun" and saw through the window someone holding a shotgun; officers seated in their car at a taco stand were approached by Pope and Richards, both armed, and fired upon resulting in a gun battle in which one officer was wounded and Pope killed; Armour, a Panther,

Continuing from latter November through December 8 an armed guard was stationed on the roof of Central Avenue headquarters; persons armed with rifles were seen at Exposition Boulevard headquarters which had been named after Walter "Toure" Pope who had been killed in the gun battle with police in an attempt to assassinate several officers. Young, a Marine, had been in the brig around this time for theft of weapons from Camp Pendleton; one of the guns taken was a machine gun, and police saw a machine gun at Central Avenue headquarters. One Williams reported that the Exposition Boulevard location was a Black Panther headquarters and he had been inside and seen six or seven firearms (handguns, rifles and shotguns) and six pipe bombs; the place was fortified with sandbags up and down stairs and there had been a discussion about setting up a trap to shoot police—firing a nearby building to attract officers and then "sniping" them from headquarters. A·photograph showed a Panther on the front porch of Exposition sewing a sandbag; later officers saw a male Negro seated on the front porch carrying a rifle in a port arms position. At Central Avenue headquarters persons with shotguns were observed inside; and two officers observed through binoculars four male Negroes behind sandbags in the second story window with an automatic weapon.

Around 5:30 a.m. on December 8, officers wearing distinctive black "SWAT" (special weapons and tactics team) uniforms and/or caps or regulation police hats bearing police emblems (Los Angeles Police Department), police badges and flack jackets or military vests, arrived at Central Avenue and Exposition headquarters. At Central Avenue headquarters Sergeant McGill shouted in a loud voice that they were police, there in response to search and arrest warrants and to "Open the door or we will force entry"; he had been informed the location was heavily barricaded and persons inside would resist violently any attempt to enter; he waited a short time, nothing happened and it was "very quiet," then he ordered the officers to batter down the door and as they did so he repeated the announcement in a loud voice; just before going over the threshold Sergeant McGill shouted they were "coming in"; as they did so they were met with gunfire from six directions from holes in the walls, fire from machine guns, and hand grenades, Molotov Cocktails and pipe bombs thrown from the building in a battle that lasted five hours; finally police gained entrance through the roof by a jet axe; Stafford and 11 persons were taken, including an armed guard who was a lookout on the roof. Inside of the buildings were pipe bombs, hand grenades, explosives, machine guns, a Thompson submachine gun, a fully loaded carbine, shotguns, a bolt-action rifle, a .45 caliber automatic, two M-14s, firearms of all descriptions, ammunition, materials for making pipe bombs, and in a gun locker various guns being repaired. Immediately before entry on December 8, teams checked the Exposition headquarters and, reported it was still barricaded; Lieutenant Keel at the command post nearby communicated with the units at Central Avenue headquarters by radio and knew of the gun battle taking place. The evening before and around 3 a.m. on December 8 just before going· to the locations, all members of the "SWAT" team had been thoroughly briefed; they had been told what to expect and warned of the dangers they would probably face. Expectation became a reality and various officers were wounded in the battle.

"It is settled that noncompliance with the announcement requirements of section 844 of the Penal Code is excusable where there are reasonable grounds to believe that com-

was involved in a gun-pointing incident when officers entered headquarters relative to a traffic violation; two officers in the Wilshire area stopped four Panthers in an automobile who fired upon them resulting in a gun battle in which three Panthers were killed and both officers injured; Pratt was involved in an altercation and he threatened to kill the officers calling them "pigs" (punctuated with profanity); and Panthers in various areas had attempted to kill or succeeded in killing law enforcement officers.

pliance would endanger the arresting officers. (*Parsley* v. *Superior Court, supra*, 9 Cal.3d 934, 938; *People* v. *Dumas*, 9 Cal.3d 871, 878 (4) [109 Cal.Rptr. 304, 512 P.2d 1208].)" (*People* v. *Bennetto* (1974) 10 Cal.3d 695, 700 [111 Cal.Rptr. 699, 517 P.2d 1163]; *People* v. *Tribble* (1971) 4 Cal.3d 826, 833 [94 Cal.Rptr. 613, 484 P.2d 589].) "The proposition that unannounced entry may be excused on the basis of information received before reaching the locations at which entry is to be effected, when the information reasonably leads the officer to believe that compliance would increase his peril or frustrate the arrest, has been affirmed more recently in *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 323 [82 Cal.Rptr. 348, 461 P.2d 628]. The ability of police officers to rely on such prior information in deciding to effect an unannounced entry is also clearly established by *People* v. *De Santiago* (1969) 71 Cal.2d 18, 28-29 [76 Cal.Rptr. 809, 453 P.2d 353],... [¶] Thus, compliance with the announcement requirements may be excused where police officers on the basis of previously obtained information, supported by facts occurring on the scene, are aware at the time they approach particular premises to effect entry that they are faced with an emergency situation as defined in our decisions." (*People* v. *Dumas* (1973) 9 Cal.3d 871, 878 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Parsley* v. *Superior Court* (1973) 9 Cal.3d 934, 940 [109 Cal.Rptr. 563, 513 P.2d 611].)

In *People* .v. *Dumas, supra*, 9 Cal.3d 871, in upholding an unannounced forcible entry, the Supreme Court said at page 879: "In the present case, however, the police had reliable information that defendant not only possessed weapons but habitually answered the door armed with a firearm. They could reasonably infer from this activity that a substantial possibility existed he would employ deadly force in order to prevent his apprehension. As the officers approached the location to be searched, they became aware of no further circumstances that would defeat this inference. They could therefore reasonably conclude at the time of entry that they were faced with an emergency and that compliance with the announcement requirements would substantially increase their peril. On these facts we hold that the officers' failure to comply with section 1531 does not give rise to an application of the exclusionary rule."

The facts presented here are much stronger than those in *Dumas*. The situation facing the officers at the time they entered both locations was such that they could reasonably conclude that they were in great personal danger from the occupants who would violently resist their entry, and was more than adequate to show a good faith belief on their part that compliance with sections 844 and 1531 would substantially increase their peril. The real purposes for withholding judicial approval of unannounced police entries in the absence of emergency circumstances are fourfold: "(1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder." (*Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 321 [82 Cal.Rptr. 348, 461 P.2d 628]; *People* v. *King* (1971) 5 Cal.3d 458, 464, fn. 3 [96 Cal.Rptr. 464, 487 P.2d 1032].) In light of the extensive fortifications of their manned arsenals and the activities of Black Panther members and their relations and encounters with police, appellants can hardly claim in good faith that they did not know that those breaking down the door and entering (assuming they did not hear Sergeant McGill in the quiet of the early morning shout three times in a voice loud enough to be heard a block away) were police officers acting in the performance of their official duties; and it stretches the imagination far beyond reason to believe that at some time during the ensuing five-hour battle in which they were resisting police entry they did not know they were officers, surrendering only when the police blew a hole in the roof. Black Panther

members spent weeks barricading the premises against possible police entry and arming themselves for just such an occasion, had an armed lookout stationed on the roof to warn them of intruders, were ready and waiting for the officers and were prepared to meet them with gunfire and did ambush the officers; their advance careful preparation is reflected in the immediate attack on officers by gunfire from six directions from holes in the walls and the number of bombs and Molotov Cocktails thrown out of the building during the battle. There was no real element of surprise involved and the premises, although housing those who worked there in the daytime and accomodating those who kept guard at night, were in fact no private home but an arsenal of deadly weapons located in what appeared to be a place of business in a business area. Under the circumstances defendants hardly fall in that class of "innocent persons" or "individuals in their homes" whose security should not be disturbed, or "fearful householders" who shoot whom they believe to be prowlers.

Likewise without merit is Pratt and Stafford's claim of error in the trial court's refusal to give their requested instruction that Melvin Smith, the main prosecution witness, was an accomplice as a matter of law, and in the submission of the issue to the jury.[5] Until granted immunity Smith was a codefendant he having taken part in the December 8 battle and been arrested with the others. The theory of the prosecution was that he was a Black Panther cooperating with police after the December 8 battle. Thus the trial judge originally intended to instruct that Smith was an accomplice as a matter of law but the subsequent testimony of Louis Tackwood created "some question as to this for the jury," and under *People* v. *Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], did not give such an instruction because it would imply that he did not believe Tackwood's testimony: Louis Tackwood was a defense witness,[6] and his testimony created a factual conflict as to the "accomplice" status of Smith.

Tackwood, a paid police informer, testified that he had been advised that Smith had been an informant at least in September 1969; in September 1969 Sergeant Farwell showed him photographs of Black Panther members, including Smith, who, Farwell told him, was to be his "contact" in the party; he was to infiltrate the Panthers but

---

[5] At the request of defendants (and also requested in some instances by the People) the jury was instructed on the definition of "accomplice" (CALJIC No. 3.10), that testimony of an accomplice must be corroborated (CALJIC No. 3.11), what constitutes sufficiency of the evidence to corroborate an accomplice (CALJIC No. 3.12), that one accomplice may not corroborate another (CALJIC No. 3.13), necessity of criminal intent to make one an accomplice (CALJIC No. 3.14), and that the testimony of an accomplice is to be viewed with distrust (CALJIC No. 3.18).

[6] Stafford asserts that although Tackwood was called by Pratt and other defendants he was not his witness. The record does not bear this out for Tackwood was called "as a witness by and on behalf of the defense" and although he was not examined by Stafford's attorney, there is nothing in the record to show that he was not also Stafford's witness. However, he raises no real issue concerning this and had he done so it would avail him nothing for at no time in the trial court did Stafford or his counsel voice objection to the testimony of Tackwood, move to strike his testimony or seek other remedy; there was complete silence on the part of both Stafford and his counsel. Under such circumstances he may not now raise the issue for the first time on appeal. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1083 [80 Cal.Rptr. 567, 458 P.2d 479]; *People* v. *Varnum* (1969) 70 Cal.2d 480, 486 [75 Cal.Rptr. 161, 450 P.2d 553]; *People* v. *Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) Moreover, evidence admitted without objection cannot be challenged on appeal (*People* v. *Gallegos* (1971) 4 Cal.3d 242, 249 [93 Cal.Rptr. 229, 481 P.2d 237]) and must be considered as part of the evidence in the cause. (*People* v. *Moore* (1970) 13 Cal.App.3d 424, 435-436 [91 Cal.Rptr. 538]; *People* v. *Goss* (1961) 193 Cal.App.2d 720, 727 [14 Cal.Rptr. 569].)

something came up and he did not meet Smith until July 1971 when he entered the room of the criminal conspiracy section of the police department with Sergeant Mahoney who introduced Smith, who was working on a building model at the rear of the room, as "Captain Smith"; during various conversations Smith told him he had been working for police for "a long time"; when working for the criminal conspiracy section he was assigned number C-14 and learned Smith had been assigned C-26; the letter "C" referred to criminal conspiracy section. To establish that Smith was an accomplice as a matter of law the evidence on the issue must be undisputed and such that reasonable men may draw but one inference which points unerringly to the existence of such fact. Where the facts are disputed or susceptible of different inferences the question of complicity must be submitted to the jury. (*People v. Santo* (1954) 43 Cal.2d 319, 326 [273 P.2d 249]; *People v. Jones* (1964) 228 Cal.App.2d 74, 94 [39 Cal.Rptr. 302].) There is an implication that Smith was a feigned accomplice, thus not a true accomplice; the testimony of an undercover agent or paid informer, and consequently a feigned accomplice (*State v. Arriola* (1965) 99 Ariz. 332 [409 P.2d 37, 39]), falls outside the ambit of Penal Code section 1111 making it unnecessary to show that it was sufficiently corroborated. (*People v. Gossett* (1971) 20 Cal.App.3d 230, 234 [97 Cal.Rptr. 528].)

Even had it fairly appeared that Smith was an accomplice as a matter of law, such an instruction in effect would have told the jury that the court did not believe Tackwood's testimony thereby invading the province of the jury and unfairly prejudicing defendants. Tackwood, a defense witness, was called for the purpose of attacking Smith's credibility. Cases of a similar nature in which the trial court was thus compelled to leave the matter of whether a witness was an accomplice to the jury's determination (*People v. Hill* (1967) 66 Cal.2d 536, 555-556 [58 Cal.Rptr. 340, 426 P.2d 908]; *People v. Cuff* (1898) 122 Cal. 589, 591-592 [55 P. 407]; *People v. O'Brien* (1892) 96 Cal. 171, 181 [31 P. 45]; *People v. Valerio* (1970) 13 Cal.App.3d 912, 924 [92 Cal.Rptr. 82]; *People v. Hartung* (1950) 101 Cal.App.2d 292, 295 [225 P.2d 614]), although not directly in point, support the trial court's refusal to give the requested instruction.

Assuming that Smith was an accomplice, Pratt and Stafford contend that his testimony was not corroborated. We find substantial factual support in the record for the jury's implied finding that either Smith was not an accomplice (*People v. Rosoto* (1962) 58 Cal.2d 304, 329 [23 Cal.Rptr. 779, 373 P.2d 867]; *People v. Santo* (1954) 43 Cal.2d 319, 326-327 [273 P.2d 249]; *People v. Platnick* (1958) 161 Cal.App.2d 313, 320 [326 P.2d 585]; *People v. Comstock* (1947) 147 Cal.App.2d 287, 292 [305 P.2d 228]) hence one whose testimony need not be corroborated (*People v. Gossett, supra,* 20 Cal.App.3d 230, 234; *People v. Canard* (1967) 257 Cal.App.2d 444, 460 [65 Cal.Rptr. 15]; *People v. Salazar* (1962) 201 Cal.App.2d 284, 287 [20 Cal.Rptr. 25]; *People v. Griffin* (1958) 98 Cal.App.2d 1, 22 [329 P.2d 930]) or he was an accomplice and his testimony was more than adequately corroborated. (*People v. Henderson* (1949) 34 Cal.2d 340, 343 [209 P.2d 785]; *People v. Trujillo* (1948) 32 Cal.2d 105, 112 [194 P.2d 681]; *People v. Smith* (1970) 4 Cal.App.3d 41, 49 [84 Cal.Rptr. 229]; *People v. Griffin* (1950) 98 Cal.App.2d 1, 24 [219 P.2d 519].)

Smith told of months of preparation by Black Panther members resulting in the obtaining and storing in both headquarters of various weaponry, including machine guns, bombs, ammunition, etc.,[7] and fortifications transforming each into an armed fortress. He testified that Pratt and another ordered fortifications to be made which included

---

[7] Appellants were convicted of conspiracy between July 1 and December 8, 1969, to possess a machine gun, destructive devices and fire bombs (Pratt) and to possess destructive devices and fire bombs (Stafford).

cutting walls open to a height from the floor and filling them with sand or dirt, and filling sandbags which were placed at strategic points along walls in both buildings; that a tunnel to be used for escape was under construction at Central Avenue headquarters; that Stafford was present and working on the fortifications at both headquarters and on the tunnel at the Central Avenue headquarters; that Stafford designated the guard on the roof of the Central Avenue location on December 8, 1969; and that he (Smith) fled to Texas to avoid prosecution where he met Pratt and Stafford, they discussed their status as fugitives and ultimately were apprehended on December 8, 1970.

The following evidence tends to connect Stafford and Pratt with the commission of the offenses with which they were charged in such a way as would reasonably satisfy the jury that Melvin Smith was telling the truth. (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; *People* v. *Johnson* (1971) 18 Cal.App.3d 458, 464 [96 Cal.-Rptr. 421].) The testimony of various police officers establishes that on December 8, 1969, an armed guard was on the roof of Central Avenue headquarters and arrested after a five-hour battle during which police were met with gunfire, explosives, bombs, and machine guns, and that Stafford was the third occupant to come out of the building and surrender; in Central Avenue headquarters on December 8 were various weaponry including shotguns, machine guns, bombs, ammunition, etc., and sandbags and gun ports as part of the fortifications; walls had been cut to a height from the floor and filled with dirt and sandbags placed along the walls; and a tunnel was under construction with dirt of the same consistency as that in a pile on the floor in another room. As in the case of Central Avenue, Exposition headquarters was fortified by sandbags and contained similar weaponry and explosives. The extensive fortifications and weaponry in Central Avenue headquarters established that it was not an "innocent" place but a fortified arsenal, and the inference is plain that Stafford, who came from the building shirtless, was a night occupant in what amounted to a fortress; he had actively participated in the battle in which fire bombs and pipe bombs were used against police after which he surrendered. Under the circumstances his presence there could hardly be deemed innocent or without knowledge. As to Pratt, officers testified that on November 28, 1969, for about two and one-half hours they observed at the window of the second floor Central Avenue headquarters, illuminated by street lights and a spotlight, Elmer Pratt holding in his hands and pivoting on a sandbag downward toward them on the street a .50 caliber machine gun; that a machine gun was fired from, and pipe bombs and fire bombs were used in the battle at Central Avenue headquarters on December 8. On the issue of intent, an envelope (addressed to Pratt at the Central Avenue headquarters' address) containing a letter and notes on a bomb fuse and the cost of length per fuse, was found in Pratt's bedroom when he was arrested on 55th Street; also found in a brief case in the Pratt bedroom were two photographs of his wife, Saundra Pratt, holding a machine gun similar to that found in Central Avenue headquarters; and on April 12, 1969, Pratt was arrested driving a vehicle in which pipe bombs and a piece of paper containing directions on how to construct a bomb were found.

The foregoing "is not insignificant" when added to evidence of defendants' flight to Texas before the trial began[8] where subsequently they were apprehended with Melvin

---

[8]After the hearing on the 1538.5 motion and appellate conclusion thereof, Pratt, Stafford and Smith "skipped bail" and 'illegally fled from California to Texas; bench warrants were issued for them and eventually they were located and arrested in Dallas on December 8, 1970, from which they were returned for trial. This constitutes evidence of flight; at the very least "Whether the actions of defendants amounted to flight and denoted a consciousness of guilt was for the jury's determination." (*People* v. *Santo, supra*, 43 Cal.2d 319, 330.) "[I]t is also probable that only one who expects his guilt to be proved at trial will attempt an escape and that an innocent man will stay for trial in

Smith. (*People* v. *Hurd* (1970) 5 Cal.App.3d 865, 876 [85 Cal.Rptr. 718].) Evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission; flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful. (*People* v. *Perry* (1972) 7 Cal.3d 756, 771, 778 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Mulqueen* (1970) 9 Cal. App.3d 532, 543 [88 Cal.Rptr. 235].) "[D]efendant's flight constitutes an implied admission by conduct and affords an inference of consciousness of guilt, [citation] and constitutes sufficient corroboration under the section. [Citations.]" (*People* v. *Hurd, supra*, 5 Cal.App.3d 865, 876.)

The jury was instructed in the language of CALJIC No. 2.04, as modified, that "Evidence that a defendant attempted to persuade a witness to testify falsely may be considered by you as a circumstance tending to show a consciousness of *that defendant's* guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your determination." Stafford claims that as to him there was no evidence to support the instruction and whatever false testimony was given related only to the 1538.5 motion not to the trial.

First, the evidence shows the involvement of Stafford. Melvin Smith testified concerning the testimony he gave on the 1538.5 motion "in this case," that he was arrested on December 8 and taken with others, including Stafford, to Parker Center; "Well, the first day we were arrested, we had started saying what we would say and wouldn't say, what we would tell the police and wouldn't tell the police, if anything at all," and those participating in this discussion were identified (by Smith) as himself, Stafford, Redd and Pharr; sometime later in December or January other conversations concerning their "future testimony" occurred; those present and involved were "Well everyone—all of the males that were at 4115 South Central [Stafford was at Central]" and Houston and Pratt; when their cell doors were unlocked they all got together in the corridor and talked about the case and their testimony; Pratt told them he still ran the chapter even in jail and what he said "still went"; part of the time Pratt gave instructions to Smith as to what to say and another time Pratt and others (Williams, Bryan, Pharr) gave him instructions; "[t]here was an agreement of what I would say when I got on the stand in court between me and some of the other participants [Pratt, Williams, Pharr, Bryan]"; on numerous occasions at which "everyone was present [those in custody including Stafford]," Pratt and others "instructed" him on "what to say when I got on the stand" and to tell the court that the police started firing machine guns through the skylight and that is what awakened him; another meeting was had on the morning before the preliminary hearing; and he testified on the 1538.5 motion as instructed, as did the others, but his testimony was a lie and it was different than what really happened on December 8. After they were released on bail there were further conversations about how they would testify.

The fair inference from the foregoing is that after their arrest various defendants, including Stafford and Pratt who agreed concerning their own testimony, conspired to have Melvin Smith testify falsely on the motion to suppress, which he did. The conversations were indicative of the purpose of all defendants to fabricate their testimony on the 1538.5 motion, and that they should consider it necessary to have such conversations and agree as to what their testimony would be affords some evidence of a guilty mind. (*People* v. *White* (1920) 47 Cal.App. 400, 401 [190 P. 821].) As a result of these conversations Smith falsified his testimony on the 1538.5 motion. Not only is evidence of efforts by a defendant himself to persuade a witness to testify falsely admissible against him but such efforts by a third person are admissible if done in his presence and he authorized the conduct of such third person. (*People* v. *Terry* (1962) 57 Cal.2d 538, 566 [21 Cal.Rptr. 185, 370 P.2d 985]; see also *People* v. *Burton* (1961) 55 Cal.2d

order to clear his name and win lawful liberty." (*People* v. *Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961].)

328, 347 [11 Cal.Rptr. 65, 359 P.2d 433]; *People v. Caruso* (1959) 174 Cal.App.2d 624, 641 [345 P.2d 282]; *People v. Moore* (1945) 70 Cal.App.2d 158, 163 [160 P.2d 857]; *People v. Burke* (1912) 18 Cal.App. 72, 91-93 [122 P. 435].) Stafford was personally involved in some of the conversations relating to how Smith and others including himself would testify, and most conversations in which Pratt gave instructions were had in the presence of Stafford and nothing indicates Stafford objected either to instructions to Smith or to being told what to say in court. Without merit is Stafford's further argument that any attempt to persuade Smith to testify falsely was in connection with the motion to suppress and not with the trial, thus there was no evidentiary basis for CALJIC No. 2.04.

The evidence supports the giving of the instruction, but if the jury found that Stafford or any other defendant did not attempt to persuade anyone to testify falsely, the instruction would not apply to him because by its very language 2.04 is restricted in application to a defendant who attempted to persuade a witness to testify falsely and to a consideration thereof "as a circumstance tending to show a consciousness of *that defendant's* guilt." Moreover, during Smith's testimony in this regard the trial judge expressly instructed the jury that if one defendant attempted such persuasion his action could not be imputed to any other defendant but could be considered for whatever weight it might have as to that defendant only and would not be binding on any other.[9] Finally, Stafford claims that in giving the 2.04 instruction the court indicated to the jury his commission of another offense, an attempt to commit subornation of perjury. CALJIC No. 2.04, as modified, indicates nothing of the kind. The evidence was admissible and could be considered by the jury for the purpose expressed in the instruction. (*People v. Burton, supra*, 55 Cal.2d 328, 347; *People v. Cole* (1903) 141 Cal. 88, 90 [74 P. 547]; *People v. Moore, supra*, 70 Cal.App.2d 158, 162-164.)

With no serious attempt to set forth the material evidence, Stafford contends that the evidence is insufficient to support the judgment. He argues briefly that although firearms, inflammables and destructive devices were found in the Central Avenue headquarters on December 8, his mere presence there was not sufficient to establish he was a party to any agreement "to go forward with a criminal scheme" and it was no crime to belong to the Black Panther organization, attend its classes or help sandbag the premises.

Stafford was found guilty of conspiring with others to possess destructive devices and fire bombs. "A criminal conspiracy exists when two or more persons agree to commit a crime and do some overt act in furtherance of the agreement. [Citations.] It need not

---

[9]At the conclusion of Smith's testimony in this regard the trial court admonished the jury that if a defendant attempted to persuade a witness to testify falsely at the trial that "may be considered by you as a circumstance tending to show a consciousness of guilt, but again that type of evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for the jury's determination. . . . If you believe that one or more of the defendants did try to persuade Mr. Smith to testify falsely, then that is a circumstance for your determination which may in your judgment be evaluated to show a consciousness of guilt although it is not sufficient in itself to prove guilt. . . . You are the exclusive judges of the facts and of the credibility of the evidence. I would simply state to you that the fact that one defendant or more than one defendant if in your discretion you determine it, did urge or suggest that this witness testified falsely is not to be imputed to all of the defendants. In other words, if you should find that one defendant attempted to have Mr. Smith testify falsely, then that might in your discretion be interpreted as showing a consciousness of guilt on the part of that defendant but it wouldn't be binding as to any of the other defendants."

be shown that the parties met and actually agreed to jointly undertake criminal action. [Citation.] The agreement may be inferred from the conduct of the defendants in mutually carrying out a common purpose in violation of a penal statute. [Citation.]" (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 667-668 [47 Cal.Rptr. 788, 408 P.2d 116].) A conspiracy may be established by direct or circumstantial evidence or a combination of both. (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427]; *People* v. *Fain* (1971) 18 Cal.App.3d 137, 144 [95 Cal.Rptr. 562].) We have assumed the responsibility of reviewing the lengthy trial record which runs in excess of 10,000 pages and, viewing the evidence in a light most favorable to respondent and presuming in support of the judgment the existence of every fact that can be reasonably deduced from the evidence (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]), we find sufficient substantial evidence to establish all elements of the criminal conspiracy, and that Stafford was not just a member of the party who happened to be present during the battle on December 8 but one who had attended courses in the use of weaponry, helped build fortifications, designated the guard on the roof on December 8, actively engaged in the battle with police personally placing fire bombs and destructive devices and fled the jurisdiction to avoid trial.

The Black Panther Party is a militant organization of which Stafford became a member early in October 1969. From October to December 8 he participated in numerous Party activities. Once or twice a week, mostly at Central Avenue headquarters, he attended "military classes" at which the use of various weaponry (guns and bombs) and different ways to kill (using firearms, bombs and explosives) and ambush and assassinate people were taught, and "political education classes" at which the party's 10-point program, doctrine and goals such as its revolutionary purposes to spread propaganda and preach violent revolution were discussed by members, including Stafford. A frequent statement made by "every Panther here" (all defendants, including Stafford) was "to get rid of the gun, you had to pick up the gun," and "a daily thing just about" with Stafford and others was the term "off the pig" or "offing the pig" meaning to kill the police. Weaponry, including guns, bombs and ammunition were kept at all headquarters and "all of the weapons at any of the Panther locations had been or were specifically there for the purpose of killing any policeman that came in the place"; all weaponry belonged to the Party, none to the individual member; on December 8, after the battle, a Thompson submachine gun, assorted firearms, powder, liquid, gas masks, hand grenades, fire bombs, pipe bombs and Molotov cocktails were found in the headquarters. During October and November, up to December 8, alterations and construction changes were made and fortification work was done at both headquarters, and Stafford participated in this work. Once during the time Smith was working at Exposition a small boy wandered into the building and picked up one of the large pipe bombs which he took from him, and report and reprimand regarding this were made to either Houston or Stafford.[10] At Central Avenue headquarters in addition to cutting out portions of walls and filling them with dirt, filling and placing sandbags, making portholes, nailing wire mesh and bed frames to windows, a trap door was cut into the floor and a tunnel was under construction; and Stafford worked with others on these fortifications and helped dig the tunnel the purpose of which was thus described by Smith—"too many Panthers had been killed by the police, so that when the police come to 4115 South Central, they didn't want the people to find anything there but dead pigs, so we were to have the tunnel completed by the time the police got there, so any police arrived there would be killed at the door and we were to take our weapons and escape through the tunnel"; the tunnel had not been completed by December 8. On one occasion a small group of members, including Stafford, met in the tunnel and dis-

---

[10]While this does not prove Stafford had been connected with this particular incident, the inference is clear that he was one of those who had undertaken to see that such pipe bombs did not fall into other hands.

cussed whether an enforcer carbine would penetrate bulletproof vests worn by police if they came to the headquarters; it was demonstrated by Pratt in the tunnel in Stafford's presence that it would firing a carbine eight or nine times and a Thompson submachine gun into a bulletproof vest. Weapons were kept in an armory, desk drawers, the front office and in a gun rack upstairs.

Bombs were kept "throughout the building [at Central Avenue]" during the summer and fall of 1969; Smith testified he saw all kinds of weapons and "about four pipe bombs" at Exposition. Commencing the last several weeks in November 1969 through December 8 there was a lookout on the roof at Central Avenue, and it was Stafford who designated and assigned the man who was the armed guard on the roof on the morning of December 8. On December 8 Smith awakened Stafford who was sleeping on a divan at Central Avenue headquarters; Stafford "jumped up and picked up an enforcer carbine that was lying on the top of the divan" and went to the second floor. Among bombs thrown from the second floor during the battle was the "granddaddy of them all," a pipe bomb about six inches long that was to be ignited with a match; Bryan and Stafford discussed "why it was taking so long getting this bomb out of the window" and later either Bernard Smith or Stafford called down to Bryan that the bomb had been thrown out the window, then it exploded. During the battle Melvin Smith heard "Willie Stafford [who was on the second floor] and Bernard Smith communicating with Robert Bryan about when to throw the Molotov cocktails and some of the bombs"; police officers saw Molotov cocktails and pipe bombs being thrown out of the second floor of Central Avenue headquarters. During the battle Stafford was asked whether they should continue the exchange of gunfire with the police and he said that he was going to give up; Stafford surrendered and was arrested. On the elevator at Parker Center Stafford removed gunshot shells (live rounds) from his pocket and dropped them to the floor saying he did not want them found on him. After arrest the defendants, including Stafford, "were saying what they would say and would not say to the police." While on bail and before trial Stafford fled the jurisdiction to Texas where he was later arrested with Smith and Pratt.

Pratt contends that evidence of "other crimes"—three incidents on March 15, 1969 (a bombing and shooting at a Naval armory in Compton, a shooting in the Doss apartment and a bombing of a branch post office in Compton) and one on April 12, 1969 (his possession of pipe bombs)—was erroneously admitted. It was offered for the purpose of supporting certain testimony of Melvin Smith concerning Pratt; the jury was so instructed and in addition, that if it believed Smith's testimony as to Pratt's involvement in any of these incidents the testimony of others that the incident actually occurred may be considered in determining whether it tends to show the existence of the specific intent to commit the objectives of the conspiracy alleged against Pratt. Also for this purpose and to show that Pratt had knowledge of the nature of pipe bombs and had knowledge or possessed the means that might have been useful or necessary to the commission of the conspiracy, evidence that on April 12, 1969, Pratt was driving an automobile in which were three pipe bombs, directions on bomb making and other items, was received. Pratt makes no claim of error in the admission of evidence of a bombing of the 77th Street police station in May 1969 in which he participated, thus we assume either that no error was committed in this regard or that Pratt has abandoned or waived any claim of error concerning it. (*People* v. *Scott* (1944) 24 Cal.2d 774, 783 [151 P.2d 517]; *People* v. *Doolittle* (1972) 23 Cal.App.3d 14, 16, fn. 1 [99 Cal.Rptr. 810].) Pratt argues that evidence of the three incidents on March 15, and the one on April 12 served only to show that he was a person of bad character and possessed of criminal disposition or propensity, and that the court committed prejudicial error in admitting it.[11]

---

[11]At Pratt's request a limiting instruction was given in which the jury was expressly directed "such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has the disposition to commit crimes."

Pratt claims that (1) evidence of the three March 15 incidents was admitted over his objection, and as to each refers to certain pages of the reporter's transcript, and (2) there is no evidence that he participated in these events except the testimony of Smith that he (Pratt) had mentioned the incidents to him. Pratt's record references in connection with each incident fail to show any objection interposed to the testimony therein contained of witnesses Cox, Rupp and Beidle. Pratt's assertion that the testimony of these witnesses in this regard was admitted over his objection is borne out by neither his record references nor any other portion of the testimony of these witnesses. Nor does he indicate where in the record such objection, if any, is to be found. He "in effect, merely invite[s] this court to read the transcript..., ascertain the nature of the objection made, if one was made, and consider the propriety of the court's ruling in each instance." (*People v. Martinez* (1966) 239 Cal.App.2d 161, 177 [48 Cal.Rptr. 521].) "It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent." (*People v. Goodall* (1951) 104 Cal.App.2d 242, 249 [231 P.2d 119]; *People v. Klimek* (1959) 172 Cal.App.2d 36, 44 [341 P.2d 722]; *People v. Justice* (1959) 167 Cal.App.2d 616, 618 [334 P.2d 1031].) This court is not required to search the record to establish the existence or nonexistence of error and the general charge may be disregarded in the absence of a reference where the alleged errors may be found. (*People v. Taylor* (1973) 30 Cal.App.3d 117, 123-124 [106 Cal. Rptr. 216]; *People v. Bowman* (1966) 240 Cal.App.2d 358, 379 [49 Cal.Rptr. 772]; *People v. Garris* (1953) 120 Cal.App.2d 617, 618 [261 P.2d 765].) Finally, "It is the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection at the trial on the ground sought to be urged on appeal [citations], and it does not appear that any exception to that rule is applicable here." (*People v. Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal. Rptr. 217, 501 P.2d 225].) Thus, the absence of any showing of a specific and timely objection at the trial on the ground sought to be urged on appeal would permit us to disregard Pratt's contention; however, we have found no error in the admission of the evidence of the three March 15 incidents.

Melvin Smith testified that in the spring of 1969 Pratt ordered him to go to a specified place and bring his "stuff" (meaning weapons); two men picked him up and they went to the place where others arrived also bringing weapons; a map was spread on the floor and Pratt and others bent over it; he (Smith) was assigned to a squad; "Pratt was in charge of the overall operation and everyone else, you know, they had to come under him and he would assign them to the squads"; Pratt picked the "target" for him—"an US organization membership house"—the squad of which he [Smith] was a part subsequently (Mar. 15) fired into the Doss apartment through the upstairs windows; incendiary tracer bullets were used; the next morning at a debriefing session at Central Avenue headquarters Pratt reported that the squad he (Pratt) had been with had used bombs and submachine guns, placed a bomb in the door of the Compton post office and after they blew off its door drove over to the Naval Reserve armory and fired submachine guns into two of them.

As to the Doss apartment (the "US organization membership house") P. L. Cox testified that James Doss was second in command to Ron Karenga of the US organization; George Hall, comanager with Doss of a four-unit apartment building, testified Doss lived on the second floor in apartment 2, on the morning of March 15 he went to apartment 2 and observed (describing) its bullet ridden condition; Officer Martin testified he went to apartment 2 and found extensive gunfire damage therein, including different size bullet holes, which had come from outside. As to the Compton post office, Richard Beidle, a postal inspector, testified that on the morning of March 15 he went there and saw extensive damage to the building and its interior. As to the United

States Naval Marine Reserve Armory, Officer Rudd testified that on the morning of March 15 he went to the armory where he saw bullet holes and a piece of pipe stuck in the wall and fragmented pipe scattered around.

Save for certain recognized exceptions, evidence of other crimes may not be introduced in a criminal prosecution. (*People v. Schader* (1969) 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841]; *People v. Durham* (1969) 70 Cal.2d 171, 186 [74 Cal. Rptr. 262, 449 P.2d 198].) Such evidence of other conduct should be excluded if it does not substantially tend to prove any fact other than the criminal character of defendant for "[h]e should not be confronted with attempted proof of other offenses interjected only to prove a criminal propensity that might have led him to the commission of other crimes.... We exclude such evidence of other crimes not because it lacks probative value but because its prejudicial effect outweighs its probative value." (*People v. Schader, supra*, 71 Cal.2d 761, 772.) Although the balance of opposing elements of probative value and prejudicial effect is frequently struck in favor of admitting evidence of other crimes showing a *modus operandi* similar to that employed in the crime charged (*People v. Schader supra*, 71 Cal.2d 761, 776-777; *People v. Haston* (1968) 69 Cal.2d 233, 245-247 [70 Cal.Rptr. 419, 444 P.2d 91]), "a common *modus operandi* is not the exclusive element upon which the balancing process will favor probative value and admissibility: other elements are 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' (Evid. Code, § 1101, subd. (b).) Variations on some of these include elements such as proof of conspiracy where relevant (*People v. Durham, supra*, 70 Cal.2d 171, at pp. 180 [fn. 7], 182 [fn. 9])...." (*People v. Lynn* (1971) 16 Cal.App.3d 259, 267 [94 Cal.Rptr. 16]; see also *People v. Kelley* (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947]; *People v. Westek* (1948) 31 Cal.2d 469, 480 [190 P.2d 9].) The evidence here was offered to corroborate Smith's testimony which was offered on the issue of specific intent to commit the objectives of the conspiracy charged against Pratt. Inasmuch as it was not received to show identity of the perpetrator of the offense charged there is no issue concerning whether there are distinctive common marks under the test of *People v. Haston* (1968) 69 Cal.2d 233, 246-250 [70 Cal.Rptr. 419, 444 P.2d 91]. Evidence of the March 15 events—the existence of other incidents in which Pratt ordered Smith to shoot up the Doss apartment, which he did using among other things incendiary tracer bullets, and in which Pratt himself used bombs and a submachine gun in the post office and armory bombing and shooting—"'tend[s] logically, naturally, and by reasonable inference, to establish [a] fact material for the people.'" (*People v. Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924].) That material fact was Pratt's specific intent to commit the objectives of the conspiracy alleged against him—conspiracy to possess a machine gun, destructive devices (bombs, grenades and tracers) and fire bombs. The record shows that the trial judge fully weighed the admissibility problem presented by the evidence even though no objection was raised by Pratt to the testimony of Cox, Rupp and Beidle, found the evidence to be relevant, material or necessary in connection with the crime charged and balanced the probative value of the other evidence against its prejudicial effect concluding that the former outweighed the latter.

The foregoing testimony of Smith, Cox, Rupp and Beidle shows attacks on a member of the US organization (a Panther rival) with incendiary weapons, and on the post office and armory (two symbols of the establishment) with submachine guns and bombs. Pratt "in charge of the overall operation" chose the "targets" for the shooting and bombing, assigned squads to make these "hits" and supervised them actually being present at and participating in two; such activity is relevant to the charge of conspiracy to commit murder (count I) of which he was acquitted, and conspiracy to possess certain illegal weapons (count III) the subject of this appeal, and relevant on the issue of specific intent to possess said weapons. Thus, the testimony of Melvin Smith that before December 8, 1969, Pratt with specific intent entered into a conspiracy with other

Black Panther members to use incendiary weapons, machine guns and bombs against those he considered to be their enemies including two establishment organizations and the rival US group, was relevant to show his specific intent to conspire with other Black Panther members on December 8, 1969, to possess a machine gun and destructive devices such as bombs and tracers for use against their "enemies," the police; and the testimony of Cox, Hall, Rupp and Beidle that the bombings and raids actually took place was proper to corroborate Smith's testimony.

In relation to the April 12 incident, Pratt makes record reference to the testimony of Officer Wilson and Officer Wolfer but again no objection was made by him to the admissibility of this evidence; nevertheless we consider the merits of his appellate contention that "the reasoning" under which the trial court admitted the evidence is erroneous. More than 100 years ago our Supreme Court considering claimed error in the refusal of certain instructions held that "we do not try the sufficiency of the arguments of the [trial] Judge, but only the soundness of his conclusions." (*People v. Sears* (1861) 18 Cal. 635, 636, quoted and applied in *People v. Selz* (1955) 138 Cal.App.2d 205, 210 [291 P.2d 186] [denial of motion to vacate murder conviction].) "In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 324, 330 [48 P. 117]; *People v. Ramos* (1972) 25 Cal.App.3d 529, 540 [101 Cal.Rptr. 230]; *People v. Gurley* (1972) 23 Cal. App.3d 536, 539-540 [100 Cal.Rptr. 407]; *People v. Rhone* (1968) 267 Cal.App.2d 652, 658 [73 Cal.Rptr. 463]; *People v. Evans* (1967) 249 Cal.App.2d 254, 257 [57 Cal.Rptr. 276].) We do not suggest that the trial court's "reasoning" was erroneous but we do point out that Pratt's contention is based on a matter not properly subject to appellate review. Pratt asserts that the court's "reasoning" was that the evidence was admissible to show his knowledge of pipe bombs, and specific intent; if this was the court's reasoning we concur therewith.

Officer Wilson testified that on April 12, 1969, while on patrol duty he activated his red lights for a vehicle ahead, to stop; Pratt, who was the driver, stopped at an angle at a deadend street; Pratt was accompanied by Roger Lewis; in the middle of the front seat were a pipe capped at both ends with a protruding fuse and a shaving kit with a pipe capped at both ends without a fuse, a similar device with one end not capped, various bullets, pieces of fuse, plastic caps, wire, a stick of dynamite and a paper containing directions on how to construct a bomb; he took these devices to the police station.[12] Officer Wolfer, a member of the bomb squad, examined the objects and testified concerning his investigation, including the formula for construction of bombs contained in the writing. Clearly the evidence was admissible to show Pratt's knowledge of the nature of pipe bombs and his specific intent in conspiring with other Black Panthers to possess pipe bombs at the Central Avenue headquarters.

We conclude that the probative value of the evidence of the prior offenses outweighs any undue prejudice which might have resulted by its receipt. There was no abuse of

---

[12]During the taking of this testimony and at the instance of Pratt's counsel, judicial notice was taken that both Pratt and Lewis were criminally charged as a result of this incident, Lewis had been tried and convicted, and Pratt had not been tried because he did not appear for trial. In *People v. Beamon* (1973) 8 Cal.3d 625, 633 [105 Cal.Rptr. 681, 504 P.2d 905], the court held that a prior offense was not rendered inadmissible by reason of the fact that defendant had been acquitted thereof. A fortiori, that defendant has not been tried of charges emanating from another offense does not constitute an impediment to its admissibility and Pratt does not contend otherwise. Subsequently Pratt was convicted of knowingly possessing and transporting a destructive device (bomb) (Pen. Code, § 1230); on January 28, 1974, this court affirmed the judgment (*People v. Pratt*, 2d Crim. No. 22838).

discretion by the trial court in admitting the evidence. (*People* v. *Beamon, supra*, 8 Cal.3d 625, 635 [105 Cal.Rptr. 681, 504 P.2d 905].)

For the foregoing reasons the judgments are affirmed.

Thompson, J., and Hanson, J., concurred.